**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**KNOXVILLE DIVISION**

IN RE MILLER ENERGY RESOURCES, INC.
SECURITIES LITIGATION

No. 3:11-cv-386 (TAV)

**JURY TRIAL DEMANDED**

---

## CORRECTED CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

**BRANSTETTER, STRANCH &**
**JENNINGS, PLLC**
James G. Stranch, III, #002542
J. Gerard Stranch, IV, # 023045
227 Second Avenue North
Nashville, TN 37201
Telephone: (615) 254-8801
*Liaison Counsel for Lead Plaintiff*


Jay W. Eisenhofer
Daniel L. Berger
Diane Zilka
David Haendler
Caitlin M. Moyna
Reena S. Liebling
**GRANT & EISENHOFER P.A.**
485 Lexington Avenue
New York, NY 10017
Telephone: (646) 722-8500
*Lead Counsel for Lead Plaintiff*

**Page(s)**

I.      INTRODUCTION ................................................................................ 1

II.     SUMMARY OF THE ACTION ........................................................ 1

III.    JURISDICTION AND VENUE ....................................................... 6

IV.     PARTIES ........................................................................................... 7

     A.      LEAD PLAINTIFF ................................................................... 7

     B.      DEFENDANTS ......................................................................... 7

V.      FACTS .............................................................................................. 10

     A.      BACKGROUND OF MILLER ENERGY .................................. 10

     B.      MILLER ACQUIRES THE ALASKA ASSETS FOR APPROXIMATELY $4.47 MILLION .. 13

          1.      Pacific Energy Was Forced Into Bankruptcy Because of the Failing Alaska Assets. ................................................................ 13

          2.      Miller Consummated the Alaska Assets Acquisition ............. 19

VI.     DEFENDANTS ISSUED MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD ........................ 20

VII.    THE REASONS WHY DEFENDANTS' STATEMENTS WERE MATERIALLY FALSE AND MISLEADING ...................................... 30

     A.      DEFENDANTS INFLATED THE VALUE OF THE ALASKA ASSETS AND MISREPRESENTED THEM ON MILLER'S BALANCE SHEET AND IN PRESS RELEASES. 30

          1.      Defendants Overvalued The Alaska Assets By Using An Impossibly Low Amount For Cost of Extracting Oil and Gas. ........................................... 32

               a.      Miller Used An 11% Average Cost For Operating Expenses Associated With Its Alaska Reserves. ........................................... 33

               b.      Miller's Expenses Were Far Greater than 11%. ........................... 35

          2.      Defendants Overvalued The Alaska Assets By Including Properties That Could Not Realistically Be Exploited Within Five Years. ........................ 38

          3.      The Actual Value of the Oil and Gas Reserves ........................ 40

i

|   |   | 4. | Davis's Involvement Does Not Immunize Defendants' False Valuations. | 40 |
|---|---|---|---|---|
|   |   | 5. | Defendants Overvalued The Alaska Assets By Assigning Unsupported Values To The Fixed Assets Obtained In The Acquisition. | 42 |
|   |   | 6. | Industry Veterans Confirm that Defendants Overstated the Value of the Alaska Assets. | 43 |
|   | **B.** | DEFENDANTS' MISREPRESENTATIONS OF MILLER'S OPERATING RESULTS. | | 45 |
|   | **C.** | DEFENDANTS MISREPRESENTED THE ADEQUACY OF MILLER'S INTERNAL CONTROLS AND COMPETENCE OF ACCOUNTING PERSONNEL. | | 46 |
|   | **D.** | DEFENDANTS PROFITED FROM THE FRAUDULENT SCHEME. | | 48 |
|   |   | 1. | Benefits to Miller as a Whole | 49 |
|   |   | 2. | Benefits To The Individual Defendants | 51 |
| **VIII.** | THE TRUTH EMERGES REGARDING THE VALUE OF THE ALASKA ASSETS AND DEFENDANTS OTHER MISREPRESENTATIONS. | | | 52 |
| **IX.** | DEFENDANTS' GAAP VIOLATIONS | | | 57 |
|   | **A.** | MILLER ADMITS ITS FAILURE TO PROPERLY RECORD ASSET RETIREMENT OBLIGATIONS. | | 57 |
|   | **B.** | MILLER ATTEMPTS TO CONCEAL IMPROPER ARO ACCOUNTING IN 2010 BY SMUGGLING RESTATEMENTS INTO 2011 FINANCIAL REPORTING. | | 60 |
|   | **C.** | MILLER ADMITS TO IMPROPERLY RECORDING ROYALTY EXPENSES, THEREBY DISTORTING REVENUE TRENDS. | | 63 |
|   | **D.** | MILLER ADMITS TO MISREPRESENTING COMPENSATION EXPENSES | | 64 |
|   | **E.** | MILLER ADMITS TO MISREPRESENTING DERIVATIVE GAINS AND LOSSES | | 65 |
|   | **F.** | MILLER FAILED TO APPROPRIATELY CONSOLIDATE MEI | | 66 |
|   | **G.** | EFFECT OF RESTATEMENTS | | 68 |
| **X.** | LOSS CAUSATION | | | 70 |
| **XI.** | PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE | | | 72 |
| **XII.** | NO SAFE HARBOR | | | 73 |
| **XIII.** | CLASS ACTION ALLEGATIONS | | | 74 |

**XIV.** CLAIMS FOR RELIEF ................................................................................................. 76

COUNT I Violation of Section 10(b) of the Exchange Act and Rule 10b-5 (Against All
Defendants) ................................................................................................................ 76

COUNT II Violation of Section 20a of the Exchange Act  (against Defendants Boruff, Boyd and
Deloy Miller) ............................................................................................................. 96

**XV.** PRAYER FOR RELIEF ................................................................................................... 97

**XVI.** JURY DEMAND ............................................................................................................ 98

iii

# I. INTRODUCTION

1.    Lead Plaintiff, Oklahoma Firefighters Pension & Retirement System ("Plaintiff") brings this federal securities class action under the Securities Exchange Act of 1934 (the "Exchange Act"), on behalf of itself and all other persons and entities, except the defendants and their affiliates, who purchased the common stock of Miller Energy Resources, Inc. ("Miller" or the "Company") between December 16, 2009 and August 8, 2011, inclusive (the "Class Period"). Plaintiff alleges that Miller and members of its senior management – Scott M. Boruff, Paul W. Boyd, David J. Voyticky, David M. Hall, Ford Graham and Deloy Miller made false and misleading statements relating to Miller's business and financial condition and the value of its assets, and violated generally accepted accounting principles ("GAAP") in reporting and accounting for the Company's assets, liabilities, revenues, expenses, net income and cash flow, which artificially inflated the price of Miller's common stock during the Class Period.

2.    The allegations in this Complaint are based upon information and belief, except as to allegations specifically pertaining to Plaintiff, which are based on personal knowledge. Plaintiff bases its belief upon information uncovered through an investigation conducted by Plaintiff's attorneys that included:  interviews with witnesses; review of Miller's filings with the Securities and Exchange Commission ("SEC"); review of Miller's press releases and other public statements; and review of regulatory filings and reports, court filings, securities analysts' reports and media reports about the Company.  Plaintiff's counsel also consulted with oil and gas industry experts, economics and market efficiency experts and accounting experts.

# II. SUMMARY OF THE ACTION

3.    Since its inception in 1978, Miller was a small player operating on the fringes of the oil and gas exploration and production industry.  In mid-2009, it found itself in dire straits, with little revenue, high expenses and few assets; it was doubtful that Miller would even be able

1

to continue as a going concern. Through this time, Miller was a "penny stock," trading on the Pink Sheets for cents a share.

4. On December 16, 2009, Miller announced that it had acquired certain oil and gas reserves and related assets in Alaska (the "Alaska Assets"), which it claimed were worth $479 million, including oil and gas reserves it initially valued at $327 million – at the incredible bargain basement price of $4.47 million (the "Acquisition"). Upon this news, shares of Miller's common stock soared 93%, increasing in two days from $0.70 per share to a closing price of $1.35 per share. However, as described below, the claimed values for these assets were enormously overstated because they were based on (1) false values assigned to supposed "fixed assets" Miller acquired; and (2) enormous overstatement of the value of the oil and gas reserves.

5. During the next year and a half that followed, the Company touted the success and high value of the Alaska Assets, periodically issuing releases placing increasingly greater values on the oil and gas reserves.

6. The Company also reported improved operating results, also attributatble to the Alaska acquisition. Accordingly, the price of the Company's common stock continued to rise, reaching a Class Period high of $8.04 per share on July 14, 2011 – an astounding 1045% increase from the $0.70 opening price on December 16, 2009, before the announcement of the Acquisition.

7. In truth, Defendants' public statements were materially false and misleading. As Defendants were aware, Miller's valuations of its Alaska Assets' oil and gas reserves were highly inflated, for at least two reasons. First, the values assigned to the oil and gas reserves were based on the underlying assumption that the oil and gas reserves could be extracted with direct expenses that amounted to only 11% of net sales, a figure that Defendants knew, based on

2

Miller's own consolidated direct expenses for oil and gas, to be false. In contrast, direct operating expenses of comparable oil and gas exploration and production companies traditionally are approximately 22-25% of net sales. Moreover, Miller's historical operating expenses had been approximately 50% of net sales. Thus, for Miller's valuations of the Alaska Assets to be accurate, Miller would have had to have been capable of extracting oil and gas from those assets for half, or less, of the direct operating expenses than comparable operators in the industry were experiencing, and approximately one-fifth of Miller's actual operating expenses as a percentage of net sales. Given Miller's actual operating history and results, this was impossible. If Miller's Alaska Assets were valued to account properly for Miller's actual direct operating expenses, they would be at least $250 million less than reported by Miller.

8.     Second, Defendants' valuations were based on the assumption that Miller would be able to extract oil and gas from the entirety of the Alaska Assets. However, as Defendants knew, 80% of the oil and gas reserves they acquired consisted of undeveloped land. Drilling wells on these lands would require time and a great deal of money. Given the enormous costs involved in bringing even the developed Alaska Assets back online and Defendants' limited access to funding, Defendants knew that they had no realistic plan to extract oil and gas from the undeveloped Alaska Assets any time in the foreseeable future, and that valuations which assumed that they could to do so were false and misleading. Valuing Miller's Alaska Assets to properly exclude the undeveloped oil and gas reserves decreases their stated value by an additional $233 million. In sum, properly accounting for the operating expenses and undeveloped reserves decreases the value to $58 million, or 11% of Miller's publicly reported $540 million figure.

Case 3:11-cv-00386-TAV-CCS   Document 47   Filed 05/14/12   Page 7 of 103   PageID #: 631

9.     In addition to promulgating false information regarding the value of the reserves, Miller also inflated the pro forma valuation of its total assets by assigning an incredible $111 million in value to the Alaska Assets' fixed assets such as buildings and pipelines – a figure with no basis in reality, and one which Miller was later forced to retract.

10.     Miller's overstatement of the Alaska Assets enabled it to overstate assets on the balance sheet by $479 million and overstate shareholders' equity by $267 million.  This made Miller appear larger, cumulatively more profitable and inherently less risky.  All of these effects were the polar opposite of reality.

11.     In addition, Miller misrepresented revenues, liabilities, expenses, and cash flows in its financial disclosures in violation of GAAP.  In fact, Miller violated one of the well-known principles of oil and gas accounting by mischaracterizing royalty payments as operating expenses.  As discussed below, this violation caused Miller to grossly exaggerate its revenue trends, making it appear as if the Company's revenue was heading sharply upwards when the true figures were nowhere near so favorable.

12.     The falsity of Miller's representations was first revealed on July 28, 2011, when analysts Melissa Davis and Janice Shell of TheStreetSweeper published an investigative report on Miller, calling into question the Company's valuation of the Alaska Assets (the "July 28 Report").  The July 28 Report indicated that other well-known and respected industry experts had expressed the view that the value Miller attributed to the Alaska Assets was exaggerated, quoting an energy industry veteran with first-hand knowledge of the properties who stated that the Alaska Assets were worth no more than $25 to $30 million and came with approximately $40 million in liabilities.  The market's reaction to this news was severe.  Miller's stock price

plummeted by $2.63 or more than 37% in two consecutive trading sessions, to close at $4.41 on July 29, 2011.

13.     On July 29, 2011, after the markets closed, the Company filed its Form 10-K for the 2011 fiscal year ending April 30, 2011 (the "July 29, 2011 10-K"), and disclosed that the Audit Committee of the Board of Directors had determined that the Company's unaudited consolidated balance sheets for periods ending July 31, 2010, October 31, 2010, and January 31, 2011 should no longer be relied upon due to misrepresentations of royalty expenses; failure to record depletion; improper reporting of depletion, depreciation and amortization expenses related to wells and equipment fixed assets; and failure to property record income taxes. This initial 2011 10-K contained an audit opinion from KPMG LLP ("KPMG"), Miller's outside auditing firm.

14.     Before the markets opened on Monday, August 1, 2011, the Company retracted its initial 10-K, filed only three days earlier, because it had been filed before KPMG had completed its review and before KPMG had given consent to use its opinion. Miller has disclosed that the financial statement for the 2011 year included in the initial 10-K should not be relied on, due to inadequate internal controls over financial reporting. With these revelations, Miller's shares fell an additional $1.04, or approximately 23.5%, to close at $3.37 on August 2, 2011.

15.     On August 9, 2011, Miller released a Form 10-K/A (the "August 9, 2011 Amended 10-K") identifying the July 29, 2011 10-K as deficient, removing KMPG's audit report and consent, and labeling its consolidated financial statements as unaudited. In the August 9, 2011 Amended 10-K, Miller also expanded on certain of its earlier disclosures and revealed that Miller had improperly tried to paper over material restatements of 2010 expense data by moving

5

these adjustments and disclosures into the 2011 fiscal year. Miller's shares fell an additional $0.37, or more than 13%, to close at $2.36 on August 9, 2011. The collective effect of Miller's misstatements relating to the false valuations of the Alaska Assets and the accounting improprieties had a devastating effect on the value of Miller's common stock, causing it to fall 70%, or $5.68, from its Class Period high of $8.04 per share reached just weeks earlier on July 14, 2011, to $2.36 on August 9. This dramatic decline in value demonstrates that investors were completely blindsided by the negative revelations of the materially false and misleading statements.

## III. JURISDICTION AND VENUE

16. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b5).

17. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

18. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b). Miller maintains its principal place of business in this District and many of the acts and practices complained of occurred in substantial part in this District.

19. In connection with the acts alleged in this Complaint, Defendants directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## IV. PARTIES

### A. LEAD PLAINTIFF

20.     Lead Plaintiff Oklahoma Firefighters Pension and Retirement System ("Plaintiff") is an agency of the State of Oklahoma.  It provides pension and retirement benefits to more than 21,000 participating members, including both active and retired firefighters and their beneficiaries.  As set forth in the attached certification, Plaintiff purchased shares of common stock of Miller at artificially inflated prices during the Class Period and was damaged thereby.  By order entered March 8, 2012, the Court appointed Plaintiff as lead plaintiff pursuant to Section 21(D)(a)(3) of the Securities Exchange Act of 1934 and 15 U.S.C. § 78u-4(a)(2)(A).

### B. DEFENDANTS

21.     **Miller Energy**:  Defendant Miller Energy Resources, Inc. is a Tennessee corporation with its principal place of business at 3651 Baker Highway, Huntsville, Tennessee 37756.   Miller's common stock was traded on the OTC Bulletin Board until May 6, 2010, when the Company's stock began trading on the NASDAQ Global Market under the trading symbol "MILL."  Miller Energy was formerly known as Miller Petroleum, Inc.  On April 12, 2011, the Company changed its name to Miller Energy Resources, Inc. and its stock began trading on the New York Stock Exchange.

22.     **Boruff:**  Defendant Scott M. Boruff has been Miller's Chief Executive Officer ("CEO") and a member of its Board of Directors since August 6, 2008.  Boruff also was the President of the Company from June 26, 2010 until June 9, 2011.  Boruff is the son-in-law of defendant Deloy Miller.  Boruff approved Miller's SEC filings, including Miller's Forms 10-Q and 10-K, and he signed the following Company SEC disclosure documents: Form 10-K Annual Report for the fiscal year ending April 30, 2010, filed on July 28, 2010 (the "2010 10-K"); the 10-K Annual Report for the fiscal year ending April 30, 2011, filed on July 29, 2011 (the "July

7

29, 2011 10-K"); the Forms 10-Q Quarterly Reports for the periods ending October 31, 2009, filed on December 21, 2009 (the "October 2009 10-Q"); January 31, 2010, filed on March 22, 2010 (the "January 2010 10-Q"); July 31, 2010, filed on September 13, 2010 (the "July 2010 10-Q"); October 31, 2010, filed on December 10, 2010 (the "October 2010 10-Q"); and January 31, 2011, filed on March 22, 2011 (the "January 2011 10-Q"); the Form 8-K filed with the SEC on March 5, 2010 (the "March 2010 8-K"); and the Form 8-K filed with the SEC on March 22, 2011. Boruff also was responsible for issuing press releases and making other statements during the Class Period to the investment community that were false and misleading. During the Class Period, Boruff was the beneficial owner of between approximately 9.9% and 11.6% of the Company's issued and outstanding common stock.

23. **Boyd**: Defendant Paul W. Boyd was the Company's Chief Financial Officer ("CFO") and its principal accounting and financial officer from September 23, 2008 until September 19, 2011, when he was replaced by Defendant Voyticky. Boyd approved Miller's SEC filings, including Miller's Forms 10-Q and 10-K, and he signed the Company's 2010 10-K; July 29, 2011 10-K; the October 2009 10-Q; the January 2010 10-Q; the July 2010 10-Q; the October 2010 10-Q; the January 2011 10-Q; the Forms 8-K filed on January 27, 2010 (the "January 2010 8-K"), May 17, 2010 (the "May 2010 8-K"), August 19, 2010 (the "August 19 2010 8-K"), and August 26, 2010 (the "August 26, 2010 8-K"); and the Form 8-K/A filed with the SEC on March 29, 2010 (the "March 2010 8-K/A").

24. **Hall**: Defendant David M. Hall has been the Chief Executive Officer of Cook Inlet Energy ("CIE") and a member of Miller's Board of Directors since December 10, 2009. From January 2008 to December 2009, Hall was the Vice President and General Manager of Alaska Operations for Pacific Energy Resources Ltd. Prior to that time, he had served as the

8

Production Foreman and Lead Operator in Alaska, and then Production Manager for all of Alaska operation for Forest Oil Corporation, the company that sold the Alaska Assets to Pacific Energy Resources. Hall signed the Company's 2010 10-K and July 29, 2011 10-K. Hall also made other statements during the Class Period to investors that were false and misleading. During the Class Period, Hall was the beneficial owner of between approximately 2.6% and 3.7% of the Company's issued and outstanding common stock.

25. **Voyticky**: Defendant David J. Voyticky has served as a member of Miller's Board since April 26, 2010 and has been President of Miller since June 9, 2011. He was named the Company's acting Chief Financial Officer on September 19, 2011. Voyticky approved Miller's SEC filings during his tenure as President, and he signed Miller's 2010 10-K and July 29, 2011 10-K.

26. **Graham**: Defendant Ford F. Graham was appointed as Vice-Chairman of the Board of Directors and President of Miller Energy on December 10, 2009. He resigned from both positions on June 25, 2010. Graham was also the President of Vulcan Capital Corporation, LLC, with which Miller arranged a financial debt agreement for the acquisition of the Alaska Assets. Graham was responsible for Miller's statements made during his tenure as President during the Class Period.

27. **Deloy Miller:** Defendant Deloy Miller founded Miller in 1978. He has been the Chairman of Miller's Board of Directors since December 1996. He served as Miller's Chief Executive Officer from 1967 until August 2008, when he put his son-in-law, Defendant Boruff, in that position. Since stepping down as the Company's CEO, Deloy Miller has served as the Company's Chief Operating Officer ("COO"). Deloy Miller signed the Company's 2010 10-K and July 29, 2011 10-K. During the Class Period, Deloy Miller was the beneficial owner of

between approximately 11.3% and 11.8% of the Company's issued and outstanding common stock.

28.     Defendants Boruff, Boyd, Hall, Voyticky, Graham and Deloy Miller are referred to hereinafter collectively as the "Individual Defendants."

29.     The Individual Defendants possessed the authority to control the contents of Miller's quarterly reports, annual reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market. They received copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## V.     FACTS

### A.     BACKGROUND OF MILLER ENERGY

30.     Deloy Miller founded Miller Energy. Prior to the Class Period, Miller Energy was a struggling, top-heavy company with little revenue and few assets. The Company had spent years trying to escape from the penny-stock arena, where it traded for mere cents a share on the OTC Bulletin Board, by attempting to broker small deals that ended up backfiring and triggering serious ongoing legal disputes. In fact, in August 2007, Miller was delisted from the OTC Bulletin Board for repeated reporting delinquencies.

31.     In August 2008, Deloy Miller arranged for Boruff, his son-in-law, to become Miller's Chief Executive Officer. Prior to joining Miller, Boruff had been a broker at GunnAllen

10

Financial Inc. ("GunnAllen") through October of 2006. GunnAllen has since been closed by regulators and entered bankruptcy in the wake of investor lawsuits and allegations of a major Ponzi scheme involving Provident Asset Management ("Provident"). GunnAllen had sold $39.5 million in private placements in oil and gas offerings from Provident; in July 2009, the SEC charged Provident with defrauding investors by commingling funds and using proceeds from later private placement offerings to pay returns promised in earlier offerings. Boruff has since hired Darren Gibson, who was Provident's former National Sales Director during the alleged Ponzi scheme, as Miller's National Sales Director, stating in a press release that, "[Gibson]'s proven track record in raising capital will allow Miller to aggressively pursue our acquisition and drilling program goals."

32. During Boruff's tenure at GunnAllen, Miller Energy used GunnAllen to broker a sale of 2.9 million shares of its stock to Wind City Oil & Gas, LLC ("Wind City"). However, the Wind City deal turned sour, leading to litigation, and on June 13, 2008, Miller settled by agreeing to pay $10 million to Wind City. In October 2006, Boruff left GunnAllen and joined Cresta Capital Strategies, LLC ("Cresta"), another firm with ties to Miller and the Wind City deal. During Boruff's tenure at Cresta, Miller paid Cresta as a consultant and investment banker in connection with the settlement of the Wind City litigation. Thus, Boruff was at two firms – GunnAllen and Cresta – that were paid by Miller Energy in connection with the Wind City deal, despite the fact that the Wind City deal was a complete failure for Miller.

33. Boruff had no experience or qualifications to serve as Miller's CEO, other than being the son-in-law of the Company's founder. In fact, upon information and belief, Boruff's dealings with Wind City comprised the sum total of his experience in the oil and gas industry.

11

34.    In his new position as CEO of Miller, Boruff received an extremely lucrative compensation package: a signing bonus of $300,000; a base salary of $250,000 per year; a grant of 250,000 shares of common stock, vesting in equal annual installments over four years or on an accelerated basis if there were a change of control of the Company; options to purchase 250,000 shares of common stock at $0.33 per share; and participation in an incentive compensation program based on meeting various gross revenue and EBITDA targets.  As described more fully below, these amounts increased substantially in the ensuing few years.  However, Boruff's compensation was not commensurate with Miller's performance.  For 2009, Miller Energy had a $3.2 million loss from operations, on only $1.6 million in revenue; and it incurred more than $2.7 million in administrative expenses, including more than $779,000 in executive compensation alone.

35.    Deloy Miller and Boruff brought on Boyd in September 2008.  By that time, Miller Energy was essentially insolvent.  The Company had a $751,732 loss from operations, on revenue of only $485,000, for its quarter ended October 31, 2008; at that time, Miller's current liabilities exceeded its current assets, and it had an accumulated deficit of $1.4 million.  For its 2009 fiscal year (ended April 30, 2009), the Company had a $3.2 million loss from operations and an accumulated deficit of $1.3 million.  As stated in its 2009 10-K, filed August 10, 2009, implementing management's business plan for Miller would require significant additional capital that the Company had little ability to obtain:

> To fully expand our operations as set forth above, we will need up to $50 million to fund the balance of our expansion plans.  To provide the expansion capital, we intend to leverage our existing assets as well as seek to raise additional capital through the sale of equity and/or debt securities. . . . While our management has devoted significant time to these efforts during 2009, we have not been successful in raising any of these funds.  Our ability to fully implement our expanded business model, however, is dependent on our ability to raise the additional capital on a timely basis so as to take advantage of the opportunities we presently

12

have available to us.  We face a number of obstacles, however, in raising the additional capital, including the relative size of our company, the low trading price of our stock and the lack of liquidity in the capital markets in general and small-cap companies in particular.  If we are not able to raise the capital as required, we will be unable to fully implement our expanded business model and will need to delay future expansion as well as further purchases of leases.

36.     Acknowledging Miller's critical financial condition, the 2009 10-K states that the "ability of the Company to continue as a going concern is dependent upon the successful completion of additional financing and/or generating profitable operations in future periods."  It further advised that various factors could result in Miller no longer continuing as a going concern, noting that Miller might "lack sufficient liquidity to continue operations over the next year."  Moreover, Miller's already dire liquidity situation was worsening:  according to Miller's Form 10-Q for the period ending July 31, 2009, as of July 31, 2009, Miller had a working capital deficit of approximately $911,000, as compared to a working capital deficit of $370,000 as of April 30, 2008.  This increase in capital deficit was primarily caused by losses from operations.

**B.     MILLER ACQUIRES THE ALASKA ASSETS FOR APPROXIMATELY $4.47 MILLION.**

**1.     Pacific Energy Was Forced Into Bankruptcy Because of the Failing Alaska Assets.**

37.     In August 2007, Pacific Energy acquired the Alaska oil and gas properties and operations of Forest Oil Corporation ("Forest") for $463.2 million in a bankruptcy auction. These assets included both the Alaska Assets that were later purchased by Miller and other assets located in Alaska that have remained with Pacific Energy's bankruptcy estate.  According to Joseph Rainwater, the former Chief Operating Officer of Pacific Energy, Pacific Energy bid substantially more than any other bidder for the assets, and the over-leveraged acquisition caused Pacific Energy to go into bankruptcy when the assets failed to provide sufficient cash flow.  This executive also stated that Pacific Energy's valuation of the assets was based on reservoir reports

13

prepared by Netherland Sewell, but these reservoir estimates were clearly wrong. The estimates as to the total barrels were accurate, but Netherland Sewell greatly underestimated the costs of extracting the oil and gas, such that the values they assigned to the assets were materially overstated.

38. By the spring 2009, Pacific Energy was unable to operate the Alaska Assets profitably and, on March 9, 2009, it filed a petition under Chapter 11 with the United States Bankruptcy Court for the District of Delaware. Pacific Energy's bankruptcy filings state that the Alaska Assets had been unable to generate sufficient cash flow to sustain ongoing operations. Specifically, during the first four months of 2009, the average cash losses from the Alaska Assets were approximately $500,000 per month. These losses were exacerbated when volcanic activity interrupted drilling activities in the Alaska Assets, bringing the monthly losses as high as $1.3 million per month. Pacific Energy also estimated that the decommissioning expenses associated with the Alaska Assets would be $30 to $40 million over a three to four year period.

39. According to former Pacific Energy Vice President and General Manager Joseph Kilchrist, at the time Pacific Energy acquired the Alaska Assets from Forest Oil Corporation in 2007, its winning bid was much higher than any of the other bids.

40. After its Chapter 11 filing, Pacific Energy tried and failed to attract a buyer for the Alaska Assets. Pacific Energy retained Lazard Freres & Company LLC ("Lazard") to market the Alaska Assets. In April 2009, Lazard prepared an offering memorandum describing the assets and approached more than forty potential buyers, of whom only two decided to make a bid. In July 2009, Pacific Energy conducted an auction, and received an $8.1 million bid from Ammadon and a $7 million bid from New Alaska Energy for the Alaska Assets. However, neither bidder obtained financing, and no sale was consummated.

41. After the unsuccessful auction, Pacific Energy received Bankruptcy Court approval to abandon the Alaska Assets so as to avoid further losses. The State of Alaska retained Nabors Industries ("Nabors") to serve as a monitor of the Alaska Assets in connection with Pacific Energy's bankruptcy. It was around this time that Miller Energy set its sights on purchasing the Alaska Assets as a potential way to avoid its own demise.

42. In or around September 2009, Miller contacted Cook Inlet Enterprises, LLC ("CIE"), a company that had been formed by Hall, Walker Wilcox and Troy Stafford to try to acquire the Alaska Assets. Hall and Wilcox were Pacific Energy employees, and both had previously worked at Forest Oil. From January 2008 to December 2009, Hall was the Vice President and General Manager of Alaska Operations for Pacific Energy. Prior to that time, he had served as the Production Foreman and Lead Operator in Alaska, and then as the Production Manager for all of Alaska operation for Forest. As such, Hall had intimate knowledge of the Alaska Assets, their value, the costs associated with their operation and their production capabilities.

43. Miller agreed to finance CIE's purchase of the Alaska Assets and used CIE to acquire them for itself. On October 16, 2009, Miller executed a non-binding memorandum of understanding with CIE, pursuant to which Miller agreed to purchase 100% of the membership interests of CIE contingent upon CIE's successful purchase of the Alaska Assets.

44. In order to obtain the Alaska Assets and vacate the abandonment order, Miller needed first not only to fund the purchase, but also to convince the Bankruptcy Court that it possessed sufficient financial wherewithal to satisfy the State of Alaskas' bonding and retirement obligations with respect to the properties. Miller itself did not have sufficient funds to purchase the assets – as of October 31, 2009, Miller had less than $100,000 of unrestricted cash and was

15

losing more than $1 million a quarter from operations. However, Miller was able to locate a funding source in Defendant Graham. On October 8, 2009, Miller entered into a letter agreement with Vulcan Capital Corporation ("Vulcan"), a company Graham controlled, to provide $5.5 million for purchase of the Alaska assets. Then, between November 2009 and December 2009, Miller borrowed an aggregate of $2.7 million from an entity named Miller Energy Income 2009-A, LP ("MEI"), an entity run by Boruff, Boyd and Deloy Miller which, as discussed below, Miller formed to covertly raise funds on its behalf.

45. Initially, CIE sought to purchase the Alaska Assets from Pacific Energy for approximately $875,000. In response, Pacific Energy requested the Bankruptcy Court's approval to vacate the abandonment order. Nabors' subsidiary Ramshorn Investments ("Ramshorn") also emerged as a bidder, and a second auction of the Alaska Assets took place on November 5, 2009. CIE won the auction with a $2.25 million bid. Ramshorn's highest bid was $2.15 million, even though it was bidding for both the Alaska Assets and additional assets owned by Pacific Energy that CIE did not seek to purchase. As part of the purchase, CIE also agreed to assume the liability to pay $2.2 million for contract cure payments, bonds, and other local, federal, and state requirements.

46. Also on November 5, 2009, Miller entered into a second financing agreement with Vulcan, replacing the October 8, 2009 agreement. According to this letter agreement, Vulcan committed to lend Miller at least $36.5 million at the closing of the Alaska Assets purchase.

47. On November 6, 2009, the U.S. Bankruptcy Court for the District of Delaware held a hearing to consider the sale of Pacific Energy's Alaska Assets to Miller. One purpose of the hearing was to allow the Court to determine if Miller was a bona fide purchaser capable of

satisfying the Alaska Assets' bonding and retirement liabilities. Defendant Graham testified before the Court that Vulcan would provide the financing for Miller and CIE's acquisition of the Alaska Assets, and that Vulcan would stand behind Miller's bonding requirements with Alaska. According to the transcript of the hearing, Graham also testified that Vulcan had entered into three or four transactions with Miller in the past, and that Vulcan and Miller "would have conversations on a weekly or once every two [week] basis on a multitude of transactions." Graham was asked, "[U]nder what circumstances [would Vulcan] be relieved of an obligation to continue to pay?" Under oath, Graham responded, "I believe we don't, there is no normal operating event that would cause us to be relieved of that."

48.     Graham further testified that Vulcan had made $50 million in financing commitments:

> Q:     I just have a couple of question for you because I heard in your proffer that Vulcan Capital has partnered with Miller to provide the financing to permit Cook Inlet as purchasers to pay the bonding requirements in Alaska, was that testimony accurate?
>
> A:     Yes, sir.
>
> Q:     And to your knowledge what are those bonding requirements that Vulcan has funded, in dollar amounts?
>
> A:     I believe the total amount of bonding between all of the assets are in the neighborhood of approximately $50 million dollars.
>
> Q:     Okay.  And since the testimony was that Vulcan was partnering with Miller could you just explain to me and to the Court how that financial partnering is going to break down with respect to commitments to Cook Inlet with respect to paying those bonding requirements?
>
> A:     Vulcan and its affiliates will make available to Miller the capital required to meet those bonding requirements.

49.     Boruff also testified at the November 6, 2009 hearing.  He stated that, "Vulcan Capital Corporation [has agreed to] financial commitments necessary to fund the significant

requirements imposed by the State of Alaska. . . . and that Miller, in connection with Vulcan, has secured all of the financing commitments that have been required."

50. Contrary to these representations, Vulcan never provided any funds to Miller, for the Acquisition or otherwise, and Miller never sought any funds from Vulcan. In its 2010 10-K Miller disclosed that, "We accepted the [Vulcan] letter agreement on November 5, 2009, however we have not proceeded towards a closing of the financing agreement." Miller also disclosed that Vulcan had advised that the previously promised funds were no longer available and that Miller would seek to obtain alternative financing on more favorable terms.

51. Despite not actually providing any financing for the acquisition, Graham was rewarded handsomely. He became Miller's President and Vice-Chairman of its Board, and held these positions from December 16, 2009 to June 25, 2010. He received a signing bonus of $200,000; base compensation of $200,000; warrants to purchase an aggregate of 1,000,000 shares of Miller common stock, consisting of warrants to purchase 400,000 shares exercisable at $0.01 per share, warrants to purchase 200,000 shares exercisable at $0.69 per share, warrants to purchase 200,000 shares exercisable at $1.00 per share, and warrants to purchase 200,000 shares exercisable at $2.00 per share. Graham left Miller on June 25, 2010, after a mere seven months on the job, purportedly because of "conflicting business and personal time commitments," according to Miller's Form 8-K announcing his departure. Graham was awarded $100,000 in severance and allowed to retain his warrants and certain options. Additionally, on the day that he resigned, the trading volume in the Company's common stock shot up to over 2.8 million shares, more than ten times the average daily trading volume for May 6, 2010 through November 30, 2010. According to Plaintiff's financial expert, there was no company specific industry news on June 25, 2010 (or in the previous days) that would explain this enormous spike in volume.

18

Based on these circumstances, the reasonable inference is that this surge in trading volume reflects Graham cashing out his warrants.

### 2. Miller Consummated the Alaska Assets Acquisition.

52. On November 25, 2009, the Bankruptcy Court approved the sale of the Alaska Assets to CIE based in part on Miller's financial commitments from Graham. In the November 25, 2009 order vacating the abandonment of the assets, the Bankruptcy Court found that: "The Sale Agreement constitutes the highest and best offer for the Sold Assets, and would provide a greater recovery for the Debtors' estates than would be provided by any other available alternative." In approving the sale to CIE, the Bankruptcy Court found that the purchase price ($2.5 million cash plus $2.22 million assumed liabilities) was fair consideration for the value of the assets sold: "[t]he consideration provided by the Buyer pursuant to the Sale Agreement constitutes reasonably equivalent value and fair consideration for the Sold Assets."

53. On December 10, 2009, Miller acquired 100% of the membership interests in CIE in exchange for four year stock warrants to purchase Miller stock, as well as $250,000 in cash and an agreement to appoint Hall as a member of the Miller Board of Directors. The stock warrants permitted the three CIE sellers, one of whom was Hall, to purchase 3.5 million shares of Miller's common stock and were divided into three tranches. The first tranche consisted of 1 million warrants with an exercise price of one cent; the second tranche consisted of 1.5 million warrants with an exercise price of $1.00; and the third tranche consisted of 1 million warrants with an exercise price of $2.00. On December 10, 2009, CIE, now a wholly-owned subsidiary of Miller, acquired the Alaska Assets from Pacific Energy. The Alaska Assets consist of onshore and offshore production and processing facilities located in Cook Inlet, Alaska, the Osprey offshore energy platform, over 600,000 net lease acres of land with geologic seismic data, and miscellaneous roads, pads and facilities.

19

## VI. DEFENDANTS ISSUED MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD.

54. During the Class Period, Defendants made a series of statements in press releases, SEC disclosure documents, and elsewhere to investors concerning the Alaska Assets and their value, and Miller's assets, liabilities, results of operations and financial condition. These statements were materially false and misleading and are set forth in ¶¶55-56, 58-59, 61, 63, 65-68, 71, 74-84, 152 and 154, below.

55. On December 16, 2009, the first day of the Class Period, the Company issued a press release regarding the Acquisition and the Alaska Assets, which stated, in relevant part:

> Miller Petroleum, Inc. dba Miller Energy Resources ("Miller"), (OTC BB: MILL:OB) *announced today that it has acquired Alaskan oil and gas assets, valued at $325 million*, from Pacific Energy Resources ("Pacific Energy") through a Chapter 11 Bankruptcy proceeding in Delaware.
>
> Miller acquired total reserves of over 13.2 million barrels of oil and 15.5 BCF of natural gas, including total proved reserves of 5.6 million barrels of oil and 3.7 BCF of natural gas. *The discounted net present value of the Alaska reserves that Miller acquired is over $325 million dollars*, including $119 million dollars of proven reserves, $185 million of probable reserves and $23 million of possible reserves.

(emphasis added).

56. Also on December 16, 2009, Defendant Boruff issued a statement, as reported by the PR Newswire, that:

> The good news just keeps coming at Miller. [I]n the past year, our shareholders have seen an increase of over 140% on their stock in the past year. This new acquisition should continue the strong improvement in Miller's value for our shareholders. Miller is very pleased to have been able to acquire these high-value Alaska energy assets at an extremely attractive value. The results of these acquisitions increases our reserves by 32 fold and significantly strengthens our balance sheet. Initial production is estimated to be 280 barrels of oil a day. Our three month target is over 800 barrels a day with a goal of pushing production over 1,100 barrels daily by the fourth quarter of 2010, which would generate more than $30 million dollars annually in gross revenue for Miller.

(internal quotations and citations omitted).

57.    In response to these disclosures, Miller's stock immediately jumped from a closing price of $0.70 on December 15, 2009 to close at $1.35 on December 17, 2009, an increase of 96%.

58.    On December 21, 2009, the Company filed a Form 10-Q Quarterly Report for the period ended October 31, 2009 with the SEC, which was signed by Defendants Boruff and Boyd. The Form 10-Q Report stated, in relevant part:

> On December 11, 2009, the ***Company acquired former Alaskan assets of Pacific Energy Resources ("Pacific Energy") valued at more than $300 million*** through a Delaware Chapter 11 Bankruptcy proceeding.  The Company paid a total of $2.25 million to acquire and obtain the Alaskan oil and gas assets which include onshore and offshore production facilities, $119 million in proven energy reserves, $185 million in probably energy reserves and $23 million in possible energy reserves, providing total reserves of $327 million.

(emphasis added).

59.    In addition, the Form 10-Q contained certifications signed by Boruff and Boyd certifying that the financial information contained in the 10-Q was accurate and that Miller had adequate disclosure controls and procedures and adequate internal controls over financial reporting.  The certifications stated that Boruff and Boyd:

> a.    Designed such disclosure controls and procedures, or caused disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to [Miller,] including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
> b.    Designed internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>
> c.    Evaluated the effectiveness of [Miller's] disclosure controls and procedures and presented in [the financial] report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

21

d. Disclosed in [the respective] report any change in [Miller's] internal control over financial reporting that occurred during [Miller's] most recent fiscal quarter . . . that has materially affected, or is reasonably likely to materially affect, the [Miller's] internal control over financial reporting.

60. Following filing of the October 31, 2009 Form 10-Q, Miller's stock rose from a closing price of $1.30 on December 21, 2009 to a closing price of $1.49 on December 22, 2009, an increase of 24.7%.

61. On March 5, 2010, Miller filed a Form 8-K which included a press release that Miller had issued on March 3, 2010. Boruff signed the Form 8-K. In the press release, Miller increased the value it placed on the Alaska oil and gas reserves from $327 million to "over $368 million:"

Miller Petroleum, Inc. dba Miller Energy Resources ("Miller"), (OTC BB: MILL:OB) announced today that it has completed the rework of its West McArthur River Unit-5 (WMRU-5) well. . . . The WMRU-5 is one of the wells acquired by Miller when it purchased Alaskan oil and gas assets, presently valued at over $368 million, from Pacific Energy Resources. . . .

62. In response to this press release, Miller's stock price jumped from $2.95 (March 2, 2010) to $3.20 per share (March 3, 2010), an 8% increase.

63. On March 15, 2010, Miller announced yet another increase to the value of the Alaska oil and gas assets. In a press release issued at 9:14 EST, entitled, "Miller Energy Resources' Assets Increase to $492 Million," Miller and Boruff stated as follows:

Miller Petroleum, Inc. dba Miller Energy Resources ("Miller"), (OTC BB: MILL:OB) announced today that *it has a total proforma asset value of over $492 million, including oil and natural gas reserves valued at $372 million* based upon an average net sales price of $61.18 per barrel of oil and $4.75 per mcf of natural gas. The increase is a direct result of the acquisition in December 2009 of oil and gas assets from Pacific Energy Resources through a Chapter 11 U.S. Bankruptcy proceeding in which Miller acquired onshore and offshore production and processing facilities, an offshore energy platform, over 600,000 net lease acres of land with hundreds of miles of 2-D and 3-D geological seismic data, miscellaneous roads, pads and facilities. On March 3, 2010 Miller announced that its Alaskan operations were producing more than 800 BOED.

22

"The Alaska acquisition has led to phenomenal growth at Miller and greatly strengthened our balance sheet," said Scott M. Boruff, Miller CEO. "Over the last year Miller has increased its asset value over forty times, its total oil and natural gas reserves ninety times, and its lease acreage by a factor of twelve. In addition, production at our Alaska operations continues to exceed original projections which will translate into greatly increased revenues at Miller over the coming year."

(emphasis added).

64.    Again, the disclosure of Miller's increased asset value caused a concomitant increase in Miller's stock price, which jumped $0.81, from a close of $3.60 on March 11 to $4.41 on March 15, a 22.5% increase.

65.    On March 22, 2010, Miller filed a Form 10-Q Quarterly Report for the period ending January 31, 2010, which was signed by Defendants Boruff and Boyd. The March 2010 Form 10-Q represented the following:

On December 10, 2009, the Company acquired former Alaskan assets of Pacific Energy Resources ("Pacific Energy") *valued at more than $479 million* through a Delaware Chapter 11 Bankruptcy proceeding. *The Company acquired the Alaskan oil and gas assets, which include onshore and offshore production facilities, $215 million in proven energy reserves, $122 million in probable energy reserves and $31 million in possible energy reserves, providing total reserves of $368 million*. The purchased assets include West McArthur River oil field, the West Foreland natural gas field, and the Redoubt unit with the Osprey offshore platform, all located along the west side of the Cook Inlet. Also included in the asset purchase are 602,000 acres of oil and gas leases as well as completed 3D seismic geology and other production facilities. At closing Miller paid Pacific Energy a purchase price of $2.25 million and provided $2.22 million for bonds, contract cure payments and other federal and State of Alaska requirements to operate the facilities.

(emphasis added).

66.    In the March 2010 10-Q, Miller also specifically represented for the first time that in the Acquisition it had acquired $110 million worth of fixed assets.

67.    The March 22, 2010 Form 10-Q also contained Sarbanes-Oxley required certifications signed by Defendants Boruff and Boyd, which included the same representations

23

as those set forth in ¶59 above, certifying that the disclosure did not contain any false or misleading statements and that Miller had adequate disclosure controls and procedures and adequate internal controls over financial reporting.

68.     In connection with the March 2010 Form 10-Q, Miller issued a press release on March 24, 2010 entitled, "Miller Energy Resources Reports $271 Million in Record Profits for the Third Quarter," which stated, in relevant part:

> Miller Energy Resources ("Miller") . . . announced today that it had net income of $271.9 million for the third quarter ending January 31, 2010. This represents earnings for the quarter of $12.44 per outstanding share and earnings of $9.51 per fully diluted share. The net income for the quarter is a direct result of the acquisition in December 2009 of oil and gas assets from Pacific Energy Resources through a Chapter 11 U.S. Bankruptcy proceeding in which Miller acquired onshore and offshore production and processing facilities, an offshore energy platform, over 600,000 net lease acres of land with hundreds of miles of 2-D and 3-D geologic seismic data, miscellaneous roads, pads and facilities. On March 3, 2010, Miller announced that its Alaskan operations were producing more than 800 BOED and on March 15, 2010, Miller announced that it has a total proforma asset value of over $492 million, including oil and natural gas reserves valued at $372 million.
>
> "This is a historic time at Miller Energy Resources," said Scott M. Boruff, Miller CEO. "The record results for the third quarter reflect the hard work of the team that has been assembled at Miller and bodes well for our ambitious business plan moving forward. ***The addition of the Alaskan operations has positively impacted all facets of our company and is a true milestone for Miller as we continue to maximize value for our shareholders***."

(emphasis added).

69.     The $271 million in recorded profit was the result of a $267 million gain-on-purchase of the Alaska Assets, which was only achieved because Miller inflated the value of the Alaska Assets (as described in §VII.A, below).

70.     Between March 22, 2010 and March 25, 2010, the Company's stock rose from an opening of $4.35 on March 22 to a closing of $4.74 on March 25.

71.     On March 29, 2010, Miller filed a Form 8-K/A which was signed by Boyd.   This Form 8-K/A contained a financial statement listing the assets of CIE as including $110 million in fixed assets and $368 million in oil and gas reserves.

72.     Following issuance of the March 29, 2010 Form-8K/A, Miller's stock rose from a closing price of $5.28 on March 26, 2010 to a closing price of $6.60 on March 29, 2010, an increase of $1.32 or 25%.

73.     On May 5, 2010, Miller issued a press release announcing that its stock had been approved to list on the NASDAQ Global Market.

74.     On May 17, 2010, the Company again announced another increase to the valuation of its Alaska oil and gas reserves.   In a Form 8-K, signed by Boyd and a press release issued that day, Defendants stated:

> Miller Petroleum, Inc. dba Miller Energy Resources ("Miller Energy Resources") . . . announced today that based upon a reserve report at April 30, 2010, ***the value of its proved, probable and possible Alaska oil and gas reserves has increased 48% to over $540 million*** using present value of future cash flows before income taxes and asset retirement obligations, discounted at 10% ("PV-10") and holding commodity prices constant throughout the lives of the properties as computed in accordance with the applicable rules of the Securities and Exchange Commission. . . .

> Miller Energy Resources also announced today that the value of its Alaska reserves had increased to over $862 million using present value of future cash flows before income taxes and asset retirement obligations as of April 30, 2010, discounted PV-10 and using a five year strip pricing scenario obtained from energy quotes retrieved from the April 30, 2010 as well as non-escalated costs of operations, i.e., prices and costs that were not escalated above current values ("NYMEX"). . . .

> The $233 million increase to $862 million in the value of the company's total reserves at fiscal year-end 2010 reflects an increase in both the quantity of reserves and value of the reserves in the company's Alaska operation, Cook Inlet Energy, LLC ("Cook").   Cook's oil and gas reserves increased as a result of the company's successful drilling program and an increase in market pricing.

(emphasis added).

75.     The May 17, 2010 Form 8-K also included slides from a presentation made by Defendant Boruff at the Rodam & Renshaw 6th Annual Global Investment Conference.  Slides 3, 8 and 18 contained statements about the value of the Alaska Assets' reserves, including  that the Company had "over $100mm of Assets to Support Alaska Production," that Miller has "$100mm of Infrastructure," and that the transaction value of the Acquisition exceeded $500 million.

76.     On July 28, 2010, Miller filed its 2010 10-K.  The 2010 10-K was signed by Defendants Hall, Voyticky, and Deloy Miller.  The 2010 10-K stated that "[o]n December 10, 2009 Cook Inlet Energy acquired former Alaska assets of Pacific Energy Resources valued at more than $479 million through a Delaware Chapter 11 bankruptcy proceeding, including oil and gas assets which include onshore and offshore production facilities, $215 million in proven energy reserves, $122 million in probable energy reserves and $31 million in possible energy reserves, providing total reserves of $368 million."

77.     The 2010 10-K also stated that Miller's Alaska Assets included fixed assets of $110.5 million, and that fixed assets had increased $111.1 million from April 30, 2009 to April 30, 2010 based on the new assets booked from the Alaska acquisition. Miller broke down its fixed assets as follows:

|                               | April 30, 2010 |             | April 30, 2009 |             |
| ----------------------------- | -------------: | ----------- | -------------: | ----------- |
| Machinery & Equipment         | $              | 4,620,219   | $              | 4,218,556   |
| Pipelines                     |                | 17,000,000  |                | ——          |
| Oil platform                  |                | 6,000,000   |                | ——          |
| Vehicles                      |                | 1,402,094   |                | 938,624     |
| Buildings                     |                | 87,682,810  |                | 544,546     |
| Office Equipment              |                | 77,411      |                | 49,291      |
|                               |                | 116,782,534 |                | 5,751,017   |
| Less: accumulated depreciation |               | (1,961,755) |                | (1,022,017  |
| Net Fixed Assets              | $              | 114,820,779 | $              | 4,729,000   |

26

Miller attributed these increases in fixed assets primarily to the acquisition of $110.5 million of Alaska Assets. The $17 million "pipelines", $6 million "oil platform" and $87 million "buildings" all came from the Alaska assets.

78.     The 2010 10-K also contained Sarbanes-Oxley required certifications, signed by Boruff and Boyd which included the same representations as those set forth in ¶59 above, certifying that the disclosure did not contain any false or misleading statements and that Miller had adequate disclosure controls and procedures and adequate internal controls over financial reporting.

79.     On August 19, 2010, Miller issued a press release, and filed a Form 8-K, signed by Boyd (the "August 19, 2010 8-K"). In the August 19, 2010 pres release and 8-K, Miller reported a further increase in the valuation of its Alaska oil and gas reserves:

> Miller Petroleum, Inc. dba Miller Energy Resources ("Miller") . . . announced today that the value of its proved, probable and possible Alaska oil and gas reserves at July 31, 2010 has increased 46% from April 30, 2010 to over $1.2 billion, using present value of future cash flows before income taxes, discounted PV-10, and using a five year strip pricing scenario obtained from energy quotes as well as non-escalated costs of operations, *i.e.*, prices and costs that were not escalated above current values. . . . The $385 million increase in PV−10 valuation to $1.247 billion at July 31, 2010 in the value of the company's total reserves from fiscal year−end 2010 reflects an increase in both the quantity and value of the gas reserves in the company's Alaska operation, Cook Inlet Energy, LLC ("Cook").

80.     On August 26, 2010, Defendant Boruff made a presentation to EnerCom, an Oil and Gas Conference held in Denver, CO. The slides from that presentation were included as exhibits to a Form 8-K filed with the SEC on August 26, 2010 that was signed by Boyd. The slides contained representations that the Company had "over $100mm of Assets to Support Alaska Production," that Miller has "$100mm of Infrastructure," and that the transaction value of the Acquisition exceeded $500 million.

27

81.     On September 13, 2010, the Company filed a Form 10-Q for the period ending July 31, 2010.   The July 2010 10-Q was signed by Boruff and Boyd.  The July 2010 10-Q included reported fixed assets of $117 million, including fixed assets of $110.5 million that Miller attributed to assets that it purchased in the Acquisition.  It reflected as assets oil and gas properties valued at $378.5 million.  Further, it reported oil and gas revenue of $4.791 million, net income before taxes of $256,292, net income of $682,907 and earnings per share of $0.02. Also, the July 2010 10-Q contained Sarbanes-Oxley required certifications, signed by Boruff and Boyd which included the same representations as those set forth in ¶59 above, certifying that the disclosure did not contain any false or misleading statements and that Miller had adequate disclosure controls and procedures and adequate internal controls over financial reporting.

82.     On December 10, 2010, the Company filed a Form 10-Q for the period ending October 31, 2010.  The October 2010 10-Q was signed by Boruff and Boyd.  The October 2010 10-Q reported fixed assets, net of $114 million, which included fixed assets of $110.5 million that Miller attributed to the assets that it purchased in the Acquisition. It reflected assets of oil and gas properties, net of $378.7 million.  Further, for the three and six months ended October 31, 2010, it reported respectively:  oil and gas revenue of $6.1 million and $10.9 million; gross profit of $1.1 million and $1.9 million; net loss of $1.7 million and $1.0 million, and an EPS loss of $0.05 and $0.03.   Also, the October 2010 10-Q contained Sarbanes-Oxley required certifications, signed by Boruff and Boyd which included the same representations as those set forth in ¶59 above, certifying that the disclosure did not contain any false or misleading statements and that Miller had adequate disclosure controls and procedures and adequate internal controls over financial reporting.

28

83. On March 22, 2011, the Company filed a Form 10-Q for the period ending January 31, 2011. The January 2011 10-Q was signed by Boruff and Boyd. The January 2011 10-Q included a restatement of corrections made to, among other things, the Company's unaudited consolidated balance sheets as of July 31, 2010 and October 31, 2010, previously filed with the July 2010 10-Q and the October 2010 10−Q, respectively. Realizing that they had no basis to reflect the value of the fixed assets that Miller purchased in the Acquisition at $110.5 million, Defendants removed the $110.5 million "fixed assets" figure and lumped it together with "oil and gas properties, net," thereby writing up those properties' purported value to $480 million for the quarter ended January 31, 2011, $482 million for the quarter ended October 31, 2010, and $483 million for the quarter ended July 31, 2010. Defendants had no basis to write up the oil and gas properties' values and provided no explanation for why the fixed assets acquired in the acquisition were included in Miller's oil and gas properties. The January 2011 10-Q contained Sarbanes-Oxley required certifications, signed by Boruff and Boyd, which included the same representations as those set forth in ¶59 above, certifying that the disclosure did not contain any false or misleading statements and that Miller had adequate disclosure controls and procedures and adequate internal controls over financial reporting.

84. In connection with the Form 10-Q, the Company issued a press release which it filed with the SEC on a Form 8-K Report. The press release described the Acquisition and its impact on Miller's balance sheet, stating that, "Our net income in the 2010 period included a gain of $474.3 million related to the acquisition of our Alaska operations."

## VII. THE REASONS WHY DEFENDANTS' STATEMENTS WERE MATERIALLY FALSE AND MISLEADING

### A. DEFENDANTS INFLATED THE VALUE OF THE ALASKA ASSETS AND MISREPRESENTED THEM ON MILLER'S BALANCE SHEET AND IN PRESS RELEASES.

85.     In order for Miller to continue as a going concern, and for the Individual Defendants to continue receiving their lucrative compensation packages, it was not enough to announce the acquisition of the Alaska Assets at the price of $4.47 million.  Defendants also faced the task of presenting the Acquisition as the "deal of the century" in order to persuade equity investors, lenders and the stock market participants that Miller had substantial collateral and that the Alaska Assets would yield windfall profits.  To do that, Defendants reported that the Alaska Assets were actually worth more than $479 million, a figure that purportedly included at least $325 million of oil and gas reserves and $111 million of fixed assets.  However, these valuations were false, and the Alaska Assets were in fact worth hundreds of millions of dollars less.

86.     As set forth in §VI above, Miller featured its purchase of the Alaska Assets in nearly every press release and SEC disclosure filing it made during the Class Period.  It made specific representations about the total value of the assets it acquired, including separately stating the value of the oil and gas reserves and the value of the fixed assets it bought.  These values were represented to be stated in conformity with Generally Accepted Accounting Principles ("GAAP") and the requirements of the SEC for oil and gas reserve accounting.

87.     In fact, the stated values were enormously overstated, and were not reflected in conformity with GAAP or SEC requirements.  GAAP requires that an acquiring entity recognize identifiable assets it acquires and liabilities it assumes at fair value.  (ASC 805-20-30-1).  As Miller reported in its 2010 10-K, it valued the Cook Inlet oil and gas reserves that it had acquired

at $368 million.  According to GAAP, this amount was required to be based on the discounted net cash flows from the use of those reserves.  The net cash flows must be determined based on future cash inflows from Miller's estimated sales of its oil and gas reserves, subtracting estimated direct operating expenses, production costs and capital expenditures associated with those sales.  (ASC 820-10-55).

88.     Miller did not provide any details of how it calculated fair value of the acquired reserves, stating only that "Management's assessment of fair value of proven, probable, and possible gas and oil reserves [was] supported by an independent appraisal on December 31, 2009."  Form 8-K filed on March 29, 2010.  However, as discussed below, Miller's estimate of the fair value of acquired reserves was overstated due to faulty assumptions related to operating costs and its ability to drill undeveloped reserves within the requisite time period.

89.     First, to properly value oil and gas reserves, companies are required to reflect the costs anticipated to be required to extract the oil and gas.  Defendants used a cost extraction amount of just 11% of net revenues that was artificially low and not based on any experience or history.  In fact, it was approximately half of what Miller's more efficient competitors could achieve and a fifth of what Miller itself was capable of.

90.     Second, SEC Regulation S-X, Article 4, Rule 4-10(a)(31)(ii), governing oil and gas reporting, provides that a company can include in its value of reserves undrilled properties only if it has a plan to develop those properties within five years and the company can demonstrate that it has the financial ability to develop them.  Approximately 80% of the oil and gas reserves purchased by Miller were contained in undeveloped fields that Miller had no realistic opportunity of drilling within the five years following the Acquisition.  Defendants

31

nonetheless valued these oilfields as if they would be viable producing properties, in violation of applicable SEC rules.

91.     Furthermore, Miller's financial statements represented that Miller acquired $110.5 million of fixed assets in the Acquisition, and listed and valued the specific components of this $110.5 million.  These amounts were enormously inflated and had no support.  In the January 2011 10-Q and the July 29, 2011 10-K, Defendants eliminated these financial statement entries and instead simply lumped these assets back in with the rest of Miller's oil and gas properties on the balance sheet, but provided no explanation for why they did that, why the fixed assets were now "oil and gas properties," or the basis for increasing the oil and gas reserve values by $110.5 million. Through these underhanded methods, Miller was able to fool the marketplace into thinking that Miller had acquired "hard" assets worth more than fifty times the price that Miller had paid for the entire Acquisition.

> **1.     Defendants Overvalued The Alaska Assets By Using An Impossibly Low Amount For Cost of Extracting Oil and Gas.**

92.     Immediately after acquiring the Alaska Assets for $4.7 million, Miller announced that the value of the oil and gas reserves – only a portion of what it acquired – was $327 million. Then in its January 2010 10-Q, the first financial statements released after the Acquisition, Miller reflected the entirety of the assets it acquired at the astonishing amount of $480 million, as follows:

| | |
|---|---|
| Inventory | $212,228 |
| Fixed Assets | $110,000,000 |
| Oil and gas properties | $368,035,281 |
| Restricted Cash Long Term | $1,789,995 |
| | ---------------- |
| Total Assets | $480,037,504 |

93.     In a May 17, 2010 press release, Miller touted a 48% increase in the value of the Alaska Assets – to "over $540 million" – based upon a purported 6.4% increase in oil reserves, a 38.5% increase in natural gas reserves, and an increase in energy prices.

94.     Neither the December 16, 2009 nor the May 17, 2010 press releases nor the January 2010 10-Q provided details of how these values were determined. Miller has since provided more detailed reserve estimates demonstrating how it calculated the valuations for the Alaska Assets' reserves. A review of these reserve estimates by oil and gas accounting experts has revealed that the enormous values that Miller ascribed to the Alaska Assets rest on the assumption that Miller will be able to extract reserves from all of these assets at a cost of only 11% of future net revenues – an assumption that is wildly at odds with Miller's historical operating expenses and the operating expenses of comparable oil and gas companies. As further explained below, using the correct assumptions of costs for the proper level of reserves results in a value of the Alaska Assets that is at least $483 million less than what Defendants reported in their May 17, 2010 press release.

> **a.     Miller Used An 11% Average Cost For Operating Expenses Associated With Its Alaska Reserves.**

95.     Miller used only an average 11% operating expense amount to value its Alaska oil and gas reserves. This is evident from examining the reports by the engineering firm, Ralph E. Davis & Associates ("Davis") whom Miller retained to prepare reserve estimates for oil and gas in the Alaska Assets. Reports prepared by Davis containing those reserve estimates were included in and incorporated by reference into both Miller's 2010 10-K and the July 29, 2011 10-K. The Davis report included in the 2010 10-K calculates the value of the reserves at the Alaska Assets as of April 30, 2010, shortly before the May 17, 2010 press release:

33

| Proved | $311,971,875 |
| Probable | $191,858,094 |
| Possible | $38,039,215 |
| Total | $541,869,184 |

96.     The Davis report included in the July 29, 2011 10-K, calculating the value of the reserves at the Alaska Assets as of April 30, 2011, contains a comparable valuation methodology.

| Proved | $331,370,000 |
| Probable | $203,272,000 |
| Possible | $663,943,000 |
| Total | $1,918,585,000 |

97.     Additionally, Miller reported that as of April 30, 2010, the value of CIE's oil and natural gas reserves increased by 48% to over $540 million since the December 10, 2009 valuation.  This comparison by Miller of the December 10, 2009 and April 30, 2010 valuations only makes sense if the two valuations are prepared on the same basis.  Backing out the 48% increase from the $540 million valuation at April 30, 2010 reveals a valuation using the Davis approach of approximately $366 million at December 10, 2009.  This amount is similar to the $368 million that Miller assigned as the final fair value of the Alaska Assets in its March 29, 2010 Form 8-K/A that revealed the purchase price allocation for the acquisition of the Alaska Assets.  Similarly, Miller reported that as of April 30, 2010, CIE's oil reserves increased by 6.4% and its natural gas reserves increased by 38.5% from their respective quantities on December 10, 2009.  After adjusting downward the reserves in the April 30, 2010 Davis report to match the initially-reported figures, the value of the reserves as of December 9, 2009 were approximately $360 million, an amount comparable to the $368 million valuation figure subsequently reported

34

by Miller in its 2010 10-K. Thus, it is clear that from the very beginning, the valuations that Miller assigned to the Alaska Assets' oil and gas reserves were based on the same or very similar data and assumptions as the Davis reports attached to the 2010 10-K and July 29, 2011 10-K.

98. One of the factors that Davis took into account when calculating the $541,869,184 valuation figure at April 30, 2010 is the estimated cost of extracting the oil and gas. Thus, Davis' $540 million valuation is only as accurate and reliable as the operating expense estimates Davis received from Miller and relied upon. For the category of proved, probable and possible reserves that Miller included in its fair value of the Cook Inlet oil and gas properties, operating costs are listed *as only 11% of future net revenue*:

| | Gross Revenue | Operating Costs | % |
|---|---|---|---|
| Proved | $ 662,151,125 | 110,840,148 | 16.7% |
| Probable | $ 422,842,094 | 14,512,419 | 3.4% |
| Possible | $ 90,603,781 | 2,596,683 | 2.9% |
| Total | $1,175,597,000 | 127,949,250 | 10.8% |

**b.    Miller's Expenses Were Far Greater than 11%.**

99. However, the 11% estimation for operating costs is not at all supported by Miller's actual, historical expenses. In contrast to the figures above, Miller reported actual operating costs of nearly *62%* of revenue for the year ended April 30, 2010, well in excess of the 11% that Miller provided to Davis to use in valuing the reserves. This huge mismatch between estimates and reality was not a mere fluke caused by a difficult year. Miller's operating expenses did not drop below 37.6% of revenue in fiscal years 2009 through 2011. According to Miller's 2010 10-K and July 29, 2011 10-K:

35

|  | 2011 | 2010 | 2009 |
|---|---|---|---|
| Revenues: | | | |
| Oil Sales | $19,999,423 | $4,064,909 | n.a. |
| Natural Gas Sales | 525,694 | 372,306 | n.a. |
| Total | $20,525,117 | $4,437,215 | $640,094 |
| Oil and Gas Operating Expenses | $9,702,548 | $2,737,774 | $240,389 |
| % of Revenue | 47.3% | 61.7% | 37.6% |

100.    At no time during the Class Period has Miller offered an explanation for the fact that it derived a value for the Alaska Assets' oil and gas reserves using an operating cost assumption that was no more than 18% of the actual operating costs as a percentage of revenue that it actually incurred in fiscal year 2010, and 23% of the actual operating costs as a percentage of revenue that it actually incurred in fiscal year 2011.

101.    In addition, various Lee Keeling and Associates reports filed with the 2010 10-K for Miller's oil and gas properties located in Tennessee use an operating expense of approximately 50% to value reserves, a level of operating expenses totally consistent with Miller's actual experience.

102.    Further, a review of the operating costs of comparable oil and gas companies reveals that while many of them appear to have lower operating costs than Miller, their operating costs are still significantly higher than 11% of gross revenues.  Notably, those competitors that disclose detailed valuation data use estimated operating cost values that are comparable to their actual experience.

103.    For example, Whiting Petroleum Corporation reported actual operating expenses (described as lease operating) equal to 16.4%, 18.2%, and 25.8% of net sales during 2011, 2010, and 2009, respectively.  The operating expenses amount Whiting used in its valuation analysis was 23% of sales.   Similarly, Bonanza Creek Energy reported actual operating expenses

(described as lease operating) equal to 20% of net sales during 2011. It used operating expenses in its valuation analysis equal to 22.5% of sales.

104.    In addition, three companies that analysts considered comparable to Miller all had higher operating expenses, and two of the three companies used much higher cost estimates. Trans Energy Inc. (which does not disclose expenses in its reserve estimates) reported operating expense at 35.7% on its financial statements. Texas Vanguard Oil Company reported operating expenses at 71% of total reported sales and used 47.8% in its reserves estimates. Evolution Petroleum Corporation reported operating expenses at 32.2% of reported sales and used 15% in its reserves estimates for proven, 25.8% for probable, and 15.8% for possible reserves. If Miller had used a cost estimate in line with these companies, and discounted its actual operating expenses by 40%, it would require an offset of at least 25%, not 11% to the gross revenues projected from the Alaska reserves.

105.    Miller never revealed why its expected operating costs, at 11% of net revenue, are less than half of the relative costs of its competitors even though Miller's actual operating costs (at approximately 50 percent of revenue) are at least twice the relative operating costs of its competitors. Oil and gas industry experts with knowledge of properties situated in Cook Inlet have confirmed to Plaintiff's counsel that this difference cannot be explained by the differences between the Alaska Assets and properties held by Miller or any of its competitors.

106.    Further casting doubt on Miller's valuation figures, in connection with a review of Miller's 2010 10-K, the staff of the SEC concluded that Miller had omitted required audited financial statements on three acquired businesses, including CIE, from the Forms 8-K reporting those acquisitions. As a result, those Forms 8-K were found to be materially deficient. Miller has admitted in its July 29, 2011 10-K that, "as accounting records were not adequately

maintained by Pacific Energy Alaska Operating LLC and Pacific Energy Alaska Holdings, we were unable to carve out historical operational results on [the Alaska Assets.]"  Thus, Miller's operating expense figures were clearly not based on historical operating results.

### 2. Defendants Overvalued The Alaska Assets By Including Properties That Could Not Realistically Be Exploited Within Five Years.

107.    In addition to overvaluing the Alaska Assets' oil and gas reserves by drastically underestimating operating costs, as described above, Defendants also overvalued the Alaska Assets' reserves by drastically overestimating the extent to which they could actually exploit those resources.

108.    The Alaska Assets that Miller purchased in the Acquisition include the West McArthur River oil field, the West Foreland natural gas field, and the Redoubt unit with the Osprey offshore drilling platform.  The Alaska Assets also include approximately 600,000 lease acres of undeveloped land.  As reported in the Davis Report included with Miller's 2010 10-K, approximately 80 percent of the $541,869,184 value of Miller's Cook Inlet reserves is attributable to its undeveloped reserves.

109.    According to the SEC's final rule on the Modernization of Oil and Gas Reporting, Release No. 33-8995, a company can only include undrilled locations in its value of reserves when it has a specific plan to develop them within five years.  This includes not only the intent to develop those properties but, importantly, ***the ability to do so***:

> Undrilled locations can be classified as having undeveloped reserves only if a development plan has been adopted indicating that they are scheduled to be drilled within five years, unless the specific circumstances, justify a longer time.

Regulation S-X, Article 4, Rule 4-10(a)(31)(ii).

110.    Miller never demonstrated that it had the ability to drill the undeveloped properties within five years of December 2009, nor has it provided any explanation that

circumstances justify a period of more than five years to drill the undeveloped properties. Indeed, given the nature of funding resources at Miller's disposal and the significant costs to bring even the developed properties back into operation, it is plain that Miller did not have the ability to drill the undeveloped properties within the designated time.

111. At the time of the Acquisition, the developed Alaska Assets (comprising, in total, ten oil wells, three gas wells and four injection wells) were shut-in, with the exception of one gas well. Additionally, the Osprey platform was badly in need of repair. In its July 29, 2011 10-K, Miller estimated that bringing the Osprey platform alone back to full production would require approximately $45 million in total. Further, Jordan "Digger" Smith, a veteran of the oil and gas industry with more than 50 years of experience and personal knowledge of the Alaska Assets, has stated that the remaining wells must be "plugged" before a bona fide drilling operation can begin, an expense that his company estimated at $35-40 million. ¶¶124-125.

112. As described in ¶¶145-146 below, the Company secured a $100 million line of credit to be used for the future development of the Alaska Assets. However, $75 million to $80 million of this line of credit has already been spoken for just for the purpose of repairing the developed properties (and an additional $4 million has already been used to pay off existing debt, with another $3 million pledged to a consultant as a finding fee). Miller has never explained how the balance of $13-18 million available under the line of credit could ever be sufficient to drill the undeveloped properties within five years. Given its high expense to revenue ratio, discussed above, it is implausible that Miller could ever actually execute on its plan to pull oil and gas out of its undeveloped reserves at any time in the reasonably foreseeable future, let alone by 2015 if Miller even had a genuine five year plan. Nevertheless, Defendants pumped up the purported value of those reserves in its balance sheet for fiscal years 2010 and 2011.

113.    Without demonstrating that it has a plan and the ability to execute that plan to drill the undeveloped reserves within the five years subsequent to its acquisition of the Cook Inlet oil and gas properties, SEC regulations precluded Miller from including the reserves associated with these undeveloped properties as part of the value it recorded on its balance sheet.

### 3.    The Actual Value of the Oil and Gas Reserves

114.    Adjusting the Davis Report included with Miller's 2010 10-K for the changes in reserves and prices since the fair value of the Alaska Assets were determined on December 10, 2009, and adjusting the operating costs from 11% of net revenue to 50% of revenue reduces the December 10, 2009 value of the Alaska Assets by $200 million.  Furthermore, eliminating the undeveloped reserves from the valuation reduces the value of the Alaska Assets by an additional $134 million.  Thus, the Alaska Assets are worth $34 million, eliminating 90 percent of the value of the oil and gas properties reported in the 2010 Form 10-K.  These adjustments alone mean that $197 million of the $277 million after-tax gain (or 70%) that Miller reported as part of the acquisition of the Alaska Assets is also eliminated.

### 4.    Davis's Involvement Does Not Immunize Defendants' False Valuations.

115.    Defendants' engineers do not provide any basis for Defendants to evade culpability for overstating the value of the Alaska Assets.

116.    Defendants supplied Davis with erroneous numbers based upon unreasonable and unachievable assumptions.  Accordingly, values for the Alaska properties' oil and gas reserves arrived at by Davis were based on Miller's drastic underestimation of the cost of extracting energy from the Alaska Assets and a gross overstatement of its ability to drill the undeveloped reserves within five years.

117.    In fact, Miller and its subsidiary CIE are responsible for providing Davis with estimate preparation material including current operation costs.  In this regard, Davis states in its report:

> Operating cost data for the previous twelve month period for which data was available were provided by CIE along an average of each property's lease operating expense and well operating expense for the same time period.   This data was used to determine the direct cost of operation for each property or producing unit.

***

> **Costs** – Drilling, operating and abandonment costs were supplied by CIE for each property and were held constant for this report.   These costs are based upon Authorities for Expenditure for the actual project or are estimated based upon comparison to similar work within the same area.

***

> Direct lease operating expense includes direct cost of operations of each lease or an estimated value for future operations based upon analogous properties.  Lease operating expense and/or capital costs for drilling and completion were held constant throughout the remaining contract life of the properties.

These statements were themselves false and misleading, because Defendants did not have any reasonable basis for the operating cost data that they provided to Davis.

118.    A Davis employee confirmed to Plaintiff's counsel that Davis clients have the discretion to direct Davis not to include certain costs when calculating valuation reports.  Thus, Defendants had the capability to manipulate the valuation estimates for the Alaska Assets simply by manipulating the operating expense figures that it provided to Davis to perform its valuation analyses.

119.    Consequently, the Davis Report does not provide any insulation to Defendants for their misrepresentation of the value of the Alaska Assets.

41

**5.    Defendants Overvalued The Alaska Assets By Assigning Unsupported Values To The Fixed Assets Obtained In The Acquisition.**

120.    Another way in which Defendants overvalued the Alaska Assets was by assigning completely unrealistic, false and inflated values to fixed assets.  In the Acquisition, Defendants stated that they purchased not only oil and gas reserves, but also fixed assets that Defendants valued in the 2010 10-K at $110.5 million as of April 30, 2010, including:   pipelines – $17 million; oil platforms – $6 million; buildings – $87.6 million.  Defendants reported these assets at these values with virtually no depreciation.  In that same filing, the Company represented that the total value of the Alaska Assets was $479 million by combining the supposed $368 million value of its proven energy reserves with the supposed $110.5 million value of its fixed assets. These values appeared in Miller's 2010 10-K, and very similar figures were presented in Miller's Forms 10-Q for the first and second quarters of 2011.

121.    Defendants had no reasonable grounds to assign such enormous values to the fixed infrastructure of the Alaska Assets.  The properties had been thoroughly marketed in the course of the Pacific Energy bankruptcy proceedings and had received minimal interest.  Indeed, Pacific Energy itself had represented to the court that a mere $875,000 was a fair and reasonable price to accept for the entirety of the Alaska Assets, including both the fixed assets and the oil and gas reserves.  Ramshorn, one of the other bidders during Pacific Energy's bankruptcy, bid only $2.15 million for all of the properties that Pacific Energy was auctioning off.  There was absolutely no justification to assign such a jaw-dropping value to these isolated buildings and pipelines.

122.    At the end of the Class Period, Miller eventually restated its 2010 financial statements to eliminate the $110 million from its fixed assets.  Miller admitted that it had failed to properly record fixed assets in 2010.  However, Miller still attempted to hide its overvaluation

42

rather than admit that a large portion of the Alaska Assets' total value had come from assigning inflated values to empty buildings. Miller restated the value of its "net equipment" (a phrase which nowhere appears in the 2010 10-K) by $107,585,556. Miller simultaneously increased the stated value of its "net oil and gas properties" by $106,552,379, increasing their purported value from approximately $376 million to $482.7 million. In recording the net assets of $110 million on its balance sheet, Miller was representing that the $110 million would be recoverable from future net cash flows. However, by reclassifying the "net equipment" to "net oil and gas properties," Miller explicitly acknowledged that recovery of the $110 million would come from the net cash flows generated by the oil and gas reserves.

123. Since, as explained herein, Miller's valuation reports for the oil and gas reserves that Miller incorporated into its 2010 10-K support a valuation of only $34 million for the reserves, Miller had no hope of recovering the additional $110 million that it now classified as part of its net oil and gas properties. The $34 million of net present value of those reserves, based on net cash flows derived from those reserves, was allocated to the value of the reserves, leaving no value for Miller to ascribe to those assets. Therefore, eliminating the more than $100 million in illusory value from the balance sheet eliminates an additional $65 million (or an additional 23 percent) of the gain recognized by Miller as part of the acquisition of the Alaska Assets. This means the initial after-tax gain from the Acquisition – which Miller initially recognized as $277 million – was in fact no **_more than $15 million_**.

### 6. Industry Veterans Confirm that Defendants Overstated the Value of the Alaska Assets.

124. Jordan Smith has confirmed that Miller overvalued the Alaska Assets by hundreds of millions of dollars, and that "[t]here are not $350 million worth of assets there." Smith is the President of Ramshorn, the Nabors subsidiary that competed against Miller and CIE in bidding

43

for the Alaska Assets but ultimately decided against offering more than $2.15 million. ¶45. In connection with the auction, Smith received an information packet containing geological maps of the area, historical production figures, and other geological studies conducted by Pacific Energy. Furthermore, because Nabors had been appointed as a monitor for the Alaska Assets, Smith had personal access to the Alaska Assets and their operations. Accordingly, Smith is particularly well qualified to discuss the value of the Alaska Assets and the degree to which their value had been vetted in the marketplace through the Pacific Energy auction.

125.    Smith was one of the sources quoted in the July 28 Report that alerted the market as to Miller's fraud (see ¶150 below). Plaintiff's counsel confirmed with Smith that he stands by his statements in the July 28 Report, in large part due to the high operating costs and problematic histories of the sites in question. In particular, the Osprey offshore oil drilling platform acquired by Miller as part of the Alaska Assets has experienced costly mechanical failures including ruptured casings. Additionally, a number of wells in the vicinity needed to be "plugged" before any bona fide drilling operations could begin, which Ramshorn estimated would cost approximately $35-40 million. These observations cast major doubt on Miller's startling estimates that it can extract energy from the Alaska Assets at a fraction of the industry standard costs, or that it can drill even the undeveloped properties with the resources available to it.

126.    Michael O'Donnell, a senior officer of Peak Oilfield Services which partnered with Digger Smith's company echoed Smith's sentiments. He informed Plaintiff's counsel that most industry professionals believed Pacific Energy had paid far too much for the assets when it purchased them from Forrest Oil. He also stated his belief that Miller would face an enormous cost associated with "demobilizing" the Osprey platform – an action that Miller would have to

perform once all viable assets had been extracted – so great, in fact, that in and of itself, it would not justify any drilling operations in the Redoubt Shoal field.

127. Also, Randy Frasier, a senior executive at SolstenXP – an independent contractor that provides engineering, logistics, field and project management support for the Alaska Assets – affirmed to Plaintiff's counsel that it is widely known among industry professionals in the region that Forrest Oil had substantially overvalued the Alaska assets, and that Pacific Energy – when acquiring the assets from Forrest – had paid far more than what industry professional believed the assets were actually worth.

**B. DEFENDANTS' MISREPRESENTATIONS OF MILLER'S OPERATING RESULTS**

128. In addition to falsifying its asset values, Miller engaged in other improper accounting, which misrepresented its operating results and further misled investors.

129. First, Miller violated a well-known oil and gas accounting rule that requires revenues to be recorded net of royalties, discounts and allowances. AAG-OGP 4.53. Instead, Miller included royalties as a separate item in operating expenses, rather than report reduced revenues that would reflect those royalties. This accounting impropriety had the effect of greatly distorting Miller's revenues and revenue trends by material amounts: Miller overstated its quarterly revenues for the first three quarters of fiscal year 2011 by 20.8%, 20.6% and 25.5%. Thus, although Miller stated that revenues increased almost 42% from the fourth quarter of 2010 to the first quarter of 2011, in fact, its revenues only increased by 17%. As investors would look to revenue growth rates to evaluate how well Miller was ramping up oil and gas production at its newly-acquired Alaska Assets, these figures are highly material to investing decisions and the market's perception of Miller.

130. Second, Miller failed to properly accrete asset retirement obligations in the fourth quarter of fiscal year 2010 and the first two quarters of fiscal year 2011, and also failed to

properly record depletion, depreciation and amortization expenses, and state tax credits. As a result, Miller understated its total depreciation, depletion and amortization expenses by approximately $715,000 in fiscal year 2010 and by approximately $2.1 million in fiscal year 2011 – material amounts for a company of Miller's size.

131. Third, in fiscal year 2010 and the first three quarters of 2011, Miller failed to properly consolidate MEI on its own balance sheet. Under GAAP, "[t]here is a presumption that consolidated financial statements are more meaningful than separate financial statements and that they are usually necessary for a fair presentation when one of the entities in the consolidated group directly or indirectly has a controlling financial interest in the other entities." (ASC 810-10-10-1). Information regarding an entity that Miller relied upon to raise capital was material to investors seeking to understand Miller's balance sheet and capital position.

132. Fourth, Miller has admitted, in its July 29, 2011 10-K, that it "failed to properly record sufficient compensation expenses on equity awards." Incredibly, even as Miller was admitting to having provided incorrect compensation figures, Miller continued its deceit by failing to provide the corrected compensation figures.

133. Fifth, Miller had admitted that it overstated its gains on derivative securities by approximately $491,000 between fiscal year 2010 and fiscal year 2011.

134. As a result of its serial accounting violations, Miller was forced to restate its prior financial statements on March 22, 2011, July 29, 2011 and August 9, 2011.

C. **DEFENDANTS MISREPRESENTED THE ADEQUACY OF MILLER'S INTERNAL CONTROLS AND COMPETENCE OF ACCOUNTING PERSONNEL.**

135. Miller's deception was not limited to the overvaluation of the Alaska Assets. As far back as fiscal year 2010, Miller management knew that their internal controls over financial reporting were not effective, and that there were serious control weaknesses, remediation of

which was "material to [Miller's] internal control environment and critical to providing reasonable assurance that any potential errors could be detected." These weaknesses included a lack of sufficient accounting personnel and the lack of a uniform accounting reporting system at its newly acquired subsidiaries.

136.    Defendants Boruff and Boyd were responsible, pursuant to the rules of the Exchange Act, for establishing and maintaining disclosure controls and procedures and internal control over financial reporting. Nevertheless, in the Company's October 2009 10-Q; January 2010 10-Q; July 2010 10-Q; October 2010 10-Q; January 2011 10-Q; and its 2010 10-K, they repeatedly represented that internal controls were adequate and that they had designed appropriate disclosure controls and procedures and internal control over financial reporting (see ¶¶59, 67, 78, 81, 82, and 83, above).

137.    These representations in the certifications were false and misleading because the controls and procedures were ineffective. In its July 29, 2011 10-K Miller admitted to that fact, disclosing that it had not established effective internal controls over financial reporting. The July 29, 2011 10-K stated that, "[O]ur management concluded that the internal control over financial reporting was not effective at April 30, 2011 as a result of material weaknesses in our internal control over financial reporting. These material weaknesses in internal controls have led to the restatement of our financial statements for the quarterly periods ended July 30, 2010, October 31, 2010 and January 31, 2011[.]" The identified weaknesses included a lack of sufficient accounting personnel and a lack of sufficient policies and procedures to detect material misstatements regarding accrual cutoffs. Defendants had clearly been aware for a year or more of these fundamental problems with Miller's internal controls and procedures, but recklessly failed to disclose that fact, or to remedy them.

138.    In a further amendment to the July 29, 2011 10-K, filed August 29, 2011, Miller

admitted that its management, including defendants Boruff, Boyd and Deloy Miller, did not

complete the Sarbanes-Oxley required assessment of the effectiveness of internal controls as of

April 30, 2011.  Miller also admitted that its lack of adequate accounting personnel and lack of

adequate internal controls is what <u>caused</u> the company's quarterly and annual financial

statements in fiscal year 2011 to be materially misstated:

> Notwithstanding our inability to complete an  assessment of our internal controls
> over financial reporting, the following material weaknesses have been identified
> in our internal control over financial reporting as of April 30,2 011:
>
> - We do not maintain a sufficient complement of personal
>   with an appropriate level of accounting knowledge,
>   experience and training in the selection and application of
>   U.S. GAAP and SEC reporting requirements commensurate
>   with our financial reporting requirements.
>
> - We do not maintain sufficient policies, procedures and
>   controls to prevent and/or detect material misstatements in
>   our financial statements.
>
> As a result of the above material weaknesses, material adjustments to the
> Company's consolidated financial statements were required for each of the
> Company's reported quarterly and annual periods in fiscal 2011 (see
> Supplemental Quarterly Financial  Information on page F-36 regarding the
> financial statement captions impacted by the above material weaknesses).

### D.    DEFENDANTS PROFITED FROM THE FRAUDULENT SCHEME.

139.    Defendants' scheme was successful.   Through their purchase of the Alaska

Assets, and subsequent misrepresentations of those assets to investors, the price of Miller's stock

soared.   This has allowed the Company to continue as a going concern, ensuring that the

Individual Defendants would continue to lead their lavish lifestyles for the foreseeable future.

The financial benefits to the Individual Defendants were magnified by the fact that Miller has

become a loyal customer of other businesses that the Individual Defendants have an interest in.

48

### 1. Benefits to Miller as a Whole

140. Upon news of the Acquisition, shares of Miller's common stock soared 93% in value, increasing from an opening trading price of $0.70 per share on December 16, 2009 to a closing price of $1.35 per share on December 17, 2009. Throughout the period that followed, the Company issued a series of press releases and SEC filings that touted the success and high value of the Alaska Assets. The price of the Company's common stock continued to rise, reaching a Class Period high of $8.04 per share on July 14, 2011 – an astounding 1045% increase from the $0.70 opening price on December 16, 2009.

141. The artificially high values assigned to the Alaska Assets and Miller's accounting improprieties enabled Defendants to secure sources of financing that otherwise would have been unavailable, thereby allowing Defendants to keep the Company going and to continue the gravy train of rich salaries and benefits.

142. For example, between December 2009 and January 2010, Miller sold 6,015,000 shares of its common stock to accredited investors in private transactions, receiving approximately $5.6 million in net cash proceeds. In March 2010, Miller executed a Securities Purchase Agreement pursuant to which it agreed to sell 1,433,432 shares of its common stock at a purchase price of $3.50 per share and five year warrants to purchase an additional 716,716 shares of common stock at an exercise price of $5.28 per share. Miller received approximately $4.7 million in net cash proceeds from this transaction.

143. Miller would not have been capable of obtaining nearly as much funding through stock and warrant sales had the price of Miller stock not been artificially increased starting in December 2009, and had Miller not misstated its financial information. In the fiscal year ending April 30, 2010, Miller faced a loss from operations of more than $11.3 million, so Miller would have faced a severe liquidity crisis if not for these capital infusions.

49

144.    On December 27, 2010, Miller entered into a $5 million short-term line of credit with PlainsCapital Bank to use as working capital.  The loan was personally guaranteed by Deloy Miller and Boruff, each of whom pledged a portion of their Miller shares as security.  Had Defendants not inflated the value of Miller shares by overvaluing the Alaska Assets, these shares would not have been sufficient collateral to support the loan.

145.    On June 13, 2011, Miller announced that it had obtained a $100 million credit facility (the "Guggenheim Facility") from Guggenheim Corporate Funding, LLC, Citibank, N.A. and Bristol Investment Fund.  This credit facility was secured by substantially all of the assets of Miller and its subsidiaries.  The Guggenheim Facility bears interest at a 9.5% annual rate, and depending on the timing of repayment, the effective repayment rate may be as high as 25% or 35%.  Furthermore, Miller is required to use 90% of its consolidated monthly net revenues to repay the loans outstanding under the Guggenheim Facility.  While the Guggenheim Facility is a very expensive line of credit, reflecting Miller's continued operating struggles, no such financing opportunity would have been available to Miller had its Alaska Assets not been assigned falsely inflated values.

146.    The initial amount available to Miller under the Guggenheim Facility was $35 million.  Miller promptly used approximately $4 million of its newly-obtained funds to pay down the PlainsCapital Bank loan for which Deloy Miller and Boruff were personally responsible, thereby relieving them of their individual exposures.  Additionally, Miller was required to pay the administrative agent fees of $730,000 and paid Bristol Capital, LLC ("Bristol Capital") approximately $1.05 million as a "finder's fee."  Bristol is entitled to 3% of the funds actually drawn on the credit facility, up to a limit of $3 million.  Bristol is affiliated with  David Voyticky (see ¶233, below).

## 2. Benefits To The Individual Defendants

147. The day after Miller secured financing from PlainsCapital, Miller agreed to an amendment of Boruff's employment contract. The purported justification was Miller's uplisting of its common stock from the OTC Bulletin Board to the NASDAQ Global Market (which happened over six months earlier, on May 6, 2010), Boruff's increased responsibilities in light of the Company's expansion, and the company's increase in stock price and market capitalization. The amendments to Boruff's contract: (1) doubled Boruff's base salary to $500,000 per year; (2) set forth a new incentive structure, whereby the Compensation Committee sets an annual benchmark with total awards ranging between 100% and 300% of Boruff's base salary; (3) granted Boruff a $260,000 bonus for fiscal year 2011 and 250,000 restricted stock options (vesting over four years); and (4) granted Boruff an option to purchase 2.5 million shares of Miller stock at $6.00 per share (vesting over four years).

148. Defendants also used the Acquisition to steer business towards other companies that they control. Boruff owns 49% of a broker-dealer named Dimirak Financial Corp. ("Dimirak"). Miller and Miller-controlled fundraising entity MEI both hired Dimirak in connection with the Acquisition. Miller paid Dimirak approximately $95,000 in 2010 and 2011, and MEI paid Dimirak another $74,000 during this period. Likewise, Voyticky is a partial owner of a consulting firm named Matrix Group LLC ("Matrix"). In August 2010, Miller entered into a consulting arrangement with Matrix to provide advice regarding financing and fundraising. In 2010 and 2011, Miller paid Matrix approximately $420,000 for these services. Further, Miller has paid approximately $1.05 million to Bristol Capital, a company run by Voyticky's colleague Paul Kessler.

149. Further, the money that Miller has raised through its financing has gone primarily to support management and administration, rather than for drilling. In each of 2010 and 2011,

51

Miller's general and administrative expenses – including salaries, overhead, professional fees, and consulting fees – dwarfed the amounts that it spent on actually pumping oil. In fiscal year 2010, Miller spent $2.7 million on oil and gas operations and $10.2 million on administration. In fiscal year 2011, Miller spent $9.7 million on oil and gas operations and $14.5 million on administration. Without the financial lifeline it obtained by recording massive gains on the Acquisition, Miller would likely be defunct and the Individual Defendants out of work.

## VIII. THE TRUTH EMERGES REGARDING THE VALUE OF THE ALASKA ASSETS AND DEFENDANTS OTHER MISREPRESENTATIONS.

150. On July 28, 2011, *TheStreetSweeper*, a website whose mission is to "partner with the public in exposing corporate fraud and bringing its engineers to justice," published a report entitled, "Miller Energy: Is This Hot 'Alaska' Stock May Be About to Melt?", (the "July 28 Report") which called into question the accuracy of Miller's valuation of the Alaska Assets, quoting an oil industry veteran with first-hand knowledge of the true costs and difficulties involved in pumping those wells. The July 28 Report stated, in relevant part:

> Before Miller Energy Resources (MILL) purchased some abandoned assets in Alaska for $4.5 million – or barely half the price that its CEO paid for his sprawling Tennessee mansion – and then pegged the value of those assets at more than $350 million on its books, the company spent years fruitlessly trying to escape from the penny-stock arena through smaller deals that often wound up backfiring instead.
>
> ***
>
> Despite that alarming track record, however, Miller has managed to convince investors that the company finally hit the jackpot – by snagging valuable assets that its previous owners (now bankrupt) initially could not sell – this time around. Miller's stock, which fetched mere pennies on the lowly Pink Sheets just a few short years ago, now commands $7 a share after snagging a coveted spot on the premiere New York Stock Exchange. The company currently boasts a handsome market value of $280 million, almost 12 times its prior-year sales, even though it relied on a gigantic gain on its new Alaska assets for the only dramatic profit that it has ever recorded since going public through a reverse merger almost 15 years ago.

*But experts contacted by TheStreetSweeper, including skeptics in both the energy and financial sectors, have expressed clear doubt about those numbers. For example, an executive at Nabors Industries (NBR) -- a $7.6 billion energy giant that decided against buying those assets for itself -- estimated that Miller actually wound up with just $25 million to $30 worth of assets, offset by $40 million worth of liabilities, through that transaction instead.*

*"That deal had been on the Street for over a year; everybody and their brother had looked at it," said Jordan "Digger" Smith, who manages energy projects for Nabors – which actually operated Miller's new properties – all across the country. "I'm a geologist, with 54 years of experience, and I can't see how anybody can write that up on their books for $350 million … There are not $350 million worth of assets there."*

*Miller's own audit committee actually reported some "accounting errors" in the company's financial statements this March – the month after hiring KPMG – when it warned of a likely restatement, adjusted for increases in both expenses and losses, going forward.  Miller has gone on to miss the deadline for filing audited financials since that time, quietly violating a covenant in a new credit agreement and technically defaulting on the terms of that $100 million funding deal in the process.*

*The Lazard investment banking firm had by then futilely sought buyers for those assets, records show, which soon fetched a winning bid of just $875,000 – a minute fraction of the value that Miller has since assigned to those same properties – when auctioned off to Cook Inlet Energy (CIE), a future subsidiary of Miller, the first time around.*

"The abandoned assets had incurred significant losses and were unable to generate sufficient positive cash flow to sustain ongoing operations," Pacific noted in court filings related to the case.  So "as a result of the debtors' marketing efforts, the debtors believe that the buyer's offer has been fully tested by the market and thus constitutes fair and reasonable consideration for the sold assets."

(emphasis added)

151.    Upon this news that the valuation of Miller's most important assets had been overstated and that Miller's shares may have been boosted by "accounting games," shares of Miller declined by $1.64 per share, or 23.3% to close at $5.40 on July 28, 2011, on unusually heavy trading volume and further declined another $0.99, or 18.33% the following day, closing at $4.41 also on unusually heavy trading volume.

53

152.    On July 29, 2011, the Company filed the July 29, 2011 10-K, which disclosed additional, material restatements to Miller's previously published financial statements (see §IX). It also disclosed that Miller lacked effective internal controls and appropriate accounting personnel with sufficient experience and training to correctly apply GAAP and SEC reporting requirements. Shares of Miller declined by $0.99 per share, or 18.33% to close at $4.41 on July 29, 2011, on unusually heavy trading volume, and further declined another $0.46, or 10.43% the following day, closing at $3.95, also on unusually heavy trading volume.

153.    On August 1, 2011, the Company filed a Form 8-K disclosing that the 10-K it had released just days before included a falsified auditors' consent and should not be relied upon. Miller admitted that the July 29, 2011 10-K was released "prior to KPMG LLP completing its review of the annual report and issuing their independent accountants' report on the financial statements, as well as the consent to the use of their report filed as Exhibit 23.3 . . . . We expect that the audited financial statements which will appear in the Amended 2011 10-K will contain revisions from those which appear in the July 29, 2011 10-K to include corrections to errors in such financial statements, including a revised consolidated statements of cash flows." On these disclosures regarding Miller's failure to maintain basic financial controls, Miller's stock fell an additional $1.04, or more than 23.5%, to close at $3.37 on August 2, 2011.

154.    To lessen the free fall in Miller's share price, on August 1, 2011, Boruff went on the offensive, issuing a letter to Miller shareholders to mollify investors' concerns about the information revealed in the July 28 Report and the Company's recent restatements of certain financial disclosures. Boruff stated:

> Last week, Miller became the target of a short selling blog that hoped to profit from discrediting our company.

***

54

What we find most disturbing in the attack blog is its use of divisive, deceptive, and manipulative means for its own short term gains at the expense of our shareholders. In contrast, members of our management team have personally put themselves on the line in guaranteeing our transitional line of credit with PlainsCapital Bank in December 2010, and not a single member of our board of directors or senior management has sold a single share of Miller stock since the Alaska acquisition. I expect our senior team to increase their holdings in Miller after our blackout period ends. After the amendment to our 10-K is finalized I will be available to respond any of our shareholders' questions or concerns.

155.  Boruff used the personal obligations incurred in connection with the PlainsCapital loan as evidence of management's good faith even though the loan had already been paid down, writing that, "members of our management team have personally put themselves on the line in guaranteeing our transitional line of credit with PlainsCapital Bank in December 2010[.]"  Boruff failed to mention that the transitional line of credit with PlainsCapital Bank had already been paid off in full.  Boruff's letter also contained false and misleading statements regarding the valuation of the Alaska Assets.

156.  On August 3, 2011, TheStreetSweeper published a second article on Miller, stating, in relevant part:

When the CEO issued his letter to anxious shareholders on Monday, however, he specifically emphasized that Miller insiders had "personally put themselves on the line" by guaranteeing that loan from PlainsCapital Bank without reminding investors that the company had since eliminated that same risk by paying off the credit line.

Boruff then sought to further reassure investors by suggesting that senior management would soon begin increasing their stock holdings in the company as well. Notably, however, Boruff stopped short of stating that executives would buy their stock at market prices – sharing the same risks shouldered by ordinary shareholders – or simply exercise cheap stock options, many priced below 50 cents a share (including some, held by the CFO, set to expire next month) instead.

***

The Red Flags

Miller actually delivered some weak financial results, overlooked by many, before dropping its big bombshell on the market this week.

55

The company fell well short of its ambitious revenue targets, its 10K filing shows, while reversing a year-ago profit (generated through a hefty, but controversial, acquisition-related gain) by posting a sizable loss for the latest fiscal year instead. *Ever since Miller acquired its new Cook Inlet Energy (CIE) subsidiary in Alaska back in late 2009, records show, the company has indicated that it would likely generate $30 million worth of annual revenue from those celebrated assets (purchased for just $4.5 million in a bankruptcy auction and then valued at more than $350 million on its books). As it turns out, however, Miller posted sales of barely $20 million – almost one-third lower than the company's CIE revenue target – from the oil and gas produced by all of its assets combined.*

While Miller increased its annual revenue by $17 million last year, a 290% jump (from a modest base) that looks rather impressive on paper, the company also increased its annual expenses by an even higher $20.7 million during that same period. Miller posted total expenses of $37.9 million, more than double the expenses reported for the previous year, with the company spending more on overhead – particularly compensation for its well-paid insiders and outside consultants – than it spent on actually drilling for oil.

***Miller spent $14.5 million last year on overhead, its new 10K filing shows, compared to just $9.7 million on drilling activities during that same period. The company recorded $5.16 million in stock-based compensation alone – a total that excludes the generous cash payments showered on its top executive – with that cost, totaling 12 cents a share, basically accounting for the entire net loss (also 12 cents a share) suffered by the company last year.***

157.    On August 9, 2011, the Company filed the 2011 Amended 10-K.  Miller clarified that the financial statements contained therein were unaudited, and also provided corrections to errors in the consolidated statement of cash flows that appeared in the July 29, 2011 10-K.  The Company admitted that, "The filing of the 2011 10-K prior to the completion of the review by KPMG LLP and the issuance of its report was a material weakness in our disclosure controls and procedures and in our internal control over financial reporting."  It further stated that,

While we have designed a system of internal controls to supplement our existing controls during our ongoing implementation of Section 404 of the Sarbanes-Oxley Act of 2002 ("SOX 404"), we have been unable to complete testing of these controls and accordingly lack the documented evidence that we believe is necessary to support an assessment that our internal control over financial reporting is effective. Without such testing, we cannot conclude that there are any additional significant deficiencies or additional material weaknesses, nor can we appropriately remediate any such deficiencies that might have been detected. In addition, during the analysis of our internal controls in connection with our

56

implementation of SOX 404, we did identify a number of control weaknesses, the remediation of which is material to our internal control environment and critical to providing reasonable assurance that any potential errors could be detected.

158.    Miller stock continued to decline, ultimately closing at $2.36 on August 9, 2011, the last day of the Class Period.

## IX.    DEFENDANTS' GAAP VIOLATIONS

159.    Miller restated its financial statements for the fourth quarter of fiscal year 2010 (entered January 31, 2010); each of the four quarters of fiscal 2011; and the fiscal year ended April 30, 2010, on two different occasions.

160.    On March 18, 2011, Miller filed a Form 8-K announcing a restatement (the "First Restatement") covering the first two quarters of fiscal 2011 (the quarters ending July 31, 2010 and October 31, 2010).   The First Restatement announced in the March 18, 2011 8-K was reported in the 10-Q for the quarter ending January 31, 2011, filed on March 22, 2011.

161.    Then, in its January 29, 2011 10-K, Miller announced a further restatement (the "Second Restatement") of the first three quarters of fiscal 2011 and a restatement of the 2010 financial statements.

162.    Finally, in the August 9, 2011 amendment to the July 29, 2011 10-K, Miller announced still further restatements to these fiscal periods.

### A.    MILLER ADMITS ITS FAILURE TO PROPERLY RECORD ASSET RETIREMENT OBLIGATIONS.

163.    In the First Restatement, Miller admitted that it violated GAAP with respect to its asset retirement obligations, as a result of its failure to use all of the facts available to it at the time the financial statements were prepared.

164.    GAAP requires that dismantlement, restoration and abandonment costs related to oil and gas properties be accounted for during the useful lives of those properties.   These costs

57

are referred to as asset retirement obligations ("AROs").  At the time an asset is placed into service, a company must estimate the cost of retiring the asset at the end of its useful life.  The present value of the ARO is recorded on the balance sheet as a liability and as part of the cost of the asset.  Over time, the discounted liabilities are "accreted" to their expected settlement value.  As a result of this process, accretion expense is recorded on the income statement and the liability is increased on the balance sheet.

165.    If estimated future costs of AROs change, an adjustment is to be recorded to both the ARO liability and the related asset.  Revisions to estimated AROs can result from changes in retirement cost estimates, revisions to estimated inflation rates and changes in the estimated timing of abandonment.

166.    Asset retirement costs recorded upon initial recognition of an ARO become part of the carrying amount of the related oil and gas property and are allocated to expense using a systematic and rational method over the useful life of the property.  Depreciation is the process of allocating to expense the cost of equipment that has useful life that is separate and distinct from the oil and gas properties.  Depletion is the process of allocating to expense the cost of equipment that does not have a useful life that is separated and distinct from the oil and gas properties.  Amortization expense is the process of allocating to expense the cost of a lease for an oil of gas property.

167.    Miller admitted in the First Restatement that it failed to properly accrete its AROs in the first two quarters of fiscal year 2011:

> [In these periods] [w]e failed to properly accrete our asset retirement obligations in each of the first two quarters of fiscal 2011 [and] also failed to properly record depletion, depreciation and amortization expenses related to leasehold costs, wells and equipment, fixed assets and asset retirement obligations and did not properly record the state tax credits expected from our Alaska operations.

58

In addition, Miller admitted it failed to properly account for depreciation, depletion and amortization expenses in those two quarters.

168.    As a result of the First Restatement, the Company disclosed that correction of these errors increased depletion, depreciation and amortization expenses, leading to an increase in the loss from operations and net loss in each of the periods. In addition, income tax expense increased as a result of the improper recording of the state tax credits and the effects of the other corrections.

169.    The First Restatement more than doubled the first quarter 2011 loss from operations, turned the previously reported first quarter 2011 net income into a net loss, and more than doubled the second quarter 2011 net loss. However, for reasons discussed below (¶¶174-181), the First Restatement ARO figures were themselves inaccurate. The true figures regarding the Company's ARO obligations did not emerge until the Second Restatement.

170.    The total adjustment to the depreciation, depletion and amortization ("DD&A") expense reported in the Second Restatement was as follows:

| | |
|---|---|
| 2010 Fiscal year | $715,306 |
| First Quarter 2011 | (757,821) |
| Second Quarter 2011 | ( 18,125) |
| Third Quarter 2011 | ( 2,872) |
| Net reduction of DD&A | $(63,512) |

171.    Combining the net increases in DD&A expenses announced in the First Restatement and Second Restatement, the total adjustment to the DD&A expense is as follows:

| | 1st Rest | 2nd Rest | Total |
|---|---|---|---|
| 2010 Fiscal year | $      - | $   715,306 | $  715,306 |
| First Quarter 2011 | 1,641,247 | (757,821) | 883,426 |
| Second Quarter 2011 | 1,241,159 | (18,125) | 1,223,034 |
| Third Quarter 2011 | - | (2,872) | (2,872) |
| Net increase (reduction) of DD&A | $2,882,406 | $  (63,512) | $2,818,894 |

172. These material overstatements of revenue inflated the Company's prospects for generating much-needed cash through the sales of its oil and gas reserves, rather than through borrowing, and exaggerated its liquidity.

173. In accordance with GAAP, Miller's restatement is an admission by management that the financial statements did not reflect the "facts that existed at the time the financial statements were prepared." ASC 250-10-20. Furthermore, the First Restatement and Second Restatement themselves violated GAAP by failing to disclose additional details related to the restated DD&A expense such as a detailed description of the misstatements in its previously filed financial statements.

### B. MILLER ATTEMPTS TO CONCEAL IMPROPER ARO ACCOUNTING IN 2010 BY SMUGGLING RESTATEMENTS INTO 2011 FINANCIAL REPORTING.

174. Miller's First Restatement itself violated GAAP by misrepresenting corrections to 2010 financial reporting as corrections to 2011 financial reporting. GAAP provision ASC 250-10-45-22 specifically prohibits including corrections of errors from prior periods in the current period:

> … net income for the period shall include all items of profit and loss recognized during the period, including accruals of estimated losses from loss contingencies, but **shall not include corrections of errors from prior periods**. As used in this Subtopic, the term period refers to both annual and interim reporting periods. (emphasis added)

175. The accounting standards also provide specific guidance on the process a company must follow in restating its financial statements to correct errors in previously issued financial statements:

> Any error in the financial statements of a prior period discovered after the financial statements are issued … shall be reported as an error correction, by restating the prior-period financial statements. ASC 250-10-45-23.

In other words, errors in 2010 reporting must be corrected by restating 2010 financial statements, *and not by bootstrapping the corrections into 2011 financial statements*.

176.    The First Restatement restated Miller's first quarter 2011 financial reporting. Miller's disclosures about the nature of restatements of its first quarter 2011 financial statements described corrections (or restatements) of the first quarter 2011 financial statements as pertaining *solely* to that quarter:

> As disclosed in our Current Report on Form 8−K filed on March 18, 2011, on March 17, 2011 the Audit Committee of the Board of Directors of Miller Petroleum, Inc. determined that **our unaudited consolidated balance sheet at July 31, 2010, and our unaudited consolidated statements of operations and cash flows for the period ended July 31, 2010**, as well as our unaudited consolidated balance sheet at October 31, 2010, and our unaudited consolidated statements of operations and cash flows for the three and six month periods ended October 31, 2010 could no longer be relied upon as a result of **errors in those financial statements**. We failed to properly accrete our asset retirement obligations in **each of the first two quarters of fiscal 2011**. **In these periods** we also failed to properly record depletion, depreciation and amortization expenses related to leasehold costs, wells and equipment, fixed assets and asset retirement obligations and did not properly record the state tax credits expected from our Alaska operations. (emphasis added).

177.    However, Miller's Second Restatement – its July 29, 2011 10-K – included a restatement of the first three quarters of fiscal year 2011 and a restatement of the 2010 financial statements.  In violation of GAAP rules governing restatements, Miller failed to disclose the nature of the 2010 adjustments or the fact that, as discussed above, these adjustments were initially included in (and were now reversed out of) its first quarter 2011 financial statements. Instead Miller's July 29, 2011 10-K only stated that the Company made an immaterial correction of an error in its 2010 financial statements,

178.    With respect to additional restatements for the first three quarters of fiscal 2011 and reported in the July 29, 2011 10-K, the Company stated the following:

> We failed to properly accrete our asset retirement obligations in each of the first two quarters of fiscal 2011. In these periods we also failed to properly record

depletion, depreciation and amortization expenses related to leasehold costs, wells and equipment, fixed assets and asset retirement obligations and did not properly record the state tax credits expected from our Alaska operations. In the third quarter of fiscal 2011 it was determined that we failed to properly classify royalty expense, failed to properly record sufficient compensation expenses on equity awards, did not properly calculate the liability for our derivative liability, and did not properly consolidate an entity we control.

179.    On August 1, 2011, Miller was forced to hastily retract its July 29, 2011 10-K, admitting that the July 29, 2011 10-K had been filed before KPMG, Miller's outside auditing firm, had completed its review and issued its consent to include its audit opinion.  As such, Miller's July 29, 2011 10-K was deficient and filing the report with the SEC constituted a violation of NYSE rules.

180.    The Company subsequently filed the 2011 Amended 10-K on August 9, 2011, explaining that while it still lacked audited financial statements, it expected to file a further amended 10-K as soon as KPMG had actually completed its review and issued its report. Although Miller's restatement did not change quantitatively from the July 29, 2011 10-K originally filed on July 29, 2011, in its August 9, 2011 Amended 10-K, the Company expanded its disclosures relating to the restatement of the 2010 full year financial statements and the financial statements for the first three quarters of fiscal year 2011.  Miller admitted to violating GAAP by restating 2010 errors in its 2011 financial reporting:

The 2010 immaterial error corrections include errors related to 2010 that were identified during the review of our 2011 fiscal third quarter. ***Such errors were originally corrected in the Company's restated unaudited consolidated financial statements for the first quarter ended July 31, 2010.***  After identifying additional errors related to our fiscal 2011 interim periods, we determined that the aggregate impact of the errors were material to the 2011 interim unaudited consolidated financial statements.  Accordingly, the 2010 consolidated financial statements were revised to correct these errors, which are considered immaterial to 2010. Such corrections resulted in a decrease to "income tax expense" of $1,107,000, an increase to "equipment, net" of $414,444, an increase to "depreciation, depletion and amortization" of $715,306, an increase to the "asset retirement obligation" of $395,532, and a decrease to "oil and gas properties, net" of $1,841,218. We also recorded a reclassification between "equipment, net" and "oil and gas properties,

62

net" in the amount of $108,000,000 to appropriately classify such assets on our consolidated balance sheet.

(emphasis added). In other words, Miller failed to disclose in its First Restatement that it had identified errors in its 2010 financial statements that it reported as adjustments in the first quarter of fiscal year 2011.

181. Miller later admitted in its August 9, 2011 Amended 10-K, that it "buried" these 2010 error corrections totaling approximately $1.8 million in the error corrections it made in the first quarter 2011 financial statements:

> *The corrections recorded to restate the unaudited consolidated financial statements as of July 31, 2010 include errors related to 2010 that were identified during the review of our 2011 fiscal third quarter. Such errors were originally corrected in the Company's restated unaudited consolidated financial statements for the first quarter ended July 31, 2010.* After identifying additional errors, we determined that the aggregate impact of such errors was material to the unaudited consolidated financial statements for the quarter ended July 31, 2010. Accordingly, the 2010 consolidated financial statements were revised to correct these errors, which are considered immaterial to 2010. Such corrections to our unaudited consolidated financial statements for the quarter ended July 31, 2010 resulted in a decrease to "general and administrative" of $1,107,000 and a decrease to "depreciation, depletion, and amortization" of $715,306.

(emphasis added)

## C. MILLER ADMITS TO IMPROPERLY RECORDING ROYALTY EXPENSES, THEREBY DISTORTING REVENUE TRENDS.

182. In addition to the correction of the First Restatement which required Miller to restate depreciation, depletion and amortization expense a second time because of the inclusion of fiscal year 2010 adjustments in the first quarter of 2011, the Second Restatement also acknowledged additional errors related to its reporting of revenue, compensation expense, derivative liabilities and consolidation.

183. Under GAAP, revenues should be recorded net of royalties, discounts, and allowances. AAG-OGP 4.53. The Company disclosed that it had record revenues on the gross

basis, including royalties in operating expenses instead of reducing revenues. Miller failed to follow one of the most fundamental accounting practices in the oil and gas industry. These adjustments had a significant impact on the trend of the Company's oil and gas revenues. The quarterly revenues for the first, second and third quarters of 2011 were overstated by 20.8%, 20.6%, and 25.5%, respectively. Thus, instead of increasing by almost 42% in the first quarter of 2011 from the fourth quarter of 2010, the Company's oil and gas revenues increased only by 17.3% from $3.382 million in the fourth quarter of 2010 to $3.966 in the first quarter of 2011.

184.    These material understatements of operating expenses also inflated Miller's operating profits, suggesting that it was able to generate a larger amount of cash from operations than it really was. These false and misleading financial statements enabled Miller to materially overstate its ability to generate cash to meet ongoing operating expenses.

185.    Not only did Miller treat royalties as operating costs rather than deducting them from gross revenues, it treated them as operating costs to an ancillary business that it knew was less significant to investors than its core oil and gas operations. The Second Restatement revealed that the Miller's original accounting for the royalty payments inflated its margins on oil and gas sales by recording part of these royalties as cost of the Company's service and drilling activities (a side business where showing lower margins would be less detrimental to the Company).

**D.    MILLER ADMITS TO MISREPRESENTING COMPENSATION EXPENSES.**

186.    GAAP requires companies to recognize compensation expense from equity awards at fair value over the applicable requisite service period. In its July 29, 2011 10-K, Miller admitted that it had "failed to properly record sufficient compensation expenses on equity awards" and restated the financial statements for the first three quarters of 2011.

187. Miller violated GAAP by failing to disclose additional details related to the restated compensation expense such as a detailed description of the error and its impact on the financial statement line items. Miller's restatement is an admission by management that the financial statements did not reflect the "facts that existed at the time the financial statements were prepared." (ASC 250-10-20.)

188. GAAP requires that an entity include a description of the nature of error(s) for which the financial statements are being restated:

> When financial statements are restated to correct an error, the entity shall disclose that its previously issued financial statements have been restated, along with a description of the nature of the error. The entity also shall disclose [both of] the following:
>
> a. The effect of the correction on each financial statement line item and any per-share amounts affected for each prior period presented
>
> b. The cumulative effect of the change on retained earnings or other appropriate components of equity or net assets in the statement of financial position, as of the beginning of the earliest period presented.

**E. MILLER ADMITS TO MISREPRESENTING DERIVATIVE GAINS AND LOSSES.**

189. GAAP requires that all derivatives be measured and reported at fair value as assets or liabilities on the balance sheet. ASC 815-10-25-1; 815-10-30-1, 815-10-35-1. Changes in the fair value of derivative instruments are generally recognized as gains or losses on the income statement. ASC 815-10-35-2.

190. The Second Restatement reduced the loss on derivative securities for fiscal 2010 by $2,561,577, and reduced the gain on derivative securities for the first, second, and third quarters of fiscal 2011 by $1,100, $2,543,090, and $508,971, respectively.

191. Miller's restatement is an admission by management that the financial statements did not reflect the "facts that existed at the time the financial statements were prepared." ASC 250-10-20.

### F. MILLER FAILED TO APPROPRIATELY CONSOLIDATE MEI.

192.    In the Second Restatement, Miller also restated its accounting to consolidate MEI, an entity it formed during fiscal 2010 to raise capital, but it failed to name MEI as the previously unconsolidated entity.   Instead, Miller stated only that in its previously issued financial statements Miller "did not properly consolidate an entity [it] control[s]."   Thus, even while admitting to having misled the public regarding MEI, Miller continued its deceit by failing to inform investors that MEI was the unconsolidated entity.

193.    Miller's 10-Q for the period ending October 31, 2009, filed on December 21, 2009, shortly after the Acquisition, contained no mention of MEI.   In the 2010 10-K, Miller had disclosed that it faces a conflict of interest with regards to MEI borrowing, because Boruff, Boyd, and Deloy Miller are officers of MEI, but at the time of the Acquisition, readers of Miller's financial statements did not understand the true role that MEI had played in raising capital for Miller.   Whereas it appeared that Miller was raising money from outside investors, the failure to consolidate MEI with Miller prevented Miller's financial statements from accurately reflecting that much of the financing cash inflows were attributable to MEI and not Miller itself. Readers knew that Miller borrowed funds from MEI, but did not know that MEI had been raising equity capital, in part, to facilitate Miller's acquisition of the Alaska Assets.

194.    In its August 9, 2011 Amended 10-K, Miller finally identified MEI as the previously unconsolidated subsidiary in question and supplemented its disclosures to include the effect of the MEI consolidation on the 2010 financial statements:

> The consolidation of MEI resulted in a decrease to notes payable of $1,803,775, an increase to stockholders' equity of $1,509,369, and minor adjustments to cash, other assets and accrued expenses.

195.    Although Miller acknowledged in its 10-Q for the period ending January 31, 2010, filed on March 22, 2010, that it controlled MEI, Miller nevertheless failed to follow GAAP

and consolidate MEI in its third quarter fiscal 2010 financial statements. The 10-Q disclosed only that Miller borrowed funds from MEI during the third quarter but did not disclose the extent of self-dealing involved in raising capital through MEI.

196. Miller later revealed in its 2010 10-K that it used MEI to raise capital as early August 2009 and issued common stock shares and stock warrants in connection with sale of interests in MEI.

197. Miller violated GAAP in its accounting for MEI transactions by failing to consolidate MEI in its financial statements. GAAP states that "[t]he purpose of consolidated financial statements is to present, primarily for the benefit of the owners and creditors of the parent, the results of operations and the financial position of a parent and all its subsidiaries as if the consolidated group were a single economic entity. There is a presumption that consolidated financial statements are more meaningful than separate financial statements and that they are usually necessary for a fair presentation when one of the entities in the consolidated group directly or indirectly has a controlling financial interest in the other entities." ASC 810-10-10-1. GAAP also states that a general partner is presumed to control a limited partnership and therefore should consolidate the limited partnership. ASC 810-20-25.

198. Consolidation requires that "[i]n the preparation of consolidated financial statements, intra-entity balances and transactions shall be eliminated. This includes intra-entity open account balances, security holdings, sales and purchases, interest, dividends, and so forth. As consolidated financial statements are based on the assumption that they represent the financial position and operating results of a single economic entity, such statements shall not include gain or loss on transactions among the entities in the consolidated group." ASC 810-10-45-1.

67

199.     Although Miller disclosed MEI's financing activities and Miller's transactions with MEI in its 2010 10-K, Miller violated GAAP by failing to consolidate MEI in its financial statements for the second and third quarter of fiscal 2010, its fiscal 2010 financial statements as well as in the financial statements for the first three quarters of fiscal 2011.

200.     By not consolidating MEI and delaying disclosing information about MEI's activities until July 28, 2010 when Miller filed its 2010 10-K, Miller maintained the false impression that it had sufficient liquidity to itself raise funds through private equity offerings during third and fourth quarters of fiscal 2010 without the need to resort to trickery and creating an off-balance sheet entity (MEI) which was also raising funds by simultaneously issuing Miller's equity to finance the Miller's operations and the Acquisition.

## G.     EFFECT OF RESTATEMENTS

201.     In restating its financial statements for fiscal year 2010 and the first three quarters of fiscal year 2011, Miller admitted to material misstatements related to the depletion, depreciation and amortization of its net fixed assets and net oil and gas properties.  Furthermore, Miller admitted to additional misstatements related to the improper accounting for its oil revenues, accretion of asset retirement obligations, failure to consolidate MEI in its own balance sheet, the insufficient compensation expense on equity awards and the overstated gain on derivative securities.

202.     The First Restatement increased Miller's pre-tax loss for the quarter ended July 31, 2010 by approximately $2.7 million.  Of this amount, approximately $1.8 million (or two-thirds) was attributable to the 2010 adjustments.  The 2010 adjustments alone increased Miller's loss from operations in the first quarter of 2011 by 77% and turned Miller's pre-tax income of approximately $256,000 into a loss of over $1.5 million, affecting the trend of its earnings.  Thus, the 2010 adjustments were material to Miller's first quarter 2011 financial statements and

the failure to restate the fiscal year 2010 financial statements in the First Restatement suggests that Miller made a deliberate attempt to avoid restating its 2010 financial statements at that time. Ultimately, Miller was unable to avoid restating its 2010 financial statements.

203. In addition to the restatements that Miller did acknowledge, the Company failed to restate for the inflated value of the oil and gas properties and fixed assets. As described herein, the oil and gas properties were overstated by $334 million at the date of acquisition and the fixed assets were overstated by $110 million. The following table shows how the additional restatement for these amounts would impact Miller's balance sheets for the fiscal year 2010 and the first three quarters of fiscal year 2011:

| MILLER PETROLEUM, INC. | | | 2011 | | | | | |
|---|---|---|---|---|---|---|---|---|
| Consolidated Balance Sheets | Fiscal 2010 | | Q1 | | Q2 | | Q3 | |
| | Reported | Restated | Reported | Restated | Reported | Restated | Reported | Restated |
| ASSETS | | | | | | | | |
| Total Current Assets | 5,166,444 | 7,499,353 | 3,033,776 | 5,579,740 | 7,121,693 | 7,780,996 | 12,809,202 | 13,185,202 |
| Net Fixed Assets | 114,820,779 | 7,761,723 | 114,577,983 | 7,807,565 | 114,170,884 | 7,687,617 | 8,016,302 | 8,648,521 |
| Net Oil and Gas | 376,216,621 | 4,733,700 | 378,509,510 | 4,963,204 | 378,714,358 | 3,337,667 | 480,387,148 | 2,064,790 |
| Total Other Assets | 4,248,311 | 2,311,895 | 4,799,853 | 2,367,079 | 3,317,067 | 2,487,651 | 3,115,047 | 2,299,538 |
| TOTAL ASSETS | 500,452,155 | 22,306,671 | 500,921,122 | 20,717,588 | 503,324,002 | 21,293,931 | 504,327,699 | 26,198,051 |
| | | | | | | | | |
| Total Current Liabilities | 4,828,333 | 4,375,720 | 6,053,165 | 5,963,100 | 20,420,718 | 15,408,062 | 12,497,578 | 9,629,181 |
| Total Long-term Liabilities | 219,883,001 | 17,689,962 | 217,331,590 | 16,778,429 | 204,848,993 | 3,932,738 | 204,987,952 | 3,153,477 |
| Total Liabilities | 224,711,334 | 22,065,682 | 223,384,755 | 22,741,529 | 225,269,711 | 19,340,800 | 217,485,530 | 12,782,658 |
| Total Stockholders' Equity (Deficit) | 275,740,821 | 240,989 | 277,536,367 | -2,023,941 | 278,054,291 | 1,953,131 | 286,842,169 | 13,415,393 |
| | | | | | | | | |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | 500,452,155 | 22,306,671 | 500,921,122 | 20,717,588 | 503,324,002 | 21,293,931 | 504,327,699 | 26,198,051 |

204. Miller's balance sheets are dramatically transformed once the false inflation of the Company's oil and gas and fixed assets is adjusted out. In particular, total assets after restatement are no more than 5% of the reported amounts at the end of any of the four periods presented. More importantly, the value of the oil and gas reserves after restatement are no more than 1% of the reported amounts at the end of any of the four periods presented.

69

205.    The additional restatement to correct for the inflated values of the oil and gas properties and the fixed assets provides further evidence that Miller's ability to generate cash flows from operations is significantly diminished.

## X.    LOSS CAUSATION

206.    Plaintiff and the Class suffered substantial damages as a direct and proximate result of Defendants' fraudulent conduct as alleged herein.

207.    Throughout the Class Period, the price of Miller common stock was artificially inflated as a direct result of Defendants' materially false and misleading statements and omissions.  These materially false and misleading statements and omissions had the purpose and effect of creating in the market an unrealistically positive assessment of Miller and its financial well being, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and the Class purchasing the Company's common stock at artificially inflated prices.  But for Defendants' misrepresentations and fraudulent acts, Plaintiff and the Class would not have purchased Miller common stock, or would not have purchased it at the artificially inflated prices at which it traded during the Class Period.

208.    Starting with the public announcement of the Acquisition on December 16, 2009, Defendants misled investors to believe that the Alaska Assets were worth more than they really were.  As a direct result of the December 16, 2009 Press Release, Miller's stock shot up to $1.35, almost doubling from its opening price of $0.70 the previous day.

209.    Throughout the Class Period, Defendants continued to misrepresent the value of the Alaska Assets, misstated the Company's balance sheets in its financial disclosures, misrepresented the Company's results from operations, and failed to prepare its financial results

70

in accordance with GAAP. These misrepresentations caused Miller's common stock to remain artificially inflated throughout the Class Period.

210.    The July 28 Report called into question the values Miller had attributed to the Alaska Assets and the accuracy of Miller's financial reporting. In response, Miller's stock fell $1.64 per share, or 23.3%, to close at $5.40 on unusually heavy trading volume. Miller's stock further declined another $0.99, or 18.33%, the following day, also on unusually heavy trading volume, closing at $4.41.

211.    On July 29, 2011, Miller disclosed to the public that it had misstated its financial statements in prior fiscal periods and revealed that its unaudited consolidated statements of operations and cash flows for the quarterly and year to date periods then ended could no longer be relied upon as a result of improper accounting. Upon this news, Miller's stock fell another 18%, from a closing on July 28, 2011 of $5.40, to a closing on July 29, 2011 of $4.41.

212.    Miller's stock continued to deteriorate on August 1, 2011, when before the market opened, the Company filed a Form 8-K disclosing that the July 29, 2011 10-K that the Company had filed just three days before should not be relied on. Miller's stock fell an additional $1.04, or more than 23.5%, to close at $3.37 on August 2, 2011.

213.    Finally, on August 9, 2011, before the market opened, the Company filed the August 9, 2011 Amended 10-K. Upon the disclosure that its 2011 financial statements were unaudited and should not be relied upon, and other new information about the restatements, Miller's common stock fell an additional $0.37, or more than 13%, to close at $2.36 on August 9, 2011.

214.    In total, from its Class Period high of $8.04 per share on July 14, 2011, Miller's share price declined $5.68 per share, or 70% as of August 9, 2011.

71

# XI.    PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

215.    From at least the beginning of the Class Period, Miller stock traded on the OTC Bulletin Board.  From May 6, 2010 through April 12, 2011, Miller's common stock traded on the NASDAQ Global Market ("NASDAQ").  Commencing April 13, 2011, through the end of the Class Period, Miller's common stock traded on the NYSE.

216.    At all relevant times, Miller common stock traded in an efficient market that promptly digested current information with respect to Miller from publicly available sources and reflected such information in the prices of Miller's shares.

217.    The evidence that Miller common stock traded on an efficient market at all relevant times includes the following:

    a.    As a regulated issuer, Miller filed periodic public reports with the SEC and/or the NYSE, the NASDAQ, and the OTC Bulletin Board.

    b.    The average weekly trading volume as a percentage of shares outstanding for the Class Period was 4.7%.

    c.    During the Class Period, Miller was followed by securities analysts employed by major brokerage firms who wrote reports about Miller that were distributed to the sales force and certain customers of their respective brokerage firms.  Twelve analyst reports were issued about Miller during the Class Period, each of which was publicly available and entered the public marketplace.

    d.    The average institutional holdings as a percentage of shares outstanding during the Class Period was 15.5%.  Generally, institutional investors have significant experience in evaluating investments and assessing the effect of new information on the future prospects of a traded company's stock.

72

e.  During the Class Period, the average short interest ratio was 3.5%. The presence of short sellers in common stock is an indication of arbitrage activity, which is a component of a well-functioning efficient market.

f.  Miller regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

218.  An expert on economics and market analysis, with whom Plaintiff's counsel consulted, conducted a preliminary analysis of the "cause and effect" relationship between the disclosures of Miller-specific news and the positive and negative movement of the price of Miller's common stock. The expert observed that Miller common stock prices generally responded promptly to new, important information regarding Miller from publicly available sources.

219.  Based on this indicia, a presumption of reliance applies.

## XII.  NO SAFE HARBOR

220.  The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded

73

herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Miller who knew that those statements were false when made.

## XIII.  CLASS ACTION ALLEGATIONS

221.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of all persons who purchased or otherwise acquired Miller's publicly traded common stock during the period beginning on December 16, 2009 through and including August 8, 2011 and who were damaged thereby (the "Class"). Excluded from the Class are (a) Defendants; (b) members of the immediate families of the Individual Defendants; (c) any subsidiaries of Defendants; (d) any affiliate, as that term is defined by the federal securities laws, of Miller or any other defendant, including the 401(k) plans of Miller; (e) any person or entity who is a partner, executive officer, director or controlling person of Miller (including any of their subsidiaries or affiliates) or any other Defendant; (f) any entity in which any Defendant has a controlling interest; (g) Defendants' directors' and officers' liability insurance carriers, and any affiliates or subsidiaries thereof; and (h) the legal representative, heirs, successors and assigns of any such excluded party.

222.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Miller's securities were actively traded on the OTC Bulletin Board, the NASDAQ, and the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through the appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Miller or

its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

223. There is a well-defined commonality in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

A. whether the Exchange Act was violated by Defendants;

B. whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Miller and the value of the Alaska Assets;

C. whether the price of Miller's publicly traded common stock was artificially inflated during the Class Period; and

D. the extent of damages sustained by Class members and the appropriate measure of damages.

224. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

225. Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests that conflict with those of the Class.

226. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.

## XIV.   CLAIMS FOR RELIEF

### COUNT I
### Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### (Against All Defendants)

227.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

228.   Plaintiff asserts this Count pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against Defendants Miller, Boruff, Boyd, Hall, Graham, Deloy Miller and Voyticky.

229.   During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

230.   **MILLER:**

a.   Miller is liable as a maker of each of the false and misleading statements specified in ¶¶55-56, 58-59, 61, 63, 65-68, 71, 74-84, 152 and 154, above.

b.   Miller acted with scienter in that it specifically knew the statements were false or misleading or was reckless as to their truth or falsity.  Specifically:

(1)   Miller's restatement of the financial statements for the fourth quarter of the fiscal year 2010, and each of the four quarters of fiscal 2011 because of violations of GAAP is an admission that those statements were false when issued.

(2)   As discussed below, Miller's senior executive officers Boruff, Boyd, Graham, Voyticky, Hall, and Deloy Miller, whose

76

knowledge is imputed to Miller, knew or were reckless in not knowing that the statements identified in ¶230a were false.

(3)     Miller was aware, at least as early as April 30, 2010, that its internal controls on financial reporting were inadequate.  In the 2010 10-K, Miller admitted, "Our management is responsible for establishing and maintaining adequate internal control over financial reporting. . . . our management concluded that the internal control over financial reporting was not effective at April 30, 2010."  The identified control weaknesses included lack of personnel with sufficient accounting knowledge and the lack of an integrated, uniform accounting reporting system for Miller's newly acquired subsidiaries.  Miller admitted that resolving these issues was "critical to providing reasonable assurance that any potential errors could be detected," and anticipated that it would be able to do so by April 30, 2011.  Despite having identified these accounting problems, Defendants recklessly failed to fix them. The July 29, 2011 10-K admitted that management had failed in its responsibility to establish and maintain adequate internal controls, leading to restatements of its financial statements.  Miller still lacked sufficient accounting personnel, and admitted that "there is more than a remote likelihood that misstatements which could be material to our annual or interim financial statements could occur and would not be prevented or detected."  In the August 29, 2011

77

10-K, Miller admitted that the lack of controls and competent accounting personnel <u>caused</u> the accounting improprieties that necessitated the restatements.

231. **<u>BORUFF:</u>**

    a.    Defendant Boruff is liable as a maker of each false and misleading statement specified in paragraphs ¶¶55, 56, 58-59, 61, 63, 65-68, 71, 74, 75-79, 80-83, 152, and 154, above.

    b.    Defendant Boruff acted with scienter in that he specifically knew the statements were false or misleading or was reckless as to their truth or falsity.  Specifically:

        (1)    Boruff worked with Hall, Boyd and Graham to devise the plan to implement the Acquisition through CIE, including making it appear that Miller had the financial wherewithal to buy the Alaska Assets, and was personally involved in negotiating the Acquisition. As Hall had years of experience in managing the Alaska Assets, Boruff learned through him the facts regarding the Alaska Assets, including their actual operating expenses and the value of the fixed assets attached thereto.

        (2)    Boruff, as Miller's Chief Executive Officer, was responsible for reviewing the information provided to Davis, the third-party engineering firm that developed Miller's reserve estimates, and thus would have known that Miller was supplying Davis with unreasonably low estimates of operating costs that were far out of

78

line with Miller's and the industry's historical practices. As Miller acknowledged in its 2010 10-K, "Our policies regarding internal controls over reserve estimates require reserves to be in compliance with the SEC definitions and guidance and for reserves to be prepared by an independent engineering firm under the supervision of our Chief Financial Officer. We provide the engineering firm with estimate preparation material such as property interests, production, current operation costs, current production prices and other information. This information is reviewed by our Chief Executive Officer and our Chief Financial Officer to ensure accuracy and completeness of the data prior to submission to our third party engineering firm."

(3) Boruff was duty-bound by statute to know the true facts underlying Miller's public filings. The Sarbanes Oxley Act of 2002 ("SOX"), enacted "to protect investors by improving the accuracy and reliability of corporate disclosures made pursuant to the securities laws, and for other purposes," requires the principal executive officer or officers and the principal financial officer or officers of a company to certify to specific responsibilities over financial reporting, disclosures, and internal control over financial reporting. SOX makes it clear that the principal officers (namely, the chief executive officer and the chief financial officer) are responsible for the company's publicly filed information, so that end users, who

rely on such information for decision making purposes, can have a higher level of comfort based on the fact that the principal officers of the company were taking "ownership" of the financial information. Boruff signed certifications pursuant to SOX Sections 302 and 906 for Miller's 2010 10-K filed on July 28, 2010 and the 2011 Amended 10-K filed on August 9, 2011, as well as certifications filed with the following Forms 10-Q: the October 2009 10-Q; the January 2010 10-Q; the July 2010 10-Q; the October 2010 10-Q; and the January 2011 10-Q. In these certifications, Boruff accepted responsibility for the disclosure controls, the truthfulness of information contained in the report, and certified that, based on their knowledge, the financial statements were free of material error. Boruff also signed the July 29, 2011 10-K, and the August 1, 2011 press release regarding the July 28 Report.

(4)     Additionally, in his role as Miller's Chief Executive Officer, Boruff was duty-bound to inform himself of the true facts regarding the Company and its most important assets.

(5)     Boruff, along with Boyd and Deloy Miller, is one of the officers of MEI, an entity that raised funds for the Acquisition and in that capacity would have learned of material facts regarding the true value of the assets that Miller was going to acquire.

80

c.       Defendant Boruff was motivated and had the opportunity to make the false and misleading statements because:

(1)       Without the boost to Miller's balance sheet provided by the overvaluations of the Alaska Assets, Miller's ability to continue as a going concern, and therefore Boruff's lucrative compensation package as Miller's CEO, would have been imperiled.  Boruff received $3.2 million in total compensation in fiscal year 2010 which doubled in fiscal year 2011 to $7.6 million in fiscal year 2011, and owned 3,799,474 shares of Miller stock as of January 18, 2011.  Boruff's compensation agreement effective August 1, 2008 provided him with a base compensation of $250,000.  Just over two years later, on December 23, 2010, this agreement was amended so that Boruff would be paid a base compensation of $500,000.  Moreover, Boruff's bonus was initially set at 100% of base salary and 100,000 shares of restricted common stock, which would thus be capped at $250,000 in cash per his base salary.  But under the amended employment agreement, Boruff could receive a bonus of up to 300% of his base salary, which would result in a cash award of $1.5 million.  The amended employment agreement also provided for 10 year options to purchase 250,000 shares of common stock at an price of $0.33 per share; a restricted stock grant of 250,000 shares of common stock; and an option to purchase 2.5 million shares  of common stock exercisable at $6.00

81

per share.  In addition, under the amended employment agreement, Mr. Boruff was entitled to receive cash and shares of Miller common stock as incentive compensation based upon the performance benchmarks of gross revenue and earnings before income taxes, depreciation and amortization (EBITDA).  Also in April 2010, Boruff was given options to purchase 500,000 shares of common stock at an exercise price of $5.94 per share as "additional compensation."  Boruff recently purchased one of the most lavish homes in Knoxville, paying $8.5 million for the home and another $1 million to furnish it.  The mortgage payments and taxes for such a home far exceed Boruff's $500,00 base salary, meaning Boruff is entirely reliant on the success of Miller's stock and the receipt of bonus awards to keep him in his 36,720-square-foot-mansion.  Boruff also enjoyed the use of the corporate airplane which, according to an article in the February 2012 issue of Esquire magazine, he flew for personal use.

(2)     Boruff also profited from the Acquisition and the overvaluation of the Alaska Assets through a side business.  Boruff is a 49% owner of Dimirak, which received approximately $169,000 from Miller and MEI in connection with the purchase and financing of the Alaska Assets.

(3)     Boruff (with Deloy Miller) guaranteed a $5 million working capital line of credit that PlainsCapital Bank provided to Miller.

Defendants' false statements also artificially inflated the value of the common stock that Boruff (and Deloy Miller) pledged as collateral for the PlainsCapital Bank credit facility. Without the artificial inflation of Miller's share value, Miller would not have been able to obtain the Guggenheim Facility. Miller then used approximately $4 million of the Guggenheim Facility to pay down the PlainsCapital Bank loan for which Boruff (and Deloy Miller) were personally responsible, thereby relieving them of their individual exposures.

(4)     Boruff was further motivated to deceive the investing public regarding Miller's business, operations, and the intrinsic value of Miller common stock, because doing so inflated Miller's stock price, enabling the him to receive bonuses and to exercise restricted stock awards priced below market. In fact, Boruff's compensation was tied largely to Miller's earnings results. When Boruff became CEO on August 6, 2008, his employment contract included options to purchase 250,000 shares of Miller's common stock at an exercise price per share of $0.33 and a restricted stock grant of 250,000 shares of common stock. Additionally, his initial contract included a provision for incentive compensation that granted him cash up to 100% of his base salary and up to 100,000 shares of restricted common stock based on two performance benchmarks, gross revenue and EBITDA. As noted above,

Boruff's amended employment agreement allowed for a cash bonus of up to 300% of his base salary, which had been doubled to $500,000, and also provided him with options to purchase 250,000 shares of common stock at $0.33 per share; a restricted stock grant of 250,000 shares of common stock; and an option to purchase 2,500,000 shares of common stock at $6.00 per share. Finally, in April 210, the Compensation Committee of the Board of Directors granted Boruff options to purchase 450,000 shares of common stock at $5.94 per share and 50,000 shares of common stock at $6.53 per share, vesting over three years. And in May 2011, the Compensation Committee of the Board of Directors granted Mr. Boruff options under the stock option plan to purchase 250,000 shares of common stock at $5.89 per share, vesting over three years.

(5)     Because Boruff is so heavily invested in the price of Miller's stock, he was motivated to take action to artificially inflate the value of that stock. The Form 10-K for fiscal year 2010 summarizes Boruff's number of securities underlying unexercised potions to purchase Miller common stock as follows: 125,000 options to purchase at $0.33 per share; 300,000 options to purchase at $5.94 per share; 33,333 options to purchase at $6.53 per share; 2.5 million options to purchase at $6.00 per share; and 250,000 options to purchase at $5.89 per share.

84

232. **BOYD:**

a.   Defendant Boyd is liable as a maker of each false and misleading statement specified in paragraphs ¶¶55, 58-59, 61, 63, 65-68, 71, 74-84, 152 and 154, above.

b.   Defendant Boyd acted with scienter in that he specifically knew the statements were false or misleading or was reckless as to their truth or falsity.  Specifically:

(1)   Boyd worked with Hall, Boruff and Graham to devise the plan to implement the Acquisition through CIE, including making it appear that Miller had the financial wherewithal to buy the Alaska Assets.  As Hall had years of experience in managing the Alaska Assets, Boruff learned through him the facts regarding the Alaska Assets, including their operating expenses and the value of the fixed assets attached thereto.

(2)   Boyd, as Miller's Chief Financial Officer, reviewed the information provided to Davis, the third-party engineering firm that developed Miller's reserve estimates and thus would have known that Miller was supplying Davis with unreasonably low estimates of operating costs that were far out of line with Miller's and the industry's historical practices.  In addition, Davis performed its work under the supervision of Boyd.

(3)   Boyd signed certifications pursuant to SOX Sections 302 and 906 for Miller's 2010 10- K filed on July 28, 2010 and August 9, 2011

Amended 10-K, as well as certifications filed with the following Forms 10-Q: the October 2009 10-Q; the January 2010 10-Q; the July 2010 10-Q; the October 2010 10-Q; and the January 2011 10-Q. In these certifications, Boyd accepted responsibility for the disclosure controls, the truthfulness of information contained in the report, and certified that, based on their knowledge, the financial statements were free of material error. Boyd also signed the July 29, 2011 10-K.

(4)     In his role as Chief Financial Officer, Boyd was duty-bound to inform himself of the true facts regarding the Company and its most important assets.

(5)     Boyd, along with Boruff and Deloy Miller, is one of the officers of MEI, an entity that raised funds for the Acquisition.

c.     Defendant Boyd was motivated to make the false and misleading statements to preserve his compensation arrangement and increase the value of his shares and options. Boyd received nearly $1.5 million in total compensation in fiscal year 2010, and owned 275,000 shares of Miller stock as of January 18, 2011. Additionally, when Boyd joined Miller, he was granted two year options to purchase 250,000 shares of common stock at an exercise price of $0.40 per share. In February 2010, Miller's Board granted Boyd five year options to purchase 25,000 shares of Miller common stock with an exercise price of $2.52 and another 350,000 shares at an exercise price of $5.94 in April 2010. Since the value of the

Company's shares is directly died to its financial performance, the value of Boyd's stock options were directly connected to Miller's financial performance. Finally, in May 2011, the Compensation Committee of the Board of Directors granted Boyd options to purchase 175,000 of common stock at $5.89 per share as additional compensation.

233. **VOYTICKY:**

a. Defendant Voyticky is liable as a maker of each false and misleading statement specified in paragraphs ¶¶76-77 and 152, above.

b. Defendant Voyticky acted with scienter in that he specifically knew the statements were false or misleading or was reckless as to their truth or falsity. Specifically:

(1) Defendant Voyticky had actual knowledge that the statements in the preceding paragraph were false and misleading when made because he has served as a member of Miller's Board since April 26, 2010, has been President of Miller since June 9, 2011, and was named the Company's acting Chief Financial Officer on September 19, 2011. In his roles as President and Chief Financial officer, Voyticky was duty-bound to inform himself of the true facts regarding the Company and its most important assets. Voyticky also signed the July 29, 2011 10-K.

(2) Defendant Voyticky was motivated to make the false and misleading statements in ¶¶76-77 so as to receive compensation from Miller and increase the value of his Miller shares and options.

87

Voyticky received $296,661 in total compensation in fiscal year 2011, and held options to purchase 300,000 shares of Miller stock as of January 18, 2011. Voyticky also profited from the Acquisition and the overvaluation of the Alaska Assets through side business that he or his colleagues controlled. Voyticky is the partial owner of Matrix, which received approximately $420,000 from Miller for consulting services in 2011 and 2010. Voyticky is also a colleague of Paul Kessler, the manager of Bristol Capital. Bristol Capital has received $1.05 million as a "finder's fee" for helping to arrange the Guggenheim Facility, and is entitled to up to $3 million under the terms of the agreement. Voyticky sits on the boards of Best Energy Services, Inc. and Genesis Biopharma, Inc. (an online freight company that has since commenced operations as a biopharmaceutical firm), two companies of which Kessler either is a major shareholder or exercises control over a major shareholder. Additionally, Voyticky and Kessler are both on the board of a company named Mosquito Consolidated Gold Mines, Ltd.

234. **HALL:**

   a.   Defendant Hall is liable as a maker of each false and misleading statement specified in paragraphs ¶¶55, 58, 61, 63, 65, 66, 68, 71, 74, 76-77, 79, 81-83, and 152, above.

b.   Defendant Hall acted with scienter in that he specifically knew the statements were false or misleading or was reckless as to their truth or falsity.  Specifically:

(1)   Hall had spent at least 15 years working with the Alaska Assets, first at Forest Oil Corporation, and then with Pacific Energy, both of which got rid of the Alaska Assets when they filed for bankruptcy, and now at CIE and Miller.  Hall was thus intimately familiar with the Alaska Assets and their operating expenses, and knew that CIE and Miller were supplying Davis with unreasonably low estimates of operating costs that were far out of line with Miller's and the industry's historical practices.  He also was aware of the true value of the fixed assets Miller supposedly acquired in the Acquisition.

(2)   Hall worked with Boyd, Boruff and Graham to devise the plan to implement the Acquisition through CIE, including making it appear that Miller had the financial wherewithal to buy the Alaska Assets.

(3)   Hall was a Director of the Company and also signed the July 29, 2011 10-K.

c.   Defendant Hall was motivated to make the false and misleading statements so as to receive compensation from Miller and increase the value of his Miller shares and options.  Hall received $251,000 in total compensation in fiscal year 2011 and $436,824 in fiscal year 2010, and

owned 1,033,450 shares of Miller stock as of January 18, 2011. Hall was also granted a number of options to purchase Miller's stock. First, on April 27, 2010, he was awarded options to purchase 100,000 shares of Miller's common stock at an exercise price of $5.94. The following year, on May 27, 2011, he was awarded an option to purchase 175,000 shares of Miller's common stock at an exercise price of $5.89.

235. **<u>GRAHAM:</u>**

    a. Defendant Graham is liable as a maker of each false and misleading statement specified in paragraphs: ¶¶55, 58, 61, 63, 65-66, 68, 71, and 74, above.

    b. Defendant Graham acted with scienter in that he specifically knew the statements were false or misleading or was reckless as to their truth or falsity. Specifically:

        (1) Graham worked with Hall, Boruff and Boyd to devise the plan to implement the Acquisition through CIE, including making it appear that Miller had the financial wherewithal to buy the Alaska Assets. As Hall had years of experience in managing the Alaska Assets, Graham learned through him the facts regarding the Alaska Assets, including their operating expenses and the value of the fixed assets attached thereto. Further, in his role as the President of Vulcan Capital, Graham personally participated in convincing the Bankruptcy Court to approve the Acquisition.

(2)      In his role as Miller's President during the period of December 16, 2009 through June 25, 2010, Graham was duty-bound to inform himself of the true facts regarding the Company and its most important assets.

c.      Defendant Graham was motivated to make the false and misleading statements because he profited handsomely from his involvement in the fraudulent scheme.  As a direct result of his agreement for Vulcan to provide financing to Miller, Graham became Miller's President and Vice-Chairman of its Board, and held these positions from December 16, 2009 to June 25, 2010.  Graham received a base compensation of $200,000, a signing bonus of $200,000, and options to purchase Miller stock at between $10.01 and $12.00 per share.  However, after just seven months as Miller's President and Vice-Chairman of the Board, Graham stepped down from his positions, purportedly because of "conflicting business and personal time commitments." For these seven months of service to Miller, Graham was awarded $100,000 in severance and allowed to retain certain of his options.  Additionally, as described in ¶51, there is reason to believe that Graham cashed out his Miller options on the same day that he resigned.

236.   **DELOY MILLER:**

a.      Defendant Deloy Miller is liable as a maker of each false and misleading statement specified in paragraphs: ¶¶55, 58, 61, 63, 65, 66, 68, 71, 74, 76-77, 79, 81-83, and 152, above.

b.  Defendant Deloy Miller acted with scienter in that he specifically knew the statements were false or misleading or was reckless as to their truth or falsity.  Specifically:

(1)  Defendant Deloy Miller had actual knowledge that the statements in the preceding paragraph were false and misleading when made because, in his role as Miller's Chief Operating Officer, Deloy Miller was duty-bound to inform himself of the true facts regarding the Company and its most important assets.  Additionally, Deloy Miller, along with Boyd and Boruff, is one of the officers of MEI, an entity that raised funds for the Acquisition.  Deloy Miller also signed the July 29, 2011 10-K.

(2)  Defendant Deloy Miller was motivated to make the false and misleading statements identified in ¶236(a) because as the founder of Miller, he had a personal interest in seeing that the Company was able to secure funding so that it could continue as a going concern.  Deloy Miller was also personally financially motivated to participate in the scheme.  He earned close to $1.5 million total compensation during 2010.  In April 2010, Deloy Miller was granted options under the Company's stock purchase plan to purchase 350,000 shares of Miller common stock.  300,000 of those shares had an exercise price of $5.94 per share and 50,000 had an exercise price of $6.54.  In May 2011, Deloy Miller was granted additional options to purchase 175,000 shares of Miller

92

common stock with an exercise price of $5.89 per share. In addition, Deloy Miller (with Boruff) guaranteed a $5 million working capital line of credit that PlainsCapital Bank provided to Miller. Defendants' false statements also artificially inflated the value of the common stock that Boruff (and Deloy Miller) pledged as collateral for the PlainsCapital Bank credit facility. Without the artificial inflation of Miller's share value, Miller would not have been able to obtain the Guggenheim Facility. Miller then used approximately $4 million of the Guggenheim Facility to pay down the PlainsCapital Bank loan for which Deloy Miller (and Boruff) were personally responsible, thereby relieving them of their individual exposures.

237.    Furthermore, Miller has always been a small, tightly run company. At the time of the Acquisition, Miller had less than two dozen employees, including its executive officers. Less than two years later, it had a total of only 70 employees. From at least the time of the Acquisition throughout the Class Period, Deloy Miller, Boruff, Hall and Boyd were the most senior corporate officers of the Company. As the Acquisition was by far the largest transaction in Miller's history and was critical to Miller's ongoing operations, each of the Individual Defendants was well-informed regarding the details of the transaction and the valuations of the Alaskan Assets, or was reckless for not being so informed.

238.    In addition, Miller's issuance of false information artificially inflated the price of its common stock which it used to obtain the funding critical to its continuing operations. The

Guggenheim Facility would not have been available had Miller not inflated the values of the assets it purchased in the Acquisition.

239.    As discussed above, the Defendants had actual knowledge of the false and misleading nature of their misrepresentations and omissions, or acted with deliberate disregard for the truth.   The Defendants' material misrepresentations and/or omissions were done knowingly or with deliberate recklessness, for the purpose and effect of concealing Miller's true financial and operating condition and future business prospects from the investing public, supporting the artificially inflated price of its common stock, and attracting funding.   The Defendants, if they did not have actual knowledge of their misrepresentations and omissions, deliberately and recklessly refrained from taking those steps necessary to discover whether those statements were false or misleading.

240.    Miller and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the United States mail, engaged and participated in a continuous court of conduct to conceal adverse material information about Miller's financial well-being and prospects, as specified herein.

241.    Each of the Individual Defendants' primary liability and controlling person liability, arises from the following: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior office and/or director of the Company, was privy to and participated in the creation, development, and reporting of Miller's internal budgets, plans, projections, and/or reports; and (iii) each of the Individual Defendants was aware of the

Case 3:11-cv-00386-TAV-CCS   Document 47   Filed 05/14/12   Page 98 of 103   PageID #: 722

Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

242.     As a result of the Defendants' material false and misleading statements and failure to disclose material facts, the market price of Miller common stock was artificially inflated throughout the Class Period.  In ignorance of this artificial inflation, and relying directly or indirectly on the false and misleading statements made by the Defendants and/or upon the integrity of the market in which the securities trade, Plaintiff and the other members of the Class purchased Miller common stock during the Class Period at artificially high prices.

243.     At the time of their Class Period purchases of Miller common stock, Plaintiff and the other members of the Class were ignorant of the false and misleading nature of the Defendants' statements, and were unaware of the material facts the Defendants were withholding from the investing public.  Had Plaintiff and the other members of the Class and the marketplace known the truth, they would not have purchased Miller common stock during the Class Period, or, if they had purchased such stock, they would not have done so at the artificially inflated prices which they paid.

244.     As the true facts that had been misrepresented and/or concealed by the Defendants began to be publicly revealed, the market price of Miller's common stock dropped as the artificial inflation began to be removed from the stock price, causing losses and damage to Plaintiffs and the Class.

245.     By virtue of the foregoing, each of the Defendants has violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

246.    As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## COUNT II
### Violation of Section 20a of the Exchange Act
### (against Defendants Boruff, Boyd and Deloy Miller)

247.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

248.    Plaintiff asserts this Count pursuant to Section 20(a) of the Exchange Act against the Individual Defendants Boruff, Boyd and Hall.

249.    Boruff, Boyd and Deloy Miller each were a controlling person of Miller Energy within the meaning of Section 20(a) of the Exchange Act.  Each had direct and supervisory involvement in the day-to-day operations of the Company and had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.

250.    Boruff, in his role as Chief Executive Officer, and by virtue of his ownership of Miller stock had the ability to control Miller and its public statements, SEC and disclosure filings.  He was charged with maintaining effective financial controls and reviewing the information that was provided to Davis regarding the operating expenses of the Alaska Assets. Boruff personally participated in the Acquisition.

251.    Boyd, in his role as Chief Financial Officer, had the ability to control Miller and its public statements and SEC disclosure filings.  He was charged with maintaining effective

financial controls and reviewing the information that was provided to Davis regarding the operating expenses of the Alaska Assets. Boyd personally participated in the Acquisition.

252. Deloy Miller, in his role as Chief Operating Officer of Miller and by virtue of his stock ownership, had the ability to control Miller and its public statements and the disclosure filings. He was charged with supervising the day-to-day operations of the Alaska Assets. Hall personally participated in the Acquisition.

253. In addition, Boruff and Boyd supplied cost figures to Davis and therefore had intimate knowledge of the Miller's operations and the value of its assets.

254. Further, Boruff and Boyd were responsible for securing financing for Miller, including through their own role as control persons of MEI and as senior officers involved with obtaining the line of credit from PlainsCapital Bank and the Guggenheim Facility.

255. Miller violated Section 10(b) and Rule 10b-5 by its acts and omissions as alleged in this Complaint, and as a direct and proximate result of those violations, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's stock during the Class Period.

256. By virtue of their control of Miller, defendants Boruff, Boyd and Deloy Miller each is jointly and severally liable pursuant to Section 20(a) of the Exchange Act for Miller's violations of Section 10(b) and Rule 10b-5, to the same extent as Miller.

## XV. PRAYER FOR RELIEF

257. WHEREFORE, Plaintiff prays for relief and judgment in their favor, as follows:

Determining that this action is a proper class action and certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

Awarding damages to Plaintiff and the Class pursuant to Section 10(b) of the Exchange Act against all Defendants, jointly and severally, in an amount to be proven at trial;

Awarding damages to Plaintiff and the Class pursuant to Section 20(a) of the Exchange Act against Individual Defendants Boruff, Boyd and Hall.

Awarding Plaintiff its reasonable costs and expenses incurred in this action, including a reasonable allowance of fees for Plaintiff's attorneys and experts; and

Awarding Plaintiff and the Class such other and further relief as the Court may deem just and proper.

## XVI.  JURY DEMAND

258.  Plaintiffs, on behalf of themselves and the Class, hereby demand a trial by jury.

Dated:   May 14, 2012

/s/ James G. Stranch, III
**BRANSTETTER, STRANCH &
JENNINGS, PLLC**
James G. Stranch, III, #002542
J. Gerard Stranch, IV, # 023045
227 Second Avenue North
Nashville, TN 37201
Telephone: (615) 254-8801
*Liaison Counsel for Lead Plaintiff*


/s/ Daniel. L. Berger
Jay W. Eisenhofer
Daniel L. Berger
Diane Zilka
David Haendler
Caitlin M. Moyna
Reena S. Liebling
**GRANT & EISENHOFER P.A.**
485 Lexington Avenue
New York, NY 10017
Telephone: (646) 722-8500
*Lead Counsel for Lead Plaintiff*

*Additional Counsel:*

Marc I. Gross
**POMERANTZ HAUDEK
GROSSMAN & GROSS LLP**
100 Park Avenue
New York, NY 10017
Telephone: (212) 661-1100

Christopher J. Keller
**LABATON SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700

99