UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

IN RE:                          )

                                )

MILLER ENERGY RESOURCES    )      No.: 3:11-CV-386-TAV-CCS

SECURITIES LITIGATION       )

## <u>MEMORANDUM OPINION</u>

Several putative securities class actions were filed against Miller Energy and certain of its officers and directors and subsequently consolidated [Doc. 31]. Oklahoma Firefighters Pension and Retirement System was appointed lead plaintiff and filed a corrected consolidated amended class action complaint (the "complaint") [Doc. 47].

The action is now before the Court on the following motions: Defendant Ford Graham's Rule 12(b)(6) Motion to Dismiss [Doc. 61],[1] Defendants Miller Energy Resources, Inc., Scott M. Boruff, Paul W. Boyd, David J. Voyticky, David M. Hall, and Deloy Miller's Motion to Dismiss Plaintiff's Corrected Consolidated Amended Class Action Complaint [Doc. 63][2] and request for judicial notice [Doc. 63-2][3] and the Request for Oral Argument [Doc. 64].[4] Upon consideration of the motions and the relevant law, and for the reasons explained herein, the Court will **GRANT** Defendant Ford Graham's Rule 12(b)(6) Motion to Dismiss [Doc. 61], **GRANT** Defendants Miller Energy

---

[1] Plaintiff filed a response in opposition [Doc. 66], and defendant Graham replied [Doc. 69].

[2] Plaintiff filed a response in opposition [Doc. 68], and defendants replied [Doc. 70].

[3] Plaintiff filed a response [Doc. 65], and defendants replied [Doc. 71].

[4] Plaintiff filed a response [Doc. 67], and defendants replied [Doc. 71].

Resources, Inc., Scott M. Boruff, Paul W. Boyd, David J. Voyticky, David M. Hall, and Deloy Miller's request for judicial notice [Doc. 63-2], and **DENY** Defendants Miller Energy Resources, Inc., Scott M. Boruff, Paul W. Boyd, David J. Voyticky, David M. Hall, and Deloy Miller's Motion to Dismiss Plaintiff's Corrected Consolidated Amended Class Action Complaint [Doc. 63].

With respect to the request for oral argument, this Court considers requests for oral argument on a case-by-case basis. After reviewing the pending motions, the Court finds that oral argument is not necessary. Accordingly, it will **DENY** the Request for Oral Argument [Doc. 64].

## I.    Background[5]

Lead plaintiff, Oklahoma Firefighters Pension & Retirement System ("plaintiff") commenced this federal securities class action under the Securities Exchange Act of 1934 (the "Exchange Act"), on behalf of itself and all other persons and entities, except defendants and their affiliates, who purchased the common stock of Miller Energy Resources, Inc. ("Miller" or the "Company")[6] between December 16, 2009, and August 8, 2011, inclusive (the "Class Period") [Doc. 47 ¶ 1]. Plaintiff alleges that Miller and

---

[5] For the purposes of a motion to dismiss, the Court takes plaintiff's factual allegations as true. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (noting that, "when ruling on a defendant's motion to dismiss, a judge must accept as true all the factual allegations contained in the complaint" (citations omitted)).

[6] Miller is a Tennessee corporation [Doc. 47 ¶ 21]. Its common stock was traded on the OTC Bulletin Board until May 6, 2010, when it began trading on the NASDAQ Global Market under the trading symbol "MILL" [*Id*.]. Miller was formerly known as Miller Petroleum, Inc. [*Id*.].

members of its senior management—Scott M. Boruff ("Boruff"),[7] Paul W. Boyd ("Boyd"),[8] David J. Voyticky ("Voyticky"),[9] David M. Hall ("Hall")[10] Ford Graham ("Graham"),[11] and Deloy Miller[12]—made false and misleading statements relating to Miller's business and financial condition and the value of its assets, and violated generally accepted accounting principles ("GAAP") in reporting and accounting for the Company's assets, liabilities, revenues, expenses, net income and cash flow, which artificially inflated the price of Miller's common stock during the Class Period [*Id.*].

---

[7] Scott Boruff has been Miller's Chief Executive Officer and a member of its Board of Directors since August 6, 2008 [Doc. 47 ¶ 22]. He was the President of Miller from June 26, 2010, until June 9, 2011, and is the son-in-law of defendant Deloy Miller [*Id.*].

[8] Paul W. Boyd was Miller's Chief Financial Officer and its principal accounting and financial officer from September 23, 2008, through September 19, 2011 [Doc. 47 ¶ 23].

[9] David J. Voyticky has been a member of Miller's Board of Directors since April 26, 2010, and has been President of Miller since June 9, 2011 [Doc. 47 ¶ 25]. He was named Miller's acting Chief Financial Officer on September 19, 2011 [*Id.*].

[10] David M. Hall has been the Chief Executive Officer of Cook Inlet Energy and a member of Miller's Board of Directors since December 10, 2009 [Doc. 47 ¶ 24]. From January 2008 through December 2009, he was the Vice President and General Manager of Alaska Operations for Pacific Energy Resources, Ltd. [*Id.*]. Prior to that time, he served as Production Foreman and Lead Operator in Alaska and then Production Manager for all of Alaska operations for Forest Oil Corporation, the company that sold the assets at issue to Pacific Energy Resources [*Id.*].

[11] Ford F. Graham was appointed as Vice-Chairman of the Board of Directors and President of Miller on December 10, 2009 [Doc. 47 ¶ 26]. He resigned from both positions on June 25, 2010 [*Id.*]. Graham was also the President of Vulcan Capital Corporation, LLC [*Id.*].

[12] Deloy Miller founded Miller in 1978 [Doc. 47 ¶ 27]. He has been the Chairman of the Board of Directors since December 1996 [*Id.*]. He served as Miller's Chief Executive Officer from 1967 through August 2008 [*Id.*]. Since that time, he has served as Miller's Chief Operating Officer [*Id.*].

3

## A.     Company Background

According to plaintiff, Miller "was a struggling, top-heavy company with little revenue and few assets" that "spent years trying to escape from the penny-stock arena, where it traded for mere cents a share on the OTC Bulletin Board, by attempting to broker small deals that ended up backfiring and triggering serious ongoing legal disputes" [*Id.* ¶ 30].  In August 2008, Deloy Miller arranged for Boruff, his son-in-law, to become the company's Chief Executive Officer ("CEO") [*Id.* ¶ 31].  Boruff previously had been a broker at GunnAllen Financial Inc. ("GunnAllen"), which was "closed by regulators and entered bankruptcy in the wake of investor lawsuits and allegations of a major Ponzi scheme involving Provident Asset Management ("Provident")" [*Id.*].   Boruff hired Darren Gibson, who was Provident's former National Sales Director during the alleged Ponzi scheme, as Miller's National Sales Director, stating in a press release that he had a "proven track record in raising capital" that would "allow Miller to aggressively pursue [Miller's] acquisition and drilling program goals" [*Id.* (quotation marks omitted)].

Plaintiff alleges that Boruff worked at two firms that Miller utilized in connection with a deal that "was a complete failure for Miller" [*Id.* ¶ 32].  In particular, Miller used GunnAllen to broker a sale of 2.9 million shares of its stock to Wind City Oil & Gas, LLC ("Wind City") [*Id.*].   Boruff left GunnAllen in October 2006 and joined Cresta Capital Strategies, LLC ("Cresta"), which also had ties to the Miller-Wind City deal [*Id.*].  That deal ultimately "turned sour" and Miller paid Wind City $10 million to settle the

4

dispute [*Id.*]. Plaintiff further alleges that the Wind City deal was Boruff's only experience in the oil and gas industry prior to becoming Miller's CEO [*Id.* ¶ 33].

According to plaintiff, Boruff "received an extremely lucrative compensation package" when he became CEO of Miller:

> [A] signing bonus of $300,000; a base salary of $250,000 per year; a grant of 250,000 shares of common stock, vesting in equal annual installments over four years or on an accelerated basis if there were a change of control of the Company; options to purchase 250,000 shares of common stock at $0.33 per share; and participation in an incentive compensation program based on meeting various gross revenue and EBITDA targets.

[*Id.* ¶ 34]. Plaintiff avers that this compensation "was not commensurate with Miller's performance" because in 2009, for example, Miller sustained a $3.2 million loss from operations and incurred more than $2.7 in administrative expenses, but had only $1.6 million in revenue [*Id.*].

By September 2008, plaintiff alleges that Miller "was essentially insolvent," as it "had a $751,732 loss from operations, on revenue of only $485,000, for its quarter ended October 31, 2008" and had "an accumulated deficit of $1.4 million" [*Id.* ¶ 35]. Further, for its 2009 fiscal year, which ended April 30, 2009, Miller "had a $3.2 million loss from operations and an accumulated deficit of $1.3 million" [*Id.*]. Plaintiff points to Miller's 2009 10-K, filed August 10, 2009, which indicated that the Company had little ability to obtain significant additional capital, which was needed to implement its business plan [*Id.*]. That filing, according to plaintiff, also "states that the 'ability of the Company to

continue as a going concern is dependent upon the successful completion of additional financing and/or generating profitable operations in future periods'" [*Id.* ¶ 36].

### B.     Miller's Purchase of the Alaska Assets

In August 2007, Pacific Energy acquired the oil and gas properties and operations of Forest Oil Corporation ("Forest Oil") for $463.2 million in a bankruptcy auction, which included certain oil and gas reserves in Alaska that were later purchased by Miller (the "Alaska Assets") as well as other assets in Alaska [*Id.* ¶ 37].  According to plaintiff, Pacific Energy's valuation of the assets was based upon incorrect reservoir estimates [*Id.*].  By spring 2009, Pacific Energy was unable to operate profitably and filed a petition under Chapter 11 with the United States Bankruptcy Court for the District of Delaware [*Id.* ¶ 38].

According to plaintiff, Pacific Energy then attempted to attract a buyer for the Alaska Assets, retaining Lazard Freres & Company LLC ("Lazard") to market the assets [*Id.* ¶ 40].  Lazard prepared an offering memorandum in April 2009 describing the assets; it approached more than forty buyers, of whom only two decided to bid [*Id.*].  An auction was conducted in July 2009 and Pacific Energy received a bid from Ammadon for $8.1 million and from New Alaska Energy for $7 million [*Id.*].  Neither bidder obtained financing, so no sale was consummated [*Id.*].  Pacific Energy then received permission from the Bankruptcy Court to abandon the Alaska Assets, and the State of Alaska retained Nabors Industries ("Nabors") to serve as a monitor of the assets [*Id.* ¶ 41].

6

In or around September 2009, plaintiff alleges Miller contacted Cook Inlet Enterprises, LLC ("CIE"), which was formed by Hall, Walker Wilcox, and Troy Stafford, for the purpose of acquiring the Alaska Assets [*Id.* ¶ 42].[13] Plaintiff states Miller agreed to finance CIE's purchase of the Alaska Assets and used CIE to acquire them for itself— the parties executed a non-binding memorandum of understanding, pursuant to which Miller agreed to purchase 100% of the membership interests of CIE upon CIE's successful purchase of the Alaska Assets [*Id.* ¶ 43].

Plaintiff claims this arrangement with CIE was necessary because Miller did not have sufficient funding to purchase the assets [*Id.* ¶ 44]. To secure funding, plaintiff states Miller entered into a letter agreement with Vulcan Capital Corporation ("Vulcan"), a company controlled by Graham, on October 8, 2009, to provide $5.5 million for the purchase of the Alaska Assets [*Id.*]. Miller also borrowed an aggregate of $2.7 million from Miller Energy Income 2009-A, LP ("MEI"), an entity run by Boruff, Boyd, and Deloy Miller, which plaintiff alleges was "formed to covertly raise funds on [Miller's] behalf" [*Id.*].

Plaintiff states CIE sought to purchase the Alaska Assets from Pacific Energy for approximately $875,000 [*Id.* ¶ 45]. Nabor's subsidiary Ramshorn Investments

---

[13] Hall and Wilcox were Pacific Energy employees and both had worked at Forest Oil [Doc. 47 ¶ 42]. From January 2008 to December 2009, Hall was the Vice President and General Manager of Alaska Operations for Pacific Energy [*Id.*]. Prior to that time, he had served as the Production Foreman and Lead Operator in Alaska, and then as the Production Manager for all of Alaska operations for Forest Oil [*Id.*]. As such, plaintiff avers, Hall had intimate knowledge of the Alaska Assets, their value, the costs associated with their operation and their production capabilities [*Id.*]

("Ramshorn") also emerged as a bidder, and a second auction took place on November 5, 2009 [*Id.*]. CIE won the auction with a bid of $2.25 million over Ramshorn's bid of $2.15 million, which was for both the Alaska Assets and additional assets owned by Pacific Energy that CIE did not seek to purchase [*Id.*]. As part of the purchase, CIE agreed to assume the liability to pay $2.2 million for contract cure payments, bonds, and other local, state, and federal requirements [*Id.*].

Also on November 5, 2009, Miller entered into a second financing agreement with Vulcan, which replaced the October 8, 2009 agreement [*Id.* ¶ 46]. Vulcan committed to lend Miller at least $36.5 million at the closing of the Alaska Assets purchase [*Id.*].

The next day, the Bankruptcy Court held a hearing to consider the sale of the Alaska Assets and determine whether Miller was a bona fide purchaser capable of satisfying the bonding and retirement liabilities [*Id.* ¶ 47]. Graham testified that Vulcan would provide the financing for Miller and CIE's acquisition of the Alaska Assets and that Vulcan would stand behind Miller's bonding requirements with Alaska [*Id.*]. He further testified that Vulcan had entered into three or four transactions with Miller in the past and that Vulcan and Miller had conversations weekly about various transactions, and that there would not be a normal operating event that would cause Vulcan to be relieved of an obligation to continue to pay [*Id.*]. Boruff also testified at the hearing, stating that "'Vulcan Capital Corporation [has agreed to] financial commitments necessary to fund the significant requirements imposed by the State of Alaska . . . and that Miller, in connection with Vulcan, has secured all of the financing commitments that have been

8

required'" [*Id.* ¶ 49 (alteration in original)]. Plaintiffs allege this representation, however, was false because Vulcan never provided any funds to Miller and Miller never sought funds from Vulcan, citing Miller's 2010 10-K, which disclosed that "'We accepted the [Vulcan] letter agreement on November 5, 2009, however we have not proceeded towards a closing of the financing agreement'" [*Id.* ¶ 50 (alteration in original)]. Plaintiff also notes Miller disclosed that Vulcan had advised that the previously promised funds were no longer available [*Id.*].

Plaintiff alleges that Graham was "rewarded handsomely" despite not providing any financing for the acquisition: he became Miller's President and Vice-Chairman of its Board on December 16, 2009, and he received a signing bonus of $200,000, a base compensation of $200,000, and warrants to purchase an aggregate of 1,000,000 shares of Miller common stock[14] [*Id.* ¶ 51]. Graham left Miller on June 25, 2010, because of "'conflicting business and personal time commitments[;]'" he received $100,000 in severance and was allowed to retain his warrants and certain options [*Id.*]. That same day, the trading volume in Miller's common stock rose to over 2.8 million shares, more than ten times the average daily trading volume for May 6, 2010, through November 30, 2010 [*Id.*]. Plaintiff alleges that there was no company-specific news that day or previous days to explain the spike in volume and that the reasonable inference is that Graham cashed out his warrants [*Id.*].

---

[14] This consisted of warrants to purchase 400,000 shares exercisable at $0.01 per share, warrants to purchase 200,000 shares exercisable at $0.69 share, warrants to purchase 200,000 shares exercisable at $1.00 per share, and warrants to purchase 200,000 shares exercisable at $2.00 per share [Doc. 47 ¶ 51].

The Bankruptcy Court approved the sale of the Alaska Assets to Miller on November 25, 2009, based in part on Miller's financial commitments from Graham [*Id.* ¶ 52].[15]  On December 10, 2009, Miller acquired 100% of the membership interests in CIE in exchange for four-year stock warrants to purchase Miller stock, as well as $250,000 in cash and an agreement to appoint Hall as a member of the Board of Directors [*Id.* ¶ 53]. That same day, CIE, as a wholly-owned subsidiary of Miller, acquired the Alaska Assets, which consist of onshore and offshore production and processing facilities located in Cook Inlet, Alaska, the Osprey offshore energy platform, over 600,000 net lease acres of land with geologic seismic data, and miscellaneous roads, pads, and facilities [*Id.*].

### C.    Alleged False and Misleading Statements and GAAP Violations

Plaintiff alleges that defendants made a series of statements in press releases, SEC disclosure documents, and elsewhere concerning the Alaska Assets and their value, as well as Miller's assets, liabilities, results of operations, and financial condition, during the class period [*Id.* ¶ 54].  In particular, plaintiff alleges that on December 16, 2009, Miller

---

[15] Plaintiff states:

> In the November 25, 2009 order vacating the abandonment of the assets, the Bankruptcy Court found that: "The Sale Agreement constitutes the highest and best offer for the Sold Assets, and would provide a greater recovery for the Debtors' estates than would be provided by any other available alternative." In approving the sale to CIE, the Bankruptcy Court found that the purchase price ($2.5 million cash plus $2.22 million assumed liabilities) was fair consideration for the value of the assets sold: "[t]he consideration provided by the Buyer pursuant to the Sale Agreement constitutes reasonably equivalent value and fair consideration for the Sold Assets."

[Doc. 47 ¶ 52].

issued a press release announcing the acquisition of the Alaska Assets and declaring that they were worth $325 million, which news caused the price of Miller stock nearly to double overnight [*Id.* ¶¶ 55, 57]. Plaintiff further alleges that defendants continued to remind investors of Miller's investment in Alaska at every possible opportunity during the Class Period [*Id.* ¶¶58–84], including increasing the stated value of the Alaska Assets from $325 million to $540 million by May 2010 [*Id.* ¶ 74]. As a result, according to plaintiff, Miller's stock price soared, reaching a Class Period high of $8.04 per share from its pre-acquisition level of $0.70 per share [*Id.* ¶140]. Plaintiffs state that valuing the Alaska Assets at over $500 million enabled Miller to secure financing previously unavailable to Miller, which included $100 million from two investment firms [*Id.* ¶¶142–46]. And, plaintiff avers, the individual defendants rewarded themselves with pay hikes, bonuses, and stock options [*Id.* ¶¶ 231–36].

Plaintiff alleges that despite these statements and unbeknownst to the marketplace, the actual fair value of the Alaska Assets Miller acquired was not $540 million, or $325 million, but only $34 million [*Id.* ¶ 114]. Plaintiff alleges that defendants fraudulently exaggerated the value of the Alaska Assets in three ways. First, in calculating the asset value, Miller used 11% of net revenues as the assumed cost of extracting oil from the Alaska reserves, a figure completely unreasonable and far below industry standards and Miller's own historical drilling costs [*Id.* ¶¶ 95–106]. Second, in violation of SEC rules, which provide that only oil and gas reserves that can reasonably be exploited within five years should be included in reserve valuations, Miller improperly included the estimated

value of reserves that it had no chance of developing within the five-year window [*Id.* ¶¶ 107–113].  Third, Miller ascribed a value of $110 million to fixed assets that it acquired, such as pipelines and drilling stations.  Plaintiff states this figure was made up, given Pacific Energy's representation to the bankruptcy court that a fair price for the totality of these fixed assets was under $1 million and Miller itself eliminated this fixed asset valuation from its financial statements in its 2010 10-K [*Id.* ¶¶ 121, 122].

In addition to the misrepresentations concerning the Alaska Assets, plaintiff alleges that defendants also committed a series of accounting violations designed to make Miller look more profitable than it was, such as, *inter alia*, failing to report revenues net of royalty payments [*Id.* ¶¶ 163–200].  Plaintiff states that because Miller lacked any semblance of adequate internal controls, its reported financial statements allegedly violated GAAP throughout the Class Period [*Id.* ¶¶ 135–38].  In March 2011, plaintiff states Miller was forced to restate its financial statements for the first two quarters of fiscal 2011 (the "First Restatement") [*Id.* ¶ 160].

According to plaintiff, on July 28, 2011, two investigative reporters published the first of two articles in Streetsweeper.org based on their independent research, which included interviews with industry veterans, describing how Miller had vastly overstated the value of the Alaska Assets [*Id.* ¶¶ 150–58].  The very next day, on July 29, 2011, Miller filed its Form 10-K for the fiscal year 2011 (the "Second Restatement") disclosing that certain of its prior financial statements—which had already been restated in March 2011—could not be relied upon [*Id.* ¶¶ 161, 177–78].  Days later, on August 1, 2011,

Miller retracted this Second Restatement, explaining that its accountants had not approved it [*Id.* ¶171], and on August 9, 2011, filed yet another 2011 Form 10-K, disclosing still more accounting violations and admitting that its First Restatement was incomplete [*Id.* ¶¶ 162, 181]. Plaintiffs allege that the sum total of defendants' fraud cost Miller investors over 70% of the value of Miller stock during the Class Period, as the value of Miller's stock rapidly collapsed upon the disclosure of true information exposing Miller's prior accounting and asset valuation improprieties [*Id.* ¶¶ 150–58, 206–14].

### D.    Claims for Relief and Response to the Complaint

On the basis of these allegations, plaintiff asserts defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 and that defendants Boruff, Boyd and Deloy Miller violated Section 20(a) of the Exchange Act [*Id.* ¶¶ 227–56]. Plaintiff seeks damages pursuant to Section 10(b) and 20(a) in addition to reasonable costs and expenses [*Id.* ¶ 257].

In response, Graham filed a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure [Doc. 61], as did defendants Miller, Boruff, Boyd, Voyticky, Hall, and Deloy Miller (the "Miller Defendants") [Doc. 63]. Plaintiff responded in opposition [Docs. 66, 68] and defendants replied [Docs. 69, 70].

In connection with their motion to dismiss, the Miller Defendants filed a request for the Court to take judicial notice [Doc. 63-2]. Plaintiff responded to the motion [Doc. 65] and the Miller Defendants replied [Doc. 71].

13

## II.   Standard of Review

### A.   Rule 12(b)(6) Motions

Federal Rule of Civil Procedure 8(a)(2) sets out a liberal pleading standard, *Smith v. City of Salem*, 378 F.3d 566, 576 n.1 (6th Cir. 2004), requiring only "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the [opposing party] fair notice of what the . . . claim is and the grounds upon which it rests,'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).   Detailed factual allegations are not required, but a party's "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions."   *Twombly*, 550 U.S. at 555.   "[A] formulaic recitation of the elements of a cause of action will not do," nor will "an unadorned, the-defendant-unlawfully-harmed-me accusation."   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In deciding a Rule 12(b)(6) motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, draw all reasonable inferences in favor of the plaintiff, and determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face."   *Twombly*, 550 U.S. at 570; *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007) (citation omitted).   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   *Iqbal*, 556 U.S. at 678.   "Determining whether a complaint states a

plausible claim for relief will [ultimately] . . . be a context-specific task that requires th[is Court] to draw on its judicial experience and common sense." *Id.* at 679.

**B.** **Securities Claims**

Section 10(b) of the Securities Exchange Act and Rule 10b-5, promulgated thereunder, prohibit fraudulent, material misrepresentations in relation to the sale or purchase of securities. *Ind. State Dist. Council of Laborers and Hod Carriers Pension and Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 942 (6th Cir. 2009). To succeed on a private cause of action for violations thereof, a plaintiff must prove six elements: "(1) a material misrepresentation or omission . . . ; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, — U.S. —, —, 131 S. Ct. 1309, 1317 (2011) (internal quotation marks and citation omitted). Recklessness satisfies § 10(b)'s scienter element if the plaintiff demonstrates that the defendant engaged in "highly unreasonable conduct which is an extreme departure from the standards of ordinary care." *La. Sch. Emps. Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 478 (6th Cir. 2010) (internal quotation marks and citation omitted).

No party disputes that the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. §§ 78u-4 *et seq.*, which was enacted "[a]s a check against abusive litigation by private parties," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007), applies to this case. The PSLSA "imposes more exacting pleading requirements than

15

Federal Rules of Civil Procedure 8(a) and 9(b)." *Ricker v. Zoo Entm't, Inc.*, — F. App'x —, —, 2013 WL 4516095, at *4 (6th Cir. Aug. 27, 2013) (citations omitted).

PSLRA's "exacting pleading requirements" obligate a plaintiff to "state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention 'to deceive, manipulate, or defraud.'" *Tellabs*, 551 U.S. at 313 (citation omitted). To plead "the facts constituting the alleged violation," the complaint "must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008) (internal quotation marks and citation omitted).

For a pleading to qualify as raising a strong inference of scienter, the inference "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. In making this analysis, a court must accept all factual allegations in the complaint as true, consider the complaint in its entirety, including documents incorporated into the complaint by reference and matters of which a court may take judicial notice, and "take into account plausible opposing inferences." *Id.* at 322–24. A complaint failing to comply with PSLRA's pleading requirements "shall" be dismissed. 15 U.S.C. § 78u-4(b)(3)(A).

16

### III. Graham's Rule 12(b)(6) Motion to Dismiss [Doc. 61]

Graham was appointed as Vice-Chairman of the Board of Directors and President of Miller on December 10, 2009. He resigned from both positions on June 25, 2010. Graham was also the President of Vulcan Capital Corporation, LLC, with which Miller Energy arranged a financial debt agreement for the acquisition of the Alaska Assets [Doc. 47 ¶ 26]. Plaintiff alleges that Graham was responsible for Miller's statements made during his tenure as President [*Id.*]. Plaintiff notes that Graham received substantial financial compensation for his tenure as President of Miller, including a $100,000 severance payment upon his resignation after seven months on the job [*Id.* ¶ 51]. Plaintiff also notes that trading volume in the Company's common stock was up on the day of Graham's resignation and speculates that the surge in trading volume reflects Graham cashing out his warrants [*Id.*].

In Count I, plaintiff alleges that the defendants disseminated or approved the materially false and misleading statements outlined in the complaint, which they knew, or deliberately or recklessly disregarded, were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 10(b) of the Exchange Act and Rule 10b-5 [*Id.* at ¶ 229]. Plaintiff alleges that Graham is liable as a maker of each false and misleading statement specified in paragraphs 55, 58, 61, 63, 65–66, 68, 71, and 74 of the complaint [*Id.* ¶ 235(a)]. Plaintiff alleges that Graham acted with scienter in that he specifically

17

knew the statements were false or misleading or was reckless as to their truth or falsity [*Id.* ¶ 235(b)]. Specifically, plaintiff claims that Graham worked with Hall, Boruff, and Boyd to devise the plan to implement the acquisition of the Alaska Assets [*Id.* ¶ 235(b)(1)]. Graham allegedly learned from Hall the facts regarding the Alaska Assets, including their operating expenses and the value of the fixed assets attached thereto [*Id.*]. Plaintiff also claims that Graham personally participated in convincing the Bankruptcy Court to approve the acquisition [*Id.*]. Further, plaintiff alleges that, as President of Miller, Graham "was duty-bound to inform himself of the true facts regarding the Company and its most important assets" [*Id.* ¶ 235(b)(2)]. Finally, plaintiff claims that Graham was motivated to make the false and misleading statements because he profited handsomely from his involvement in the fraudulent scheme [*Id.* ¶ 235(c)].

In his motion to dismiss, Graham argues that plaintiff fails to meet the heightened pleading requirements articulated above because plaintiff fails "to allege any facts, much less particularized facts, detailing Graham's involvement in making any statements which were materially false or misleading" [Doc. 62]. More particularly, Graham asserts that the complaint fails to identify a single action taken by Graham in preparing or issuing the allegedly false statements and does not allege that Graham was even aware of the statements [*Id.*]. Further, Graham asserts that the complaint does not establish the requisite level of scienter that is required by the heightened pleading requirements of § 10(b) of the Securities Exchange Act and Rule 10b-5 [*Id.*]. The Court finds both of these arguments persuasive.

## A.     Whether the Amended Complaint States Facts with Particularity Constituting the Alleged Violation

Defendant Graham argues that plaintiff has failed to state with particularity the facts constituting the alleged violation by Graham. Specifically, Graham contends that the complaint fails to connect any of the allegedly false or misleading statements to him. Graham argues that the general allegations that he was "a maker" of the statements and "was responsible" for statements during his tenure as President of the Company fall short of the standard set by the PSLRA [Doc. 62].

In response, plaintiff argues that Graham was responsible for the false and misleading statements made by Miller during his tenure as President. Relying on *Winslow v. BankcorpSouth, Inc.*, No. 3:10-00463, 2011 WL 7090820 (M.D. Tenn. Apr. 26, 2011), and *Janus Capital Group, Inc. v. First Derivative Traders*, — U.S. —, —, 131 S. Ct. 2296 (2011), plaintiff contends that, as President, Graham had the "ultimate authority" for the statements issued by the Company and is therefore liable for those statements [Doc. 66]. Plaintiff also argues that Graham is liable for the false and misleading statements issued by Miller Energy under the group-pleading doctrine [Doc. 66].

In reply, Graham notes that even the complaint alleges that the other individual defendants, not Graham, were the Company's "most senior corporate officers" [Doc. 47 ¶ 237]. Further, Graham notes that none of the statements released during his tenure at Miller were issued by him, signed by him, presented by him, or quote him. Thus, he cannot be a "maker" of the allegedly false statements as required by *Janus* [Doc. 69].

19

Further, Graham argues that the current validity of the group-pleading doctrine following passage of the PSLRA has not been addressed by the Sixth Circuit [Doc. 69].

Under Rule 10b-5, it is unlawful for "any person, directly or indirectly, . . . [t]o make any untrue statement of a material fact" in connection with the purchase or sale of securities. 17 C.F.R. § 240.10b-5(b). The complaint alleges that Graham "is liable as a maker of each false and misleading statement specified in paragraphs: 55, 58, 61, 63, 65-66, 68, 71, and 74" [Doc. 47 ¶ 235]. As noted by Graham, however, none of those paragraphs mention Graham in any way. He is not alleged to have signed any reports, issued any press releases, or made any presentations on the Company's financial status. The complaint generally alleges that the "Individual Defendants possessed the authority to control the contents of Miller's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors" and that they "had the ability and opportunity to prevent" the issuance of the Company's reports and press releases or cause them to be corrected [Doc. 47 ¶ 29]. The issue then is whether these allegations state with particularity the facts of the alleged violation; that is, whether Graham "made" the materially false or misleading statements.

In *Janus*, the Supreme Court considered the meaning of "to make" a false statement in Rule 10b-5. 131 S. Ct. 2296. Concluding that the phrase "'[t]o make any . . . statement' is the approximate equivalent of 'to state,'" the Court explained as follows:

> For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not "make" a

20

> statement in its own right. One who prepares or publishes a statement on behalf of another is not its maker. . . . This rule might best be exemplified by the relationship between a speechwriter and a speaker. Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it. And it is the speaker who takes credit—or blame—for what is ultimately said.

131 S. Ct. at 2302. Thus, the Court must determine whether the complaint has alleged facts with particularity that Graham had ultimate authority over any of the statements, including their content and whether and how to communicate them.

In light of the admittedly narrow definition adopted by *Janus*, the Court cannot conclude that the complaint sets forth with sufficient particularity facts supporting the conclusion that Graham was a "maker" of the allegedly false statements. As noted above, there are no allegations tying any actions by Graham to any of the statements. Simply asserting that he was a "maker" of the statements with "the authority to control" them, without more, is not enough; these are conclusions, not allegations of facts stated with particularity. In contrast to the allegations in *Winslow* where the complaint "ma[d]e[] specific allegations of false . . . statements" against the board chairman and "that a particular Defendant merely participated in a conference call or presentation, or approved a document in which false statements allegedly were made," 2011 WL 7090820, at *15, the present case contains no similar allegations against Graham.

Relying on *City of Monroe Employees Retirement System v. Bridgestone Corp.*, 399 F.3d 651, 689 (6th Cir. 2005), plaintiff urges the Court to find Graham liable for the allegedly false and misleading statements under the group-pleading doctrine [Doc. 66]. In that case, the Sixth Circuit was asked to find sufficient allegations of scienter against

21

the defendant company's CEO and Executive Vice-President. Quoting the Ninth Circuit, the court noted that the group-pleading doctrine is an exception to the pleading-with-particularity requirements of Rule 9(b) whereby "[i]n cases of corporate fraud where the false or misleading information is conveyed in prospectuses, registration statements, annual reports, press releases, or other 'group-published information,' it is reasonable to presume that these are the collective actions of the officers." 399 F.3d at 689 (alteration in original and internal quotation marks omitted) (quoting *Wool v. Tandem Computers Inc.*, 919 F.2d 1433, 1440 (9th Cir. 1987)). The Sixth Circuit also noted that some courts have questioned the continued viability of the group-pleading doctrine subsequent to passage of the PSLRA. *Id.* at 689–90. However, the Sixth Circuit declined to decide the current viability of the group-pleading doctrine because the complaint failed to contain sufficient allegations against the individual defendant:

> The Retirement Fund does not allege by direct allegation or even upon information and belief that Ono played any role in drafting, reviewing, or approving the Firestone's 'objective data' representation or the Bridgestone annual reports, 1999 or any other years. Nor does it allege that he was, as a matter of practice, or by job description, typically involved in the creation of such documents. Even if we permit the group-pleading inference, these alleged facts, without more, are not enough to attribute the alleged misstatements to Ono.

*Id.* at 690.

It is beyond the purview of this Court to adopt a doctrine that the Sixth Circuit has expressly declined to follow. Further, the absence of any specific factual allegations that defendant Graham took any action, failed to take any action, or played any role whatsoever in preparing or issuing the alleged false or misleading statements supports the

conclusion that the plaintiff has failed to allege with sufficient particularity the alleged violations committed by Graham. *See N. Port Firefighters' Pension Local Option Plan v. Fushi Copperweld Inc.*, No., 3:11-cv-00595, 2013 WL 866943, at *29 (M.D. Tenn. Mar. 7, 2013) (declining to follow the group-pleading doctrine because "a fraud claim requires specific allegations as to each defendant's alleged involvement in the securities violations"); *Garden City Emps. Ret. Sys. v. Psychiatric Solutions, Inc.*, No. 3:09-00882, 2011 WL 1335803, at *43 (M.D. Tenn. Mar. 31, 2011) (same); *In re Am. Serv. Grp., Inc.*, No. 3:06-0323, 2009 WL 1348163, at *30 (M.D. Tenn. Mar. 31, 2009) (same).

**B.    Whether the Complaint States Facts with Particularity That Graham Acted with Scienter**

Assuming arguendo that plaintiff's allegations against Graham are sufficient to show he made untrue statements or committed omissions of material facts, the Court turns to Graham's alternative argument that the complaint fails to state facts with particularity that give rise to a strong inference that Graham acted with the requisite state of mind.

Relying on *Konkol v. Diebold, Inc.*, 590 F.3d 390 (6th Cir. 2009), *abrogated in part by Matrixx Initiatives*, 131 S. Ct. 1309, Graham argues that fraudulent intent cannot be inferred from his position in the Company and alleged access to information. The allegations that "Graham learned through defendant Hall the facts regarding the Alaska Assets, including their operating expenses and the value of the fixed assets attached thereto[,]" and that, as President, he was "duty-bound to inform himself of the true facts regarding the Company and its most important assets" are, according to Graham,

23

insufficient to show that he recklessly disregarded the information or fraudulently withheld it [Doc. 62].

In response, plaintiff contends that the complaint alleges that Graham had actual knowledge that the value of the Alaska Assets were inflated and of the GAAP violations. Plaintiff also notes the allegations that Graham worked with defendants Hall, Boruff, and Boyd to devise the plan to acquire the assets, "including making it appear that Miller had the financial wherewithal to buy the Alaska Assets" and personally participated in convincing the Bankruptcy Court to approve the acquisition [Doc. 66]. Plaintiff suggests that the "Court may presume that Graham was aware of the true value of the Alaska Assets" based on his position as President and that this "provides support for a strong inference that he acted with scienter, knowingly or, at least recklessly, disregarding the statements inflating their value" [Doc. 66]. Finally, plaintiff contends that Graham was personally motivated to inflate the value of the Alaskan assets and commit GAAP violations for his own financial gain [*Id.*].

As noted initially, the PSLRA requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). That is, the plaintiff must allege with particularity facts showing "the defendant's intention to deceive, manipulate, or defraud," *Tellabs*, 551 U.S. at 313 (internal quotation marks and citation omitted), or recklessness, "'a mental state apart from negligence and akin to conscious disregard,'" *La. School Emps. Ret. Sys.*, 622 F.3d at 478 (quoting *In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 550 (6th Cir. 1999)).

24

Recklessness is "'highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it.'" *Id.* at 478 (citation omitted). The Court must take into account "plausible opposing inferences" and review "all the allegations holistically." *Tellabs*, 551 U.S. at 323, 326. A complaint adequately pleads scienter "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

According to the complaint, Graham was President of Miller for approximately seven months, from December 10, 2009, to June 25, 2010 [Doc. 47 ¶ 26]. Graham worked with defendants Hall, Boruff, and Boyd to devise the plan to implement the acquisition of the Alaska Assets through CIE [*Id.* ¶ 235]. Graham learned through defendant Hall the facts regarding the Alaska Assets, including their operating expenses and the value of their fixed assets [*Id.*] and was, in his role as President, "duty-bound to inform himself of the true facts regarding the Company and its most important assets" [*Id.* ¶ 235]. Finally, the complaint alleges that Graham was motivated because he "profited handsomely" from his involvement in the allegedly fraudulent scheme by receiving substantial compensation and options to purchase Company stock for his short tenure [*Id.* ¶¶ 51, 235]. The complaint asserts that, on the day Graham resigned, the trading volume in the Company's common stock was "more than ten times the average

daily trading volume" with "the reasonable inference . . . that this surge in trading volume reflects Graham cashing out his warrants" [*Id.* ¶ 51].

Taking all the allegations as true, and reviewing the complaint as a whole, a reasonable person could conclude that Graham knew the "true value" of the Alaska Assets.[16] A reasonable person could further infer that the "true value" of these assets was less than represented in statements to the public. There are no allegations, and thus no reasonable inferences to be drawn, however, that Graham took any action whatsoever with respect to this knowledge. There are no specific allegations that Graham intended to deceive, manipulate, or defraud, or that he engaged in highly unreasonable conduct. "Fraudulent intent cannot be inferred merely from the [defendant's] position[] in the Company and alleged access to information," *Konkol*, 590 F.3d at 397, which plaintiff alleges here. Without more, these allegations do not show that it was "obvious" to Graham that Miller was improperly inflating its financial statements. *See id.* at 398. In contrast with the allegations of *In re America Service Group, Inc.*, 2009 WL 1348163, at *60, cited by the plaintiff, the complaint contains no allegations that Graham participated in meetings, signed SEC filings, or participated in earnings announcements sufficient to infer scienter based merely on his position with the Company.

With respect to Graham's compensation, the alleged facts demonstrate only that he received compensation totaling $500,000 (consisting of base compensation, signing bonus, and severance) plus options to purchase Company stock. The allegations

---

[16] It is worth noting, though, that the alleged "plan" to acquire the Alaska Assets occurred prior to Graham's tenure with the Company.

regarding the increase in trading volume on the day of Graham's resignation are speculation. There are no factual allegations that Graham exercised his stock options at any time or that such activity would constitute insider trading and thus evidence of scienter. Such an inferential leap is too far to satisfy the high standards of the PSLRA. Accordingly, the Court concludes that plaintiff has not pled facts with sufficient particularity that defendant Graham acted with scienter.

For all these reasons, the Court will grant defendant Graham's motion to dismiss.

## IV. Defendants Miller Energy Resources, Inc., Scott M. Boruff, Paul W. Boyd, David J. Voyticky, David M. Hall, and Deloy Miller's Motion to Dismiss Plaintiff's Corrected Consolidated Amended Class Action Complaint [Doc. 63]

The Miller Defendants have moved to dismiss the complaint for failure to state a claim, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure [Doc. 63]. In connection with this request, the Miller Defendants also ask the Court to take judicial notice of several documents. The Court turns to that request before addressing the merits of the motion.

### A. Request for the Court to Take Judicial Notice of Documents in Connection with Motion to Dismiss [Doc. 63-2]

The Miller Defendants move the Court to take judicial notice of certain documents cited in their motion to dismiss, pursuant to Rule 201 of the Federal Rules of Evidence. These documents include: (1) certain filings with the SEC, including (a) Form 10-Q for the quarterly period ended July 31, 2009 [Doc. 63-3 Ex. D], (b) Form 10-Q for the quarterly period ended January 31, 2010 [*Id.* Ex. E], (c) Form 10-Q for the quarterly

27

period ended July 31, 2010 [*Id.* Ex. H], (d) Form 10-Q for the quarterly period ended October 31, 2010 [*Id.* Ex. I], (e) Form 10-Q for the quarterly period ended January 31, 2011 [*Id.* Ex. J], (f) Form 10-Q for the quarterly period ended July 31, 2011 [*Id.* Ex. P], (g) Form 8-K filed with the SEC on May 17, 2010 [*Id.* Ex. F], (h) Form 8-K/A filed with the SEC on March 29, 2010 [*Id.* Ex. Q], (i) Form 10-K for the fiscal year ending April 30, 2010 [*Id.* Ex. G], (j) Form 10-K for the fiscal year ending April 30, 2011 [*Id.* Ex. M], (k) Form 10-K/A for the fiscal year ended April 30, 2011 [*Id.* Ex. N], and (l) the filing detail for Miller Energy Resources Inc.'s Form 10-K for the period ending April 30, 2011 [*Id.* Ex. O]; (2) a Pacific Energy SEDAR filing; (3) the entire *StreetSweeper* reports; and (4) the documents filed in the United States Bankruptcy Court for the District of Delaware. Plaintiff objects only to the Court taking judicial notice of Form 10-Q for the quarterly period ended July 31, 2011 [*Id.* Ex. P], the SEDAR filing, and the documents filed in the United States Bankruptcy Court for the District of Delaware [Doc. 67].

As already noted, in ruling on a motion made pursuant to Rule 12(b)(6), as here, the Court must accept as true all factual allegations in the complaint and draw all reasonable inferences from those allegations, construing the complaint in the light most favorable to the plaintiff. *Ashland, Inc. v. Oppenheimer & Co.*, 648 F.3d 461, 467 (6th Cir. 2011). A court may consider other materials, however, if those matters are integral to the complaint, are public records, or are otherwise appropriate for the taking of judicial notice under Rule 201 of the Federal Rules of Evidence. *In re Unumprovident Corp. Sec. Litig.*, 396 F. Supp. 2d 858, 875, (E.D. Tenn. 2005) (citing *Bovee v. Coopers & Lybrand*

*C.P.A.*, 272 F.3d 356, 360–61 (6th Cir. 2001)). The determination of whether a document is "integral" to the complaint is within the court's discretion and is guided by the judicial notice standards of Federal Rule of Evidence 201. *In re Cardinal Health, Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 712 (S.D. Ohio 2006). Rule 201 of the Federal Rules of Evidence permits the Court to take judicial notice of facts that are "not subject to reasonable dispute in that [they are] either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

In light of plaintiff's acquiescence, the Court need address only whether it should take judicial notice of the following: Form 10-Q for the quarterly period ended July 31, 2011, the SEDAR filing, and the documents filed in the United States Bankruptcy Court for the District of Delaware.

### 1. Form 10-Q for the quarterly period ended July 31, 2011

Plaintiff submits that the Court should not consider the Form 10-Q for the quarterly period ended July 31, 2011, because it was filed on September 9, 2011, thirty days after the end of the Class Period, it is not referred to in the complaint, and it is not integral to the allegations made in the complaint [Doc. 67]. Defendants assert that the document is integral to the allegations made in the complaint because it relates to the value of the Alaska Assets. More specifically, defendants state that the complaint alleges the Alaska Assets are worth only $25 million to $30 million, offset by $40 million of liabilities, and the SEC filing demonstrates that the Alaska Assets had generated more

29

than $30 million in oil revenue within eighteen months of the acquisition of the Alaska Assets [Docs. 63-2, 71].

The Court agrees with the Miller Defendants. While the Form 10-Q for the quarterly period ended July 31, 2011, was filed outside the Class Period, it is integral to the complaint because it relates to the value of the Alaska Assets. Moreover, with respect to a claim for securities fraud, a court may consider "the contents of relevant public disclosure documents which are required to be filed with the [SEC] and are actually filed with the SEC." *In re Direct Gen. Corp. Sec. Litig.*, 398 F. Supp. 2d 888, 893 (M.D. Tenn. 2005). Such documents, however, should be used "only for the purpose of determining what statements the documents contain, not to prove the truth of the documents' contents." *Id.*

## 2. Pacific Energy SEDAR Filing

Plaintiff argues that the Court should not take judicial notice of Pacific Energy's SEDAR filing because it is not cited in the complaint, nor integral to any statement made in the complaint [Doc. 67]. The Miller Defendants assert that SEDAR is the Canadian system used for electronically filing most securities-related information with the Canadian securities regulatory authorities and thus, like SEC filings, are appropriate for judicial notice. The Miller Defendants also assert the SEDAR filing is integral to the complaint because it "give[s] the Court context of how assets, like the Alaskan Assets, are valued" [Doc. 71]. Alternatively, the Miller Defendants ask the Court to judicially

notice "the fluctuating oil process for their impact on the valuation of the Alaskan Assets" [*Id.*].

As noted, a court may consider public records in deciding a Rule 12(b)(6) motion, including SEC filings. *In re Direct Gen. Corp. Sec. Litig.*, 398 F. Supp. 2d at 893; *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002); *see also United States ex rel. Dingle v. BioPort Corp.*, 270 F. Supp 2d 968, 972 (W.D. Mich. 2003) ("Public records and government documents are generally considered not to be subject to reasonable dispute. This includes public records and government documents available from reliable sources on the Internet." (internal quotation marks and citation omitted)). SEDAR is the Canadian securities document database and thus, the Court may properly consider documents filed therein in ruling on a Rule 12(b)(6) motion. *See Sgalambo v. McKenzie*, 739 F. Supp. 2d 453, 464 n.8 (S.D.N.Y. 2010) (taking judicial notice of document "'filed publicly pursuant to the laws of Canada'").

### 3. Bankruptcy Filings

Plaintiff urges the Court not to take judicial notice of the excerpts of the two bankruptcy court filings because the Miller Defendants have failed to provide the Court with "necessary information" from those filings, that is, the entire content of the bankruptcy court filings [Doc. 67]. Plaintiff also asserts the filings are neither cited in the complaint nor integral to the complaint. The Miller Defendants responded by providing

the Court with the complete filings and asserting that the documents contain facts relied upon by plaintiff in the complaint [Doc. 71].

A court "may take judicial notice of pertinent matters of public record such as [a] bankruptcy order." *Signature Combs, Inc. v. United States*, 253 F. Supp. 2d 1028, 1041 n.5 (W.D. Tenn. 2003); *see also Malin v. JP Morgan*, 860 F. Supp. 2d 574, 578 (E.D. Tenn. 2012) (judicially noticing bankruptcy petitions and orders from the bankruptcy court). The Court finds that the bankruptcy filings at issue are integral to the complaint because they relate to the Alaska Assets and that the Court may, therefore, properly consider them in connection with the motion to dismiss.

In sum, the Court takes judicial notice of all of the documents identified in the Miller Defendants' request, but does so only to the extent that their "existence or contents prove facts whose accuracy cannot be reasonably questioned." *Passa v. City of Columbus*, 123 F. App'x 694, 697 (6th Cir. 2005).

### B.    Analysis of Motion to Dismiss

The Miller Defendants assert various grounds for dismissal of the complaint, including that plaintiff's allegations regarding Miller's estimates of the value of the Alaska Assets are insufficient, that plaintiff fails to allege particular facts necessary to show the Miller Defendants' statements regarding Miller's internal controls were not true, that plaintiff's allegations regarding Miller's GAAP violations are insufficient, that the complaint fails to raise a strong inference of scienter, and that plaintiff fails to plead loss causation. The Court, however, finds none of these arguments persuasive.

### 1. Whether the Complaint States Facts with Particularity Constituting the Alleged Violation

The complaint identifies three categories of statements that plaintiff claims were false and misleading: (1) statements regarding the value of the Alaska Assets [Doc. 47 ¶¶ 54–84]; (2) GAAP violations [*Id.* ¶¶ 159–200]; and (3) statements regarding the adequacy of Miller's internal controls [*Id.* ¶¶ 99–123, 137].   With respect to the statements regarding the value of the Alaska Assets, the Miller Defendants argue that the allegations are insufficient and break down plaintiff's allegations about the Alaska Assets into two categories: (1) the estimated value Miller ascribed to the Alaska Assets as an asset on its balance sheet, and (2) estimates of future cash flows that potentially could be generated from the Alaska Assets [Doc. 63-1].   To this end, the Miller Defendants argue that the estimates of the Alaska Assets as an asset are opinions and that plaintiff has not pled that the opinions were not held at the time they were made and that the estimates of future cash flows are protected by the safe harbor.   With respect to the GAAP violations, the Miller Defendants assert that plaintiff's allegations do not "cry out" scienter and that the Company's corrected errors improved the Company's financial condition.   Finally, regarding the statements about the adequacy of Miller's internal controls, the Miller Defendants assert that "Miller disclosed the very thing Plaintiff contends was concealed" and that Boyd and Boruff never certified that Miller had adequate internal controls [Doc. 63-1].

Turning first to the Miller Defendants' arguments regarding the allegations about the value of the Alaska Assets, the Court finds that the allegations in the complaint are

sufficient. First, the Court finds that even if the statements were opinions, as the Miller Defendants assert, plaintiff has pleaded particular facts sufficient to demonstrate that the Miller Defendants[17] did not believe those opinions at the time they were made. Indeed, taking all the allegations as true, and viewing the complaint as a whole, a reasonable person could conclude that the Miller Defendants knew the alleged "true value" of the Alaska Assets and infer that the "true value" of these assets was less than represented in statements to the public [*See* Doc. 47 ¶¶ 99, 111–12, 120–23 (alleging that defendants assumed operating costs of 11% of net revenues, even though historical costs had never been less than 35%, and had even reached over 60%; that defendants could not reasonably have believed that they could develop the undeveloped portions of the Alaska Assets given financial constraints; and that defendants' valuation of the fixed assets was knowingly overblown)]. Second, the Court finds that the valuations of the Alaska Assets are not protected by the safe harbor. As discussed with respect to the Court's analysis of whether plaintiff adequately pleaded scienter, *see infra* Section IV.B.2, even if the valuations were forward-looking statements, plaintiff has pled that the Miller Defendants had knowledge that they were false. *See* 15 U.S.C. § 78u-5(c)(1)(B)(i) (safe harbor protection applies only if plaintiff "fails to prove that the forward-looking statement . . . was made with actual knowledge by that person that the statement was false or misleading"); *In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d at 756 ("[B]ecause the Court concluded the Plaintiffs adequately pled scienter based on their numerous

---

[17] The Court addresses the Miller Defendants collectively, as the parties do in their briefs.

allegations, the Court finds that Plaintiff's allegations are, for pleading purposes, sufficient to show scienter as to . . . Defendants' forward-looking statements."); *In re SmarTalk Teleservices, Inc. Sec. Litig.*, 124 F. Supp. 2d 527, 544 (S.D. Ohio 2000) (finding that scienter for accounting errors was sufficient to establish knowledge of falsity of forward-looking statements).

Next, the Court addresses plaintiff's allegations regarding Miller's GAAP violations. The Sixth Circuit has held that "[t]he failure to follow GAAP is, by itself, insufficient to state a securities fraud claim." *In re Comshare, Inc. Sec. Litig.*, 183 F.3d at 553(internal citation omitted). However, where the alleged errors are "especially dramatic" and resemble "pervasive and egregious manipulations" "that 'cry out' scienter," they may be sufficient. *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 686 (6th Cir. 2004), *abrogated on other grounds by Matrixx Initiatives*, 131 S. Ct. 1309. As discussed *infra* Section IV.B.2, the Court finds that there are sufficient allegations of scienter with respect to the Miller Defendants. Moreover, plaintiff has adequately pled that the Miller Defendants violated GAAP and that such violations were material [*See, e.g.*, Doc. 47 ¶¶ 183–88]. To the extent the Miller Defendants argue that these errors were not material, consideration of that argument is not appropriate at this stage. *See Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 716–17 (2d Cir. 2011) ("Materiality is an 'inherently fact-specific'" finding that can form the basis for dismissal only where the alleged misstatements are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." (internal

quotation marks and citations omitted)).  Indeed, plaintiff alleges that Miller restated its financials, which one could infer suggests that Miller "thereby tacitly acknowledged that the previous financial statements were materially misstated, since under [GAAP], restatements are only required to correct material accounting errors."  *In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. 132, 138 (S.D.N.Y. 2008).

Finally, the Court turns to plaintiff's allegations about the statements concerning the adequacy of Miller's internal controls.  The Miller Defendants argue that, with respect to these allegations, the complaint does not specify each statement that is alleged to have been misleading and the reasons why.  The Court disagrees.  The complaint alleges that defendants' assurances concerning its internal controls were false because of various known weaknesses and that defendants had to restate their financial statements due in part to inadequate internal controls [*See* Doc. 47 ¶¶ 135–38].  *See Simons v. Dynacq Healthcare, Inc.*, No. H-03-05825, 2006 WL 1897270, at *5 (S.D. Tex. July 10, 2006).  The Miller Defendants also argue that Boyd and Boruff never certified that Miller had adequate internal controls, but this is a quibble about facts and the complaint, which much be taken as true, alleges that Boyd and Boruff attested to the adequacy of the internal controls [*See id.* ¶¶ 58–59].

Moreover, the complaint specifies why the three types of statements were false and misleading [*Id.* ¶¶ 99–123, 137].  While the Miller Defendants disagree that the statements were false and misleading, their arguments, again, amount to quibbling with the facts alleged.  *Ing v. Rock Fin. Corp.*, 281 F.3d 613, 623 (6th Cir. 2002) (argument

36

that "invites some degree of inquiry into the facts and circumstances of the case" cannot be resolved on a Rule 12(b)(6) motion). And the complaint alleges with particularity the dates on which the statements were made [*Id.* ¶¶ 55–84], as well as the particular defendant to whom each alleged false statement is attributed [*Id.* ¶¶ 22–27, 231, 232, 233, 234, 236]. Thus, for these reasons, the Court finds that the complaint states with particularity the facts constituting the alleged violation.

### 2. Whether the Complaint States Facts with Particularity That the Miller Defendants Acted with Scienter

As noted already, the PSLRA requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). That is, the plaintiff must allege with particularity facts showing "the defendant's intention to deceive, manipulate, or defraud," *Tellabs*, 551 U.S. at 313 (internal quotation marks and citation omitted), or recklessness, "a mental state apart from negligence and akin to conscious disregard," *La. School Emps. Ret. Sys.*, 622 F.3d at 478 (quoting *In re Comshare Inc. Sec. Litig.*, 183 F.3d at 550). Recklessness is "highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it." *Id.* at 478 (citation omitted). The Court must take into account "plausible opposing inferences" and review "all the allegations holistically." *Tellabs*, 551 U.S. at 323, 326. A complaint adequately pleads scienter "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

37

The Miller Defendants urge the Court to consider whether the complaint adequately pleads scienter by considering the factors set forth in *Helwig v. Vencor, Inc.*, 251 F.3d 540, 550 (6th Cir. 2001), *abrogated on other grounds by Tellabs*, 551 U.S. 308. The non-exhaustive list of factors is:

> (1) insider trading at a suspicious time or in an unusual amount;
>
> (2) divergence between internal reports and external statements on the same subject;
>
> (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information;
>
> (4) evidence of bribery by a top company official;
> (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit;
>
> (6) disregard of the most current factual information before making statements;
>
> (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication;
>
> (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and
>
> (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

251 F.3d at 552. While plaintiff suggests that these factors no longer have a place in determining whether a complaint adequately pleads scienter, neither the Sixth Circuit nor the Supreme Court has so stated and, indeed, courts within the Sixth Circuit continue to employ them. *See*, *e.g.*, *S.E.C. v. Delphi Corp.*, 508 F. App'x 527, 532 (6th Cir. 2012); *I.B.E.W. v. Ltd. Brands, Inc.*, 788 F. Supp. 2d 609, 630 (S.D. Ohio 2011). This Court

will as well, while keeping in mind that it must review the complaint holistically and that an inference of scienter must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." 551 U.S. at 314.

The complaint alleges that Miller knew the statements about the value of the Alaska Assets were false and misleading because it restated its financial statements for the fourth quarter of fiscal year 2010 and for each quarter in fiscal year 2011, its senior officers knew the statements were false, and it knew that its internal controls were inadequate [Doc. 47 ¶ 230]. Regarding the individual Miller Defendants, plaintiff alleges Boruff knew the statements were false because he worked with Boyd, Graham, and Hall, who had experience managing the Alaska Assets (as discussed below), to devise the plan to implement the acquisition of the assets, was responsible, as CEO, for reviewing the information Miller provided to Ralph E. Davis & Associates, the engineering firm Miller retained to prepare reserve estimates for oil and gas in the Alaska Assets, was duty-bound to know the true facts underlying the Company's public filings and inform himself of the true facts regarding the Company, and is an officer of MEI, an entity that raised funds for the acquisition of the assets [*Id.* ¶ 231]. Further, plaintiff alleges that Boruff was "motivated and had the opportunity to make the false and misleading statements because" he would lose his "lucrative compensation package as Miller's CEO" if Miller did not continue as a going concern, he received approximately $169,000 in connection with the acquisition through a side business, he was relieved of his individual exposures, he

received compensation tied to Miller's earning results, and he is "so heavily invested in the price of Miller's stock" [*Id.*].

Regarding Boyd, the complaint asserts that he knew the statements were false or misleading because he worked with Boruff, Graham, and Hall, he reviewed the information provided to Davis as Miller's CFO, he signed certifications for Miller's public filings, he was duty-bound, as CFO, to inform himself of the true facts regarding Miller, and he is an officer of MEI [*Id.* ¶ 232]. And plaintiff claims he was motivated to make the statements to "preserve his compensation arrangement and increase the value of his shares and options" [*Id.*].

Plaintiff alleges that Voyticky knew the statements were false and misleading because he served as a member of Miller's board beginning April 26, 2010, has been Miller's President since June 9, 2011, and was named the Company's acting CFO on September 19, 2011, and therefore duty-bound to inform himself of the true facts regarding the company, and because he signed the July 29, 2011 10-K [*Id.* ¶ 233]. And plaintiff states he was motivated to make the statements to receive compensation [*Id.*].

With respect to Hall, plaintiff alleges that he knew the statements regarding the assets were false because he "had spent at least 15 years working with the Alaska Assets, first at Forest Oil Corporation, and then with Pacific Energy, both of which got rid of the Alaska Assets when they filed for bankruptcy, and now at CIE and Miller[,]" he worked with Boyd, Boruff, and Graham to devise the plan to acquire the assets, and he was director of Miller and signed the July 29, 2011 10-K [*Id.* ¶ 234]. Plaintiff claims he was

40

motivated to make the statements "so as to receive compensation from Miller and increase the value of his Miller shares and options" [*Id.*].

Finally, with respect to Deloy Miller, plaintiff asserts that he knew the statements were false and misleading because, as COO, he was duty-bound to inform himself of the true facts regarding Miller, he is one of the officers of MEI, and he signed the July 29, 2011 10-K [*Id.* ¶ 236]. And plaintiff claims he was motivated to make the false statements because, "as the founder of Miller, he had personal interest in seeing that he Company was able to secure funding so that it could continue as a going concern" and because he received financial benefits [*Id.*].

As the Court found in addressing defendant Graham's motion to dismiss, taking all the allegations as true, and viewing the complaint as a whole, a reasonable person could conclude that the Miller Defendants knew the alleged "true value" of the Alaska Assets. A reasonable person could further infer that the "true value" of these assets was less than represented in statements to the public. Contrary to the findings with respect to defendant Graham, though, the Court finds that plaintiff has adequately pleaded scienter with respect to the Miller Defendants.[18]

As a general matter, plaintiff alleges that the individual Miller Defendants were in positions within the Company that made them "duty bound" to keep apprised of the true facts regarding the Company, the same as with Graham. While "[f]raudulent intent cannot be inferred merely from [a defendant's] position[] in the Company and alleged

---

[18] Again, the Court addresses the Miller Defendants collectively, as the parties do in their briefs.

41

access to information," *Konkol*, 590 F.3d at 397, plaintiff asserts more with respect to the individual Miller Defendants. Specifically, the complaint asserts not only that Boruff was the CEO, that Boyd was CFO, that Voyticky was a board member, President, and acting CFO, and that Deloy Miller was COO, but also that the these defendants signed SEC filings and participated in the plan to acquire the Alaska Assets. *See In re Am. Serv. Grp., Inc.*, 2009 WL 1348163, at *60 ("A company's chief executive officer who regularly participates in meetings, signs SEC filings and participates in earnings announcements can be sufficiently involved so as to raise strong inference of scienter." (citation omitted)). Plaintiff also alleges that some of the individual Miller Defendants were or are officers of MEI, an entity that raised funds for the acquisition of the Alaska Assets, as well.

Moreover, while "motive and opportunity alone do not establish strong inference of scienter, . . . they may be relevant in scienter pleading." *Hess v. Am. Physicians Capital, Inc.*, No. 5:04-CV-31, 2005 WL 459638, at *12 (W.D. Mich. Jan. 11, 2005) (citing *In re Comshare, Inc. Sec. Litig.*, 183 F.3d at 551)). "In order to demonstrate motive, a plaintiff must show concrete benefits that could be realized by one or more of the false statements . . . ." *PR Diamonds*, 364 F.3d at 690 (citing *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 621 (4th Cir. 1999)) (recognizing the distinction between "motives common to corporations and executives generally from motives to commit fraud").

The Court finds that the assertions in the complaint about the individual Miller Defendant's motives further support a strong inference of scienter. Plaintiff claims that

one motive was to facilitate financing and that the Company was "dependent upon the successful completion of additional financing and/or generating profitable operations in future periods" [Doc. 47 ¶ 36]. Courts have, in fact, recognized that where companies and the individuals who run them are under unusual pressure to achieve certain financial goals, that pressure, "coupled with other factors, can provide motive." *In re Am. Serv. Grp.*, 2009 WL 1348163, at *57 (concluding that "Defendants' motivation to falsify information to assure investors" and "to remain a financially viable company in which to invest" gave rise to strong inference of scienter); *Haw. Ironworkers Annuity Trust Fund v. Cole*, No. 3:10CV371, 2011 WL 1257756, at *10 (N.D. Ohio Mar. 31, 2011) (finding complaint alleged strong inference of scienter where, among other allegations, plaintiff alleged that defendants "deliberately manipulated . . . revenue and accounts payable to meet pressure [imposed] to achieve unattainable six percent profit increases").

In addition, the "magnitude of a defendant's compensation package, together with other factors, may provide a heightened showing of motive to commit fraud." *In re Cardinal Health*, 426 F. Supp. 2d at 737–38; *see also Tellabs*, 551 U.S. at 325 (pecuniary "motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference"). The complaint contains allegations of the individual Miller Defendant's "lucrative compensation packages," which included stock options, that would have been lost had Miller failed [*See* Doc. 47 ¶¶ 231, 232, 233, 234, 236]. The Court recognizes, though, that the individual Miller Defendants did not sell any stock

43

during the Class Period.  *See PR Diamonds*, 364 F.3d at 691 (noting lack of inside sales "dulls allegations of fraudulent motive").

The Court also recognizes the Miller Defendants' arguments that Miller disclosed that it had material weaknesses in its internal controls, that there are no allegations that the public disclosures diverged from internal documents, and that there is a lack of company-insider allegations.  *See Helwig*, 251 F.3d at 552.  Despite these arguments, the Court finds upon review of the entire complaint that a "reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference." *Tellabs*, 551 U.S. at 314.

### 3.     Whether the Complaint Sufficiently Pleads Loss Causation

Loss causation is "a causal connection between the material misrepresentation and the loss."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005).  The Supreme Court has explained that liability for fraud attaches "when the facts . . . become generally known and as a result share value depreciates."  *Id.* (internal quotation marks and citation omitted).

Loss causation is not subject to heightened pleading standards; rather, allegations of loss causation must be supported only by a "short and plain statement of the claim showing that the pleader is entitled to relief."  *See id.* at 346 (citing Fed. R. Civ. P. 8(a)(2)) (assuming without deciding that loss causation is subject to normal pleading standards).  Even so, to sufficiently plead loss causation, a complaint must allege more than mere boilerplate.  It must specify "the relevant economic loss" sustained by plaintiff

44

and explain "how the loss occurred." *D.E. & J. Ltd. P'ship v. Conaway*, 133 F. App'x 994, 999–1000 (6th Cir. 2005). "This includes pleading when the alleged fraud became known, estimating the damages the alleged fraud caused, and (most critically) connecting, other than in "boilerplate language," the alleged loss with the defendants' disclosure." *Fla. Carpenters Reg'l Council Pension Plan v. Eaton Corp.*, — F. Supp. 2d —, —, 2013 WL 4054630, at *13 (N.D. Ohio Aug. 9, 2013).

Plaintiff alleges that, throughout the Class Period, defendants' materially false and misleading statements and omissions about the Alaska Assets artificially inflated the price of Miller common stock [Doc. 47 ¶ 207–209]. Plaintiff and the class purchased the common stock at allegedly inflated prices and plaintiff alleges that these purchases would not have been made but for the misrepresentations and fraudulent acts of defendants [*Id.* ¶ 207].

Regarding losses, plaintiff alleges that the July 28, 2011 *StreetSweeper* report "called into question the values Miller had attributed to the Alaska Assets and the accuracy of Miller's financial reporting[,]" causing the price of Miller's stock to fall by $1.64 per share, or 23.3%, and then by $0.99, or 18.33%, the following day [*Id.* ¶ 210]. Plaintiff further alleges that Miller's disclosure on July 29, 2011, that it had misstated its financial statements in prior fiscal periods and revealed that its unaudited consolidated statements of operations and cash flows for the quarterly and year to date periods then ended could no longer be relied upon as a result of improper accounting caused Miller's stock to fall an additional 18% [*Id.* ¶ 211]. Even further, plaintiff alleges that Miller's

45

disclosure on August 1, 2011, before the market opened, that the July 29, 2011 filing should not be relied upon caused Miller's stock to fall 23.5%, or $1.04 [*Id.* ¶ 212]. And finally, plaintiff alleges that Miller's August 9, 2011 disclosure that its financial statements were unaudited and should not be relied upon, among other things, caused Miller's stock to fall 13%, or $0.37 [*Id.* ¶ 213]. In total, plaintiff asserts Miller's stock fell by $5.68, or 70%, as a result of these disclosures [*Id.* ¶ 214]. The Miller Defendants argue that plaintiff fails to adequately plead loss causation because (1) the *StreetSweeper* report was comprised of previously disclosed public information, (2) the July 29 SEC filing was filed after the market closed and therefore could not have caused any loss, and (3) the August 9 SEC filing included information that had been disclosed more than a week earlier in the August 2 SEC filing [Docs. 63-1, 70].

Despite the Miller Defendants' argument, the Court finds plaintiff has sufficiently pleaded loss causation. "[I]n addition to formal disclosure by a defendant, 'the market may learn of possible fraud [from] a number of sources: e.g., from whistleblowers, analysts' questioning financial results, resignation of CFOs or auditors, announcements by the company of changes in accounting treatment going forward, newspapers and journals, etc.'" *In re Winstar Communs.*, No. 01 CV 3014(GBD), 01 CV 11522, 2006 WL 473885, at *14 (S.D.N.Y. Feb. 27, 2006) (citing *In re Enron Corp. Sec. Derivative & "ERISA" Litig.*, No. MDL-1446, Civ.A H013624, Civ.A. H040087, 2005 WL 3504860, at *16 (S.D. Tex. Dec. 22, 2005)). However, as another district court has recognized, there is no "bright-line test of when a report based on publically released data becomes a

corrective disclosure" and the apparent key "is whether the report contains genuinely new information beyond a mere re-characterization of previously disclosed facts." *Meyer v. St. Joe Co.*, No. 11-cv-27, 2011 WL 3750324, at *6 (N.D. Fla. Aug. 24, 2011). "The author must add significant original insight that identifies, reveals, or corrects prior misstatements, omissions, or improper accounting practices." *Id.*

While the *StreetSweeper* report did include information previously disclosed publicly, the report also included some "new" information from what plaintiff calls "an oil industry veteran with first-hand knowledge of the true costs and difficulties involved in pumping those wells" forming the Alaska Assets [*See* Doc. 47 ¶ 150–58]. *Cf. In re Omnicom Group Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010) (affirming dismissal on summary judgment, finding that plaintiff failed to demonstrate any new information in an article regarding defendant's alleged fraud); *In re Almost Family, Inc. Sec. Litig.*, No. 3:10-CV-520-H, 2012 WL 443461, at *13 (W.D. Ky. Feb. 10, 2012) (finding allegations of complaint insufficient where news article that plaintiffs alleged constituted partial disclosure of defendant's misrepresentations because the article focused on a different company, revealed no information about the alleged fraud, and presented no new information to the market); *Meyer*, 2011 WL 3750324, at *3–6 (finding failure to plead loss causation where presentation of an investor with a short position in the defendant's stock did not "indicate an impermissible practice" and only suggested future action the company needed to take). And the Court notes, "to be corrective, the disclosure need not precisely mirror the earlier misrepresentation." *In re Williams Sec. Litig.-WCG Subclass*,

558 F.3d 1130, 1140 (10th Cir. 2009). Further, the Court finds that the *StreetSweeper* report, when considered with the July 29 and August 9 SEC filings supports the finding that plaintiff has met its burden. Indeed, the truth of an alleged misrepresentation may be revealed through a series of disclosures. *See In re DVI, Inc. Sec. Litig.*, No. 2:03-cv-05336, 2010 WL 3522090, at *6 (E.D. Pa. Sept. 3, 2010) (citing cases). Defendants argue that the SEC filings could not have caused any loss, but they do not point the Court to any authority supporting their position.

Thus, construing the complaint in the light most favorable to plaintiff, accepting all factual allegations as true, and drawing all reasonable inferences in favor of plaintiff, the Court finds that plaintiff has sufficiently plead "a causal connection between the material misrepresentation and the loss." *Dura*, 544 U.S. at 342; *see also D.E. & J. Ltd. P'ship*, 133 F. App'x at 1000 (finding complaint insufficient where plaintiff had "done nothing more than note that a stock price dropped . . . never alleging that the market's acknowledgment of prior misrepresentations caused that drop").

## V. Section 20(a) Claim Against Scott M. Boruff, Paul W. Boyd and Deloy Miller

As noted, the complaint alleges violations of Section 20(a) of the Exchange Act against Boruff, Boyd and Deloy Miller [Doc. 47 ¶¶ 247–56]. The only argument defendants make to dismiss this claim is that plaintiff failed to state a claim under Section 10(b) [Doc. 63-1]. In light of the Court's disagreement with this position, *see supra* Section IV, the Section 20(a) claim will survive.

## VI. Conclusion

For the reasons explained, the Court will **GRANT** Defendant Ford Graham's Rule 12(b)(6) Motion to Dismiss [Doc. 61], **DENY** Defendants Miller Energy Resources, Inc., Scott M. Boruff, Paul W. Boyd, David J. Voyticky, David M. Hall, and Deloy Miller's Motion to Dismiss Plaintiff's Corrected Consolidated Amended Class Action Complaint [Doc. 63], **GRANT** the request for judicial notice [Doc. 63-2], and **DENY** the Request for Oral Argument [Doc. 64]. Defendant Ford Graham will be **DISMISSED** as a party to this action. The Clerk of Court will be directed to **LIFT** the stay previously imposed in this case. *See* 15 U.S.C. § 78u-4(b)(3)(B).

ORDER ACCORDINGLY.


s/ Thomas A. Varlan
CHIEF UNITED STATES DISTRICT JUDGE

49